## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| JUDY K. EVANS, Administratrix of the Estate of TYLER JAY EVANS, Deceased | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 1:20-cv-00722 |
| | : | |
| vs. | : | |
| | : | |
| COLUMBIA COUNTY, WARDEN DAVID VARANO, DEPUTY WARDEN GEORGE NYE, SARAH NOVOTNEY, LPN MEDICAL JOHN DOES 1-10 SERGEANT JARED CUNFER, CORRECTIONAL OFFICER PATRICK ZIELECKI, CORRECTIONAL OFFICER BRENT HARNER, LIEUTENANT DAVID MCCOY, LIEUTENANT RYAN BOATMAN, CORRECTIONAL OFFICER JOHN DOES 1-8 | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

_____

## COMPLAINT – FIRST AMENDED

### I.    INTRODUCTION

1.    Prison restraint chairs allow correctional officers to strap an inmate at the wrists, ankles, lap and shoulder, thereby substantially restricting the prisoner's ability to move any part of his or her body.

2.    Restraint chairs pose well-known safety dangers and their use often subjects prisoners to cruel and inhumane treatment.  Restraint chair misuse by poorly trained, deliberately indifferent and/or malicious correctional staff has caused numerous needless deaths of prisoners in the United States.

3.     For that reason, as far back as the year 2000, the United Nations Committee on Torture urged the United States to abolish restraint chairs as a method of restraining those in custody because their use "almost invariably leads" to breaches of the United Nations Human Rights Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which the United States ratified in 1994.

4.     Prisons in the United States nonetheless continue to use restraint chairs but, in an effort to prevent deaths and serious injuries, generally accepted correctional standards require that restraint chairs be used in very limited circumstances, with significant controls, supervision and medical care, and for the shortest duration necessary to achieve a legitimate correctional objective, where one exists.

5.     On June 2, 2019, Tyler Jay Evans – a 19-year-old man with intellectual disabilities and mental illness – died as a result of 22 hours of continuous restraint chair confinement at Columbia County Prison.  Tyler Evans was in prison on a probation violation after testing positive for methamphetamine following a domestic disturbance.  He was supposed to be on suicide watch, though a medical evaluation immediately before he was taken to prison concluded that he did not present a significant suicide risk.  Once restrained in the chair, Tyler Evans spent most of the next 22 hours in distress, struggling against the restraints for any freedom of movement and crying out in vain to speak with his "mommy."

6.     As set forth in detail below, Tyler Evans died at the hands of Columbia County Prison correctional and medical staff so poorly trained in restraint chair use that, by their own admission under oath, they had no understanding that prolonged chair confinement created a risk of death or serious injury.  Prison staff violated multiple policies by placing Tyler Evans in the restraint chair without either a legitimate reason or the required documentation, by keeping him

in the chair without justification and well beyond the permitted time limits for restraint, by failing to obtain necessary supervisory approvals, and by failing to provide timely medical attention when it became clear that his life was in danger.  From the moment he arrived at the prison, Tyler Evans was insulted and mocked; he was called a "retard" among other derogatory and offensive terms.  Prison staff subjected Tyler Evans to excessive force by keeping him mechanically restrained for 22 hours for no legitimate purpose and when it was clear that prolonged restraint was taking a profound physical and psychological toll.  Then, with deliberate indifference, they failed to provide or request any medical attention when Tyler Evans was clearly in medical distress.  Ultimately, Tyler Evans suffered a fatal cardiopulmonary arrest as the CPR-trained correctional officers responsible for his well-being took no appropriate action for more than 20 minutes.

7.     For these reasons, Plaintiff Judy Evans, as the Administrator of the Estate of Tyler Evans, brings this civil rights action pursuant to 42 U.S.C. § 1983 against Columbia County and various individual Columbia County Prison correctional and medical staff.  Plaintiff seeks substantial damages and all available remedies under federal for the needless and tragic death of Tyler Evans.

## II.   THE PARTIES

### A.   <u>Plaintiff and Her Decedent</u>

8.     Plaintiff Judy K. Evans is an individual citizen of the Commonwealth of Pennsylvania and the duly appointed Administratrix of the Estate of Tyler Jay Evans, Deceased. *See* Short Certificate attached hereto as Exhibit A.

9.     Tyler Jay Evans was born on January 14, 2000 and died on June 2, 2019 at Columbia County Prison.

### B.  **Defendants**

10.     Defendant Columbia County is a municipal government in the Commonwealth of Pennsylvania, which operates Columbia County Prison, 721 Iron Street, Bloomsburg, PA 17815.

11.     At all relevant times, Defendant David Varano was employed by Defendant Columbia County as the Warden of Columbia County Prison and was the final policymaker for Defendant Columbia County regarding all correctional matters at Columbia County Prison.

12.     At all relevant times, Defendant George Nye was employed by Defendant Columbia County as the Deputy Warden of Columbia County Prison.

13.     At all relevant times, Defendant Sarah Novotney, LPN was a nurse working as an independent contractor and/or employee of Defendant Columbia County whose duty and responsibility was to provide medical care to inmates at Columbia County Prison.

14.     At all relevant times, Defendant Medical John Does 1-10 were medical professionals working as independent contractors or employees of Defendant Columbia County whose duty and responsibility was to provide medical care to inmates at Columbia County Prison.  Plaintiff does not presently know the names of these defendants but will seek leave to amend the Complaint if needed as to any appropriate defendant after the completion of additional discovery.

15.     At all relevant times, Defendant Jared Cunfer was employed by Defendant Columbia County as a Correctional Officer holding the position of Sergeant and Third Shift Commander at Columbia County Prison.

16.     At all relevant times, Defendant Patrick Zielecki was employed by Defendant Columbia County as a Correctional Officer at Columbia County Prison.

17.     At all relevant times, Defendant Brent Harner was employed by Defendant Columbia County as a Correctional Officer at Columbia County Prison.

18.     At all relevant times, Defendant Lieutenant David McCoy was employed by Defendant Columbia County as a Lieutenant and First Shift Commander at Columbia County Prison.

19.     At all relevant times, Defendant Lieutenant Ryan Boatman was employed by Defendant Columbia County as a Lieutenant and Second Shift Commander at Columbia County Prison.

20.     At all relevant times, Defendant Correctional Officers John Does 1-8 were correctional employees employed by Defendant Columbia County at Columbia County Prison. Plaintiff will seek leave to amend the Complaint as to name any appropriate defendant whose identity is presently unknown to Plaintiff but whose name becomes known during discovery.

21.     At all relevant times, all Defendants acted under color of state law.

22.     At all relevant times, all Defendants acted in concert and conspiracy and were jointly and severally liable and responsible for the harms to, and death of, Tyler Evans.

## III.     SUBJECT MATTER JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## IV.     FACTS

### A.     Prison Restraint Chairs and Columbia County Prison's Policies and Procedures Regarding Restraint Chair Usage

25.     Given their safety risks and potential for misuse as described above, manufacturers of restraint chairs typically provide warnings regarding conditions of use,

including recommendations regarding monitoring, medical supervision and limits of restraint duration.

26.     In addition, prisons that use restraint chairs generally adopt policies and procedures regarding their use, including policies and procedures that establish requirements for monitoring, medical supervision and limits of restraint duration.  Such policies and procedures should comply with national standards established by recognized correctional health organizations.

27.     Columbia County Prison has utilized a restraint chair on inmates for many years and, as of June 2019, had a Restraint Usage Procedure (Policy No. 085-2010) in effect that governed use of its restraint chair.

28.     Columbia County Prison originally adopted Policy No. 085-2010 on August 30, 2010, and, as of June 2019, the most recent revision was approved on October 23, 2015.

29.     Policy No. 085-2010 (hereinafter referred to as the 2015 Policy) was approved by Defendant Warden David Varano.

30.     According to the 2015 Policy, the restraint chair must "never [be] used as a form of punishment and is designed to allow an inmate to either sober up or calm down."

31.     The 2015 Policy states that use of the Restraint Chair "allows correctional staff to seek medical or psychological help for the detainee as the situation dictates."

32.     The 2015 Policy provides further, *inter alia*, that:

a.  "Any inmate placed in the Emergency Restraint Chair will be monitored until such time as the chair is no longer used or needed."  (2015 Policy, ¶ 2.)

b.  "The Restraint Chair Log shall be filled out to completion each time the Restraint Chair is utilized."  (*Id.* ¶ 3.)

c. "If no medical staff available [sic] on site, they will be called in.  If medical staff are unavailable, the watch commander can check the restraints." (*Id.* ¶ 5.)

d. "Medical treatment, if needed, shall be provided in a timely manner." (*Id.* ¶ 6.)

e. "When an inmate is placed in the restraint chair, the Warden must be notified." (*Id.* ¶ 10.)

f. "As with any planned Use of Force, the hand-held video camera will be utilized." (*Id.* ¶ 11.)

33. The time limits for restraint under the 2015 Policy were as follows:

a. "The time limit for anyone placed in the chair will be two (2) hours." *Id.* ¶ 12a.

b. "All restraints will be checked by a staff member hourly." *Id.* ¶ 12b.

c. The time limit "may be extended but only under direct medical supervision or at the direction of the Warden." *Id.* ¶ 12c.

d. "No inmate may remain in the chair for more than eight hours unless mandated by Mental Health representatives or the Warden." *Id.* ¶ 12d.

e. "Range of motion exercises must be performed regularly." *Id.*

34.  Defendants Columbia County and Warden Varano understood that appropriate policies and procedures regarding restraint chair use had to be adopted, followed and enforced to prevent inmate deaths and serious injuries caused by restraint chair misuse, and to prohibit correctional staff from subjecting inmates to excessive force or otherwise using the restraint chair to inflict cruel and unusual punishment on inmates.

35.     Defendants Columbia County and Warden Varano understood that in order for the 2015 Policy and any other applicable policies and procedures to be followed, correctional staff (including medical staff) had to be adequately trained regarding those policies and, more generally, regarding the safety dangers associated with restraint chair usage, including the risk of death or serious injury associated with prolonged restraint chair confinement.

36.     Defendants Columbia County and Warden Varano understood that in order for the prison's policies and procedures to be followed, only appropriately trained correctional staff (including medical staff) could and should be permitted to place an inmate in a restraint chair, monitor an inmate restrained in the chair, perform medical supervision of an inmate in the restraint chair, and/or make any decisions related to restraint chair usage.

37.     Defendants Columbia County and Warden Varano understood that in order for the 2015 Policy and any other applicable policies and procedures to be followed, they had to be strictly enforced, with appropriate reviews of instances of restraint chair usage to assess compliance with applicable polices and training, education and (if necessary) discipline imposed on correctional staff when violations occurred.

38.     On information and belief, the Columbia County Prison restraint chair has routinely been used in violation of the prison's own policies and procedures, including the rules governing time limits.

39.     Defendants Columbia County and Warden Varano have failed to ensure that correctional and medical staff received appropriate training regarding both (a) the safety dangers associated with the restraint chair generally (including the risks of prolonged restraint chair confinement) and (b) the 2015 Policy and any other applicable policies and procedures governing use of the chair.

8

40.     Defendants Columbia County and Warden Varano have failed to enforce the 2015 Policy and any other applicable policies and procedures by failing to cite or discipline correctional staff (or conduct additional training and education) when violations have occurred.

41.     Defendants Columbia County and Warden Varano understood that by failing both to train prison correctional staff (including medical staff) regarding restraint chair usage and to enforce the 2015 Policy and any other applicable policies and procedures, inmates would be subjected to excessive force and cruel and unusual punishment at Columbia County Prison and would be placed at risk of serious injury or death.

42.     As a result of the failure of Defendants Columbia County and Warden Varano over many years to follow or enforce appropriate policies in its restraint chair usage, prison correctional staff and medical staff including the individual defendants named herein had absolutely no understanding of the risks of inmate death or serious injury associated with prolonged restraint chair confinement.  Moreover, to the extent that they had any understanding of the 2015 Policy or any other applicable policies or procedures, they had no fear of reprimand or other consequence for failing to follow those policies, particularly those governing time limits and the need to provide timely medical treatment.

**B.      Background on Tyler Jay Evans**

43.     In June 2019, Tyler Evans resided in Berwick, PA, with his mother, Tylee R. Ruskuski, and stepfather, Justin J. Ruskuski.

44.     Starting at a very young age, Tyler Evans received mental health and other services through the Columbia Montour Snyder Union Service System ("CMSU") for severe intellectual disability and mental illness.

45.     As he grew older, Tyler Evans received psychiatric care and was treated with prescription medications for diagnoses including Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder.

46.     His intellectual limitations and psychiatric conditions made Tyler Evans prone to behavior that led to occasional encounters with law enforcement.

47.     As of June 2019, Tyler Evans was serving a sentence of one-year probation with Columbia County Adult Probation/Parole Department for an April 8, 2019 guilty plea to a Disorderly Conduct offense committed on March 5, 2019.

48.     Tyler Evans was incarcerated at Columbia County Prison from March 5, 2019 to March 8, 2019 related to that offense and the prison staff was familiar with Tyler Evans (including his intellectual limitations and mental illness) based on this and other periods of incarceration.

49.     Notwithstanding his intellectual and emotional challenges and the troubles they sometimes caused, Tyler Evans had the capacity for love and joy, and he was cherished by his mother, stepfather, plaintiff Judy Evans and other family.

**C.     Events of June 1 and June 2, 2019**

50.     The death of Tyler Evans was the subject of a public proceeding (or "Inquest") conducted by the Columbia County Coroner on February 3, 2020 pursuant to Section 1219(b) of the Pennsylvania Coroner's Statute.  Any testimony referred to below is testimony that was given under oath at the Inquest.

1.     **Tyler Evans's arrest**

51.     Shortly after midnight on Saturday, June 1, 2019, Briar Creek Township police were called to the home of Tyler Evans, his mother and stepfather for a reported domestic incident involving Tyler Evans and Mr. Ruskuski.

52.     The officers located Tyler Evans seated in his bedroom and, though he was agitated, he complied with the officers' requests to stand up and place his hands behind his back.

53.     Tyler Evans was handcuffed and placed in the back of a patrol car and the officers began investigating the incident.

54.     Based on the information provided by Mr. and Mrs. Ruskuski, Officer Kressler concluded that the incident occurred because Tyler Evans mistakenly thought that his stepfather was assaulting his mother during an argument.

55.     Aware that Tyler Evans was on probation, Briar Creek Police Officer Justin Kressler contacted Columbia County Adult Probation and spoke with the on-call Probation Officer Caitlin Letteer.

56.     Officer Kressler told Probation Officer Letteer that he was issuing a Non-Traffic Citation for Harassment to Tyler Evans.

57.     When questioned by Probation Officer Letteer, Officer Kressler stated that he suspected that Tyler Evans was under the influence of a controlled substance.

58.     Based on Officer Kressler's suspicion, Probation Officer Letteer directed that Tyler Evans be detained and taken to the Briar Creek Township Police Station for a urinalysis.

2.     **Briar Creek Township Police Station**

59.     Officer Kressler and his partner transported Tyler Evans from his home to the station.

60.     According to the police report, Tyler Evans's speech was "rapid" and "barely audible" but the report quotes him as saying that someone "'may have slipped him meth'" and describe him as "crying and upset over the fear of 'getting in trouble for something he didn't do.'"

61.     According to the police report, Probation Officer Letteer arrived at Briar Creek Township Police Station at 1:59 a.m. and a urinalysis was administered.

62.     According to the police report, Tyler Evans was restrained in a transport belt and cuffed in the front at the police station, but he was compliant and cooperative with the officers' instructions, including while providing a urine sample.

63.     The urinalysis was positive for methamphetamine.

64.     According to the police report authored by Officer Kressler, Probation Officer Letteer had discretion whether or not to deem the positive urinalysis a probation violation and order him to jail.

65.     Probation Officer Letteer decided to do both, and, at her direction, arrangements were made to transport Tyler Evans to Columbia County Prison for a probation violation.

66.     According to the police report, as Officer Kressler and Probation Officer Letteer began to drive Tyler Evans to Columbia County Prison at 2:25 a.m., he began making suicidal comments.

67.     According to the police report, Officer Kressler contacted CMSU at 2:30 a.m. and reported Tyler Evans's statements.  Five minutes later, a CMSU crisis worker called Officer Kressler back and they agreed that Tyler Evans would be taken to the Geisinger Bloomsburg Hospital Emergency Room for evaluation for a possible involuntary confinement pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act.

### 3. __Geisinger Bloomsburg Hospital__

68.     Officer Kressler and Probation Officer Letteer brought Tyler Evans to the Geisinger Bloomsburg Hospital Emergency Room, where he was examined by a triage nurse and taken to a room in the Emergency Department for evaluation.

69.     According to the Probation Officer's report, the restraints were removed from Tyler Evans at the hospital.

70.     Tyler Evans was evaluated by an emergency room physician, Jed Thomas Ritter, M.D., shortly before 3:00 a.m.

71.     In his note, Dr. Ritter stated that Tyler Evans was there for evaluation for possible suicidal ideation after having "endorsed to the police that he wanted to kill himself" and tested positive for methamphetamine.

72.     In Dr. Ritter's view, Tyler Evans appeared to be "mildly intoxicated."

73.     Dr. Ritter noted that Tyler Evans was "rambling with poor eye contact but states that he had no plan as to how he would hurt himself and denies current suicidal ideation."

74.     Tyler Evans also denied auditory or visual hallucinations or other symptoms, was not in acute distress, and was able to follow commands.

75.     Dr. Ritter's conclusion was that it was less likely that Tyler Evans had plans to harm himself and "more likely there is an element of secondary gain" in his suicidal threats.

76.     Dr. Ritter concluded that, because he had been arrested, the "safer option" was for Tyler Evans to be placed on "suicide watch" for the next 24 hours while incarcerated.

77.     A CMSU worker had arrived at the hospital while Tyler Evans was in the ER and he agreed with the plan to discharge to police custody to be taken to prison.

78.     On information and belief, the CMSU case worker did not independently evaluate Tyler Evans before agreeing to his discharge to police custody and prison.

79.     According to the Probation Officer's report, upon learning that he would be discharged from the hospital and taken to prison, Tyler Evans became "verbally combative" but not "physically combative" and he continued to comply with directives.

80.     Though he was agitated, Tyler Evans was compliant with instructions at the hospital to get into the police car and get out of the police car upon arrival at the prison at approximately 4:00 a.m.

### 4.     Columbia County Prison

#### a.     Intake (4:06 a.m. to 4:21 a.m.)

81.      Upon arriving at Columbia County Prison, Officer Kressler and Probation Officer Letteer brought Tyler Evans to an intake area where a restraint chair was waiting.

82.     Defendant Cunfer was the Columbia County Prison Shift Commander on duty at the time.

83.     As Shift Commander, Defendant Cunfer's responsibilities included ensuring that Columbia County Prison's policies and procedures regarding restraint chair confinement were followed, including policies and procedures governing Tyler Evans's physical and medical well-being, duration of restraint, and reporting to the Warden or his designee.

84.     According to testimony at the Inquest, Defendant Deputy Warden Nye was on call and was Defendant Varano's designee during the weekend of June 1 and 2, 2019.

85.     Tyler Evans was seated in the restraint chair at approximately 4:06 a.m.  Initially, he was wearing the transport belt with handcuffs that he arrived in from the hospital.

86.     For just under 10 minutes, Defendant Cunfer and other Columbia County Prison staff spoke to Tyler Evans as he remained in the chair wearing the restraint belt and cuffs.

87.     On at least one occasion, one of the correctional officers addressed Tyler Evans as "retard."

88.     During this time, Tyler Evans was crying and asking to speak with his mother; a call was placed but Tyler and his mother were not able to hear each other, and the line was quickly disconnected.

89.     Tyler Evans was not physically combative or threatening in any way.

90.     At no time did any officer have to subdue Tyler Evans or take any defensive action whatsoever.

91.     Nevertheless, at approximately 4:15 a.m., the transport belt and handcuffs were removed from Tyler Evans, and Defendant Cunfer and the other Columbia County Prison correctional officers strapped Tyler Evans into the restraint chair using the straps at the wrists, ankles, torso and shoulders.

92.     Defendant Cunfer and the other correctional officers who strapped Tyler Evans into the restraint chair at 4:15 a.m. did so without any legitimate justification.

93.     The Geisinger ER physician had recommended that Tyler Evans be placed on suicide watch.

94.     A restraint chair is not an appropriate or recognized method of suicide watch.

95.     Defendant Cunfer and the correctional officers who strapped Tyler Evans into the restraint chair at 4:15 a.m. either made a deliberate decision to use the restraint chair improperly as a form of suicide watch or they were so poorly trained by Columbia County and Warden Varano that they did not know that it was improper to use the chair for this purpose.

96.     Moreover, Defendant Cunfer and the correctional officers who strapped Tyler Evans into the restraint chair at 4:15 a.m. violated multiple provisions of the 2015 Policy.

97.     They failed to notify Warden Varano or his designee Deputy Warden Nye that they were placing Tyler Evans in the restraint chair in violation of 2015 Policy ¶ 10.

98.     They failed to complete a Restraint Chair Log, including the Screening Tool which documents the justification for restraint, in violation of 2015 Policy ¶ 3.

99.     They also failed to use a hand-held video camera to record the unplanned Use of Force in violation of 2015 Policy ¶ 11.

100.    There were no exigent circumstances that prevented these officers from notifying the Warden or Deputy Warden, completing the log or recording the event with a hand-held camera as required by the 2015 Policy.   Tyler Evans was not engaged in any physically threatening behavior, he posed no danger to himself or others as he was already restrained in the transport belt and cuffs, and he had been consistently compliant with instructions since being taken into custody earlier that morning.

101.    Defendant Cunfer and the other correctional officers who strapped Tyler Evans into the restraint chair at 4:15 a.m. either made a deliberate decision to violate the policies (knowing that they would face no consequence for any violation) or were so poorly trained as to be completely unaware of the policies.

102.    At approximately 4:21 a.m., Columbia County Prison correctional officers wheeled Tyler Evans out of the intake area on their way to take him to Columbia County Prison Unit E.

### b.  Unit E in a cell (4:23 a.m. to 10:50 a.m.)

103.    Tyler Evans arrived on Unit E in the restraint chair at approximately 4:23 a.m. and was placed in a cell on the first floor.

104.    Defendant Cunfer remained the shift commander in charge of Columbia County Prison until his shift ended at 8:00 a.m. on June 1, 2019.

105.    According to his Inquest testimony, Defendant Deputy Warden Nye was not notified by anyone that Tyler Evans had been placed in the restraint chair until 7:00 a.m., when Defendant Cunfer called him.

106.    By this time, Tyler Evans had already been restrained longer than was permissible under the 2015 Policy without direct medical supervision or the approval of the Warden.

107.    Tyler Evans remained in the restraint chair in the Unit E cell for approximately six-and-a-half hours.

108.    The interior of the cell was out of view of the surveillance camera and, on information and belief, Columbia County Prison recorded no video of Tyler Evans in the cell (or, if any such video was recorded, has not yet made that video available for review).

109.    The six-and-a-half hours that Tyler Evans spent in a restraint chair in the Unit E cell was more than three times longer than the two-hour time limit than the 2015 Policy permitted without either direct medical supervision or the Warden's approval.

110.    Defendant Nye, Defendant Cunfer and the Columbia County Prison correctional officers responsible for watching Tyler Evans did not seek the Warden's approval to keep Tyler Evans restrained in the chair for more than two hours and Tyler Evans was not under direct medical supervision during this time.

111.    There was no legitimate reason for Tyler Evans to be restrained in the chair at all when adequate suicide watch could and should have been performed with him unrestrained and confined to a cell.

112.    Defendant Nye failed to ensure that there was appropriate justification for using mechanical restraints at all let alone any duration beyond the two-hour limit provided by the 2015 Policy.

113.    At approximately 8 a.m., Defendant McCoy became the Shift Commander at Columbia County Prison and he remained on duty for the next eight hours.

114.    As Shift Commander, Defendant McCoy's responsibilities included ensuring that Columbia County Prison's policies and procedures regarding restraint chair confinement were followed, including policies and procedures governing Tyler Evans's physical and medical well-being, duration of restraint, and reporting to the Warden or his designee, and he is therefore personally responsible for all such violations that occurred with his knowledge or participation and/or under his supervision.

### c.  Unit E inside shower area (10:50 a.m. to 6:25 p.m.)

115.    Defendant Nye testified that he received a call at approximately 10 a.m. on June 1 asking his permission to move Tyler Evans to a different area of Unit E.

116.    The call that Defendant Nye received at approximately 10 a.m. was from Defendant McCoy.

117.    Defendant Nye gave permission without taking any steps to ensure that continued restraint was necessary or appropriate, that the reasons for restraint had been properly documented, that Tyler Evans would receive timely and adequate medical care, or that he would be kept appropriately informed of Tyler Evans's status and condition going forward.

118.    Due to his failure to enforce or ensure compliance with the 2015 Policy, Defendant Nye did not receive another report regarding Tyler Evans for another sixteen hours, after Tyler Evans had suffered a fatal cardiopulmonary arrest and 911 had been called.

119.    At approximately 10:50 a.m., Columbia County Prison correctional officers wheeled Tyler Evans (still in the restraint chair) out of the cell and down to a shower area at the other end of the floor.

120.    The shower area was accessible via a gated door and portions were visible on the surveillance camera.

121.    The guards placed the restraint chair in the shower area, with Tyler Evans's back to the camera, and closed the gate behind him at approximately 10:56 a.m.   Tyler Evans remained partially visible on camera through the gate.

122.    To the extent that there had been one-to-one monitoring of Tyler Evans during any of the preceding approximately six-and-a-half hours, there was no one-to-one monitoring of Tyler Evans after this point.

123.    Instead, there were periodic (and, for certain stretches of time, infrequent) checks by prison staff.

124.    Although the 2015 Policy prohibits any inmate from remaining in the restraint chair "for more than eight hours unless mandated by Mental Health representatives or the Warden," Tyler Evans continued to be restrained in the chair well past 12:15 p.m. (*i.e.*, 8 hours after he was first placed in the chair) without either notice to the Warden or Deputy Warden Nye or contact with any mental health representative.

125.    Defendant McCoy failed to contact Defendant Nye, or take any steps necessary to seek authority from a mental health provider, at or around 12:15 p.m. or any time thereafter in direct violation of the 2015 Policy.

126.    The surveillance video from 12 noon to 1 p.m. is no longer available.

127.    Based on the surveillance video made available to Plaintiff to date, the next range of motion check was not performed until 1:41 p.m. and there were only two more brief range of motion checks over the next four hours thereafter.

128.    Based on the surveillance video, Tyler Evans appeared agitated and distressed while restrained in the chair, but he was cooperative with direction during the range of motion checks.

129.    At no time when the straps were unfastened during a range of motion check did Tyler Evans act in a combative or threatening way.

130.    On two occasions when guards offered him a cup of something to drink, Tyler Evans was cooperative and compliant.

131.    There continued to be no legitimate purpose to keep Tyler Evans restrained in the chair when mechanical restraints were not necessary to prevent harm to himself or others – and, in fact, were contributing to his agitation and distress – and were a totally inappropriate method of suicide watch.

132.    At approximately 4:00 p.m., Defendant Boatman took over as Shift Commander at Columbia County Prison, and he remained on duty for the next eight hours.

133.    As Shift Commander, Defendant Boatman's responsibilities included ensuring that Columbia County Prison's policies and procedures regarding restraint chair confinement were followed, including policies and procedures governing Tyler Evans's physical and medical

well-being, duration of restraint, and reporting to the Warden or his designee, and he is therefore personally responsible for all such violations that occurred with his knowledge or participation and/or under his supervision.

134.    When Defendant Boatman's shift started, Tyler Evans had been restrained in the restraint chair for nearly 12 hours.

135.    According to Defendant Nye, as he understood Columbia County Prison's policy and procedure, Defendant Boatman was required to contact him at approximately 8 p.m. to seek approval for Tyler Evans's continued restraint.

136.    Defendant Boatman failed to contact Defendant Nye at any time during his shift in direct violation of Columbia County Prison's policy and procedure, either as written or as Defendant Nye understood it.

137.    Ultimately, Tyler Evans remained in the restraint chair inside the shower area for approximately seven-and-a-half hours.

138.    By this time (approximately 6:25 p.m.), Tyler Evans had been in the restraint chair for more than 14 hours.  He continued to be agitated and distressed, frequently pleading to speak with his "mommy."  Yet, despite Tyler Evans's pre-existing mental health disorders and obvious anguish, no mental health representative was contacted, and the Warden still had not been notified by Defendant Boatman of Tyler Evans's continued restraint.

139.    Due to some combination of malice, deliberate indifference and ignorance due to lack of training, the shift commanders and correctional officers responsible for watching Tyler Evans throughout this period continued to keep him restrained in the chair without seeking required approval from the Warden or his designee or necessary medical and mental health treatment, causing Tyler Evans's medical and psychological condition to continue to deteriorate.

### d.  Unit E outside the shower area (6:25 p.m. to 10:33 p.m.)

140.    At approximately 6:25 p.m., several correctional officers wheeled Tyler Evans out of the shower area and repositioned the restraint chair immediately outside the gate to the shower area so that Tyler was now facing the surveillance camera.

141.    Whereas Tyler Evans's back had been to the camera while he was inside the shower area, his face and body (partially obscured by an overhang on the prison wall) were now visible on the surveillance camera.

142.    The correctional officers left Tyler Evans in that location and no one returned to check on him for more than 90 minutes.

143.    After the restraint chair was repositioned outside of the shower area, Tyler Evans can be seen clearly on the surveillance video straining relentlessly against the straps, twitching about continuously in a vain effort to have any freedom of movement.  On information and belief, he continued to ask to speak with his mother.

144.    Defendant Sarah Novotney, LPN has testified that her shift on June 1, 2019 ran from 5:30 a.m. until 9:30 p.m. and that she attended to Tyler Evans multiple times while on duty.

145.    Defendant Novotney has testified that she had no training in restraint chair use, the adverse effects of prolonged restraint, or the possibility that continuing to fight physically against restraints for long periods could result in death.

146.    Defendant Novotney has testified that she checked on Tyler Evans's restraints several times over the course of her shift and she observed injuries caused by the restraints on both wrists and one shoulder.

147.    Defendant Novotney has testified that, at 6:38 p.m., she contacted Geisinger Bloomsburg Hospital to get the results of Tyler Evans's toxicology screen.

22

148.    Defendant Novotney has testified that she was concerned about Tyler Evans's behavior when she called Geisinger Bloomsburg Hospital.

149.    The nurse to whom Defendant Novotney spoke testified that she told Defendant Novotney that "if she was concerned with his behavior, that he should be brought back to the emergency department."

150.    Defendant Novotney denies that the nurse told her this, but regardless of whose testimony is accurate, Defendant Novotney knew or acted in reckless disregard of the fact that Tyler Evans could be brought back to Geisinger Bloomsburg Hospital for evaluation or treatment.

151.    Ms. Novotney has testified that, at 9:11 p.m., she contacted her nurse supervisor, Lottie Neiswender, who instructed that Tyler Evans be provided Benadryl to try to get him to fall asleep.

152.    Ms. Novotney has testified that, pursuant to her nurse supervisor's order, Tyler Evans was given two 25 mg capsules of Benadryl at or about 9:20 p.m.

153.    Ms. Novotney has testified that, if Benadryl were not effective, the next "medical course of action" would be to contact a physician.

154.    Ms. Novotney has testified that her shift then ended and she took no steps to determine whether the Benadryl was effective and, if not, to ensure that a physician was contacted.

155.    Ms. Novotney has testified that she neither personally followed up nor gave instructions to any other correctional or medical staff to do so.

156.    Once Ms. Novotney's shift ended, no medical staff was on duty at the prison until 8 a.m. the following morning.  According to Defendant Varano's testimony, it was the shift

commander's responsibility to request assistance from medical staff on call in the event of an emergency.

157.   At no time prior to the events described below starting at paragraph 201 did any shift commander – *i.e.*, Defendants Cunfer, McCoy or Boatman – seek assistance from any medical staff.

158.   On information and belief, Tyler Evans briefly fell asleep at or about 10:00 p.m. but then woke up quickly and resumed straining repeatedly against the straps and calling out in distress.

159.   Defendant Novotney's complete failure to take any step to determine whether Tyler Evans remained awake and agitated after 17 hours of restraint chair confinement and sleep deprivation despite receiving 50 mg of Benadryl reflects both her deliberate indifference to Tyler Evans's serious medical need and her complete lack of understanding and training regarding the dangers of prolonged restraint chair confinement.

160.   Moreover, Columbia County's failure to have any medical staff on duty after Defendant Novotney's shift ended was a direct violation of the 2015 Policy and resulted inevitably in a failure to ensure that Tyler Evans received appropriate medical attention.

161.   As a result, no physician was contacted despite Defendant Novotney's testimony that the appropriate medical course of action if 50 mg Benadryl did not calm Tyler Evans down was to contact a physician.

162.   As a result of both her deliberate indifference to Tyler Evans's serious medical need and her complete lack of understanding and training regarding the dangers of prolonged restraint chair confinement, Defendant Novotney failed to recommend or ensure that Tyler Evans be brought back to Geisinger Bloomsburg Hospital for evaluation or treatment.

### e.  Briefly moved to cell, outside the view of the camera <u>(10:33 to 10:41 p.m.)</u>

163.    At 10:33 p.m., four Columbia County correctional officers approached Tyler Evans and wheeled him in the restraint chair back down to the same Unit E cell where he had been from 4:22 a.m. to 10:45 a.m.

164.    Tyler Evans remained out of view of the surveillance camera for the next approximately eight minutes.

165.    At 10:41 p.m., the guards wheeled Tyler Evans – still in the restraint chair, still agitated, physically struggling and calling out in distress – out of the cell back to the location where he had originally been placed at approximately 6:25 p.m.

### f.  <u>Back outside the shower area (from 10:41 p.m. on)</u>

166.    Tyler Evans remained visibly distressed and agitated upon being returned to the area outside the gate to the shower area, and he continued calling out and pleading to speak with his mother.

167.    At approximately 11:20 p.m., Tyler Evans was given something to drink.  His left arm was unfastened so he could hold the cup and drink it himself; he was completely cooperative and made no threatening movement or gesture when his limb was freed.

168.    At midnight on June 2, 2019, the "Third Shift" came on duty at Columbia County Prison.

169.    Defendants Brent Harner and Patrick Zielecki were the Third Shift correctional officers assigned to Tyler Evans, with Defendant Zielecki having one-on-one (or "constant watch") responsibility for Tyler Evans.

170.    Defendant Jared Cunfer was the Third Shift commander.

171.    No medical personnel was on duty at the prison during the Third Shift.

172.   When the Third Shift started, Tyler Evans had already been restrained for approximately 20 hours in violation of multiple prison policies.

173.   Defendants Cunfer, Harner and Zielecki have each testified that they received no training in that prolonged restraint could lead to death, but they all testified that they were trained in CPR and first aid.

174.   At approximately 1:04 a.m., Defendants Cunfer, Zielecki, and Harner performed a range of motion check and offered Tyler Evans something to drink.

175.   This was the first welfare check of Tyler Evans by any Third Shift personnel and the first such check by any prison personnel for approximately an hour and forty-five minutes.

176.   Since the last check at approximately 11:20 p.m., Tyler Evans had remained agitated and distressed, though it is apparent from the surveillance camera footage that he was fatiguing and, consistent with Ms. Novotney's testimony, required physician evaluation.

177.   The range of motion check starting at 1:04 a.m. was separately recorded by a hand-held video camera that also captured the audio.  On information and belief, this is the only audio of Tyler Evans that remains available of the 22 hours that he spent in the restraint chair.

178.   On this video, Tyler Evans appears exhausted and drained and his verbal responses to questions (which Defendant Novotney had described as "clear" earlier in the evening) are unintelligible and incoherent.

179.    By this time, after 21 hours of restraint, Tyler Evans was obviously in urgent need of physician attention.

180.   Regardless of their woefully inadequate training in restraint chairs and the danger of prolonged confinement and the complete failure of Defendant Novotney to provide them with any instruction, Defendants Cunfer, Harner and Zielecki had sufficient knowledge from their

CPR and basic first aid training to recognize the signs and symptoms of declining medical and mental status.

181.    Due to some combination of malice, deliberate indifference and ignorance, Defendants Cunfer, Harner and Zielecki concluded their check of Tyler Evans at 1:07 a.m. and did not request any medical evaluation.

182.    Defendant Cunfer left Unit E, leaving Defendants Harner and Zielecki responsible for Tyler Evans's well-being with Defendant Zielecki having no responsibility other than constant watch of Tyler Evans.

183.    Defendants Zielecki and Harner did nothing over the next 45 to 50 minutes other than occasionally observe Tyler Evans from the guard bubble or elsewhere on Unit E as his condition continued to deteriorate.

184.    Defendant Harner testified that, at approximately 1:45 or 1:50 a.m., he observed that Tyler Evans "seemed more exhausted" and that this was a "noticeable change" from an hour earlier, but that he did "nothing" other than just "watching him."

185.    In the minutes leading up to 2:00 a.m., Tyler Evans was unconscious with visibly diminished signs of life on the surveillance video.

186.    Tyler Evans was dying right in front of Defendants Zielecki and Harner and they did nothing more than stand idly by and watch.

### g.   The death of Tyler Evans

187.    Defendant Harner testified that, when he and Defendant Zielecki "noticed [Tyler Evans's] breathing lessened," Defendant Zielecki went to check on him.

188.    According to the surveillance video, at approximately 2:01 a.m., Defendant Zielecki approached Tyler Evans and jostled him but got no response.

27

189.    By this time, Tyler Evans was critically in need of urgent medical attention, breathing either faintly or not at all.

190.    Despite being trained in CPR and first aid and having no responsibility other than Tyler Evans's welfare, Defendant Zielecki failed to measure Tyler Evans's pulse or respiratory rate, failed to perform CPR or provide any other form of medical assistance, and failed to call for help.

191.    Instead, Defendant Zielecki simply walked away, leaving Tyler Evans alone and in (or on the verge of) cardiac arrest.

192.    According to the surveillance video, Defendant Zielecki returned to observe Tyler Evans at approximately 2:05 a.m.

193.    Defendant Zielecki prodded Tyler Evans again – again getting no reaction.

194.    Once more, Defendant Zielecki failed to measure his pulse or respiratory rate, failed to perform CPR or provide any other form of medical assistance, and failed to call for help.

195.    For a second time in approximately five minutes, Defendant Zielecki simply walked away from Tyler Evans, deliberately indifferent to his obvious and urgent need for medical attention.

196.    According to the surveillance video, Defendant Zielecki returned to observe Tyler Evans at approximately 2:12 a.m.

197.    For a third time, Defendant Zielecki jostled Tyler Evans and got no response.

198.    Despite obvious signs that Tyler Evans had suffered (or was suffering) a life-threatening emergency, Defendant Zielecki stood for several moments, stared at Tyler Evans as he lay dying, and then walked away.

28

199. At approximately 2:14 a.m., Defendant Zielecki returned with Third Shift commander Defendant Cunfer, who finally checked Tyler Evans's pulse and felt nothing.

200. With Tyler Evans pulseless, unconscious and not breathing, Defendant Cunfer and Defendant Zielecki poured water into his open mouth.

201. When Tyler Evans did not respond, 911 was called.

202. Over the next eleven minutes, correctional officers continued to observe Tyler Evans and check his pulse before finally removing him from the restraint chair at 2:25 a.m. and laying him on the cell block floor.

203. Not until approximately 2:25 a.m. – approximately 40 minutes after Defendants Harner and Zielecki first noticed "lessened breathing," 24 minutes after Defendant Zielecki first got no response from Tyler Evans after shaking him, and 11 minutes after Defendant Cunfer felt no pulse – did any correctional officer commence CPR.

204. Despite having "constant watch" responsibility for Tyler Evans and being trained in CPR, Defendant Zielecki performed no respiratory or cardiac assessment, provided no medical care, and called for no medical assistance at any point during his shift, as Tyler Evans's condition deteriorated and progressed to fatal cardiac arrest.

205. Defendant Zielecki testified at the Inquest that he failed to recognize the medical emergency because he was concerned that Tyler Evans may have been "faking it." This testimony reveals a shocking level of incompetence (reflecting Columbia County Prison's complete lack of adequate training of its correctional officers) and/or unapologetic deliberate indifference to Tyler Evans's serious medical needs and the gratuitous infliction of pain to which Tyler Evans was subjected for 22 hours in violation of multiple prison policies.

206.    Tyler Evans remained unresponsive and in cardiac arrest when paramedics arrived on the block and took over the resuscitative efforts.

207.    The EMS report states "[b]lood was noted near where the chair was initially located in the cell area" and describes "abrasions to bilateral wrists, bilateral ankle, neck, sides and circumferentially to the waist area" of Tyler's body.

208.    Tyler Evans remained in asystole with no signs of return of spontaneous circulation for the duration of the paramedics' efforts.

209.    Life-saving efforts were discontinued, and Tyler Evans was pronounced dead on June 2, 2019 at 3:13 a.m.

210.    Following an autopsy, the official cause of death was listed as "complications of an excited state associated with methamphetamine toxicity and restraint chair confinement."

211.    At no time did any correctional or medical staff contact the Warden or any mental health representative to seek authority for the extraordinarily prolonged – and ultimately lethal – restraint to which Tyler Evans was subjected.

212.    Tyler Evans's death was the direct and proximate result of the actions and inactions of Columbia County and the individual defendants as alleged herein.

213.    At all relevant times, all Defendants were aware that, by subjecting an intellectually disabled and mentally ill young man to mechanical restraints for 22 hours, they were subjecting Tyler Evans to a gratuitous infliction of wanton and unnecessary pain without any legitimate purpose.

214.    On information and belief, throughout the course of Tyler Evans's restraint chair confinement, Columbia County Prison correctional officers verbally abused and mocked him, calling him "retarded" and using racial epithets.

215.    At all relevant times, all Defendants were aware of Mr. Evans's serious medical needs and failed, with deliberate indifference and/or with gross and extraordinary negligence, to ensure that Tyler Evans received the care and treatment that he needed.

216.    As a direct result of the conduct of all defendants, jointly and severally, Tyler Evans suffered grave injuries during the 22 hours from his arrival at Columbia County Prison on June 1, 2019 until his untimely death on June 2, 2019, including but not limited to extreme physical and emotional pain and suffering, loss of the ability to enjoy the pleasures of life, disfigurement, embarrassment and humiliation.

## V.    CAUSE OF ACTION – SURVIVAL ACTION

217.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

218.    As a result of the actionable conduct of all Defendants, Plaintiff's decedent, Tyler Jay Evans, was caused grave injuries and death resulting in the entitlement to damages by the Estate of Tyler Jay Evans, deceased under the Survival Act of the Commonwealth of Pennsylvania, 42 Pa. C.S. § 8302.

219.    Plaintiff's decedent, Tyler Jay Evans, died intestate, so any recovery by the estate will be distributed to any lawfully recognized beneficiaries pursuant to Pennsylvania's law of intestacy.

220.    Plaintiff Judy K. Evans brings this Survival Action on behalf of the Administratrix of the Estate of Tyler Jay Evans and claims the full measure of damages under the Survival Act.

31

**WHEREFORE**, Plaintiff Judy K. Evans, Administratrix of the Estate of Tyler Jay Evans, demands damages against all Defendants herein in an amount in excess of local arbitration limits, exclusive of prejudgment and post-judgment interest.

## VI.    CLAIMS FOR RELIEF

**COUNT I**
**Plaintiff v. Defendants Varano, Nye, Novotney, Medical John Does 1-10**
**Cunfer, Harner, Zielecki, McCoy, Boatman and Correctional Officer John Does 1-8**
**<u>Federal Constitutional Claims</u>**

221.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

222.    Defendants Varano, Nye, Novotney, Medical John Does 1-10, Cunfer, Harner, Zielecki, McCoy, Boatman and Correctional Officer John Does 1-8 subjected Tyler Evans to gratuitous infliction of wanton and unnecessary pain and thereby violated Tyler Evans's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or Tyler Evans's right to due process of law under the Fourteenth Amendment to the United States Constitution.

223.    Defendants Varano, Nye, Novotney, Medical John Does 1-10, Cunfer, Harner, Zielecki, McCoy, Boatman and Correctional Officer John Does 1-8 were deliberately indifferent to Tyler Evans's serious medical needs and thereby violated Tyler Evans's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or Tyler Evans's right to due process of law under the Fourteenth Amendment to the United States Constitution.

## COUNT II
### Plaintiff v. Defendant Columbia County
### <u>Federal Constitutional Claims</u>

224.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

225.    The violations of Mr. Evans's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, plaintiff's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and inactions of defendant Columbia County, which, with deliberate indifference, failed to establish and enforce policies, practices and procedures to ensure that inmates at Columbia County Prison were not restrained inappropriately, without good cause, and for excessive lengths of time in the restraint chair.

226.    The violations of Mr. Evans's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, plaintiff's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and inactions of defendant Columbia County, which, with deliberate indifference, failed to ensure through proper training, supervision and discipline that the individual defendants complied with established policies, practices and procedures (a) for addressing the serious medical needs of inmates in restraint chairs for prolonged lengths of time and (b) for avoiding the gratuitous infliction of wanton and unnecessary infliction of pain caused by inappropriate and prolonged restraint chair confinement.

## VII.    REQUESTED RELIEF

227.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

228.    Plaintiff demands a jury trial.

229.    WHEREFORE, Plaintiff respectfully requests:

a.    Compensatory damages as to all Defendants;

b.    Punitive damages as to Defendants Varano, Nye, Novotney, Medical John Does 1-10, Cunfer, Harner, Zielecki, McCoy, Boatman, and Correctional Officer John Does 1-8;

c.    Reasonable attorneys' fees and costs; and

d.    Such other equitable relief as the Court deems appropriate and just.

Respectfully submitted,

**YOUMAN & CAPUTO, LLC**

Dated:  May 12, 2021                    BY:  _____

DAVID J. CAPUTO, ESQUIRE
ZACHARY ARBITMAN, ESQUIRE
1635 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 302-1999
dcaputo@youmancaputo.com
zarbitman@youmancaputo.com

*Attorneys for the Plaintiff*