**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUDY K. EVANS, Administratrix of the Estate of TYLER JAY EVANS, Deceased | : | |
| | : | |
| | : | |
| Plaintiff, | : | DOCKET NO. 20-CV-00722-SES |
| | : | |
| v. | : | |
| | : | |
| COLUMBIA COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Respectfully submitted,

**YOUMAN & CAPUTO, LLC**

Dated:  January 27, 2023        BY: _____

DAVID J. CAPUTO, ESQUIRE
Two Logan Square
100-120 N. 18th Street, 1925
Philadelphia, PA 19103
(215) 302-1999
dcaputo@youmancaputo.com

*Attorneys for the Plaintiff*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ............................................................................................... 1

II.   COUNTERSTATEMENT OF PROCEDURAL HISTORY ............................................ 4

III.  COUNTERSTATEMENT OF FACTS ........................................................................ 4

IV.   COUNTERSTATEMENT OF ISSUES ....................................................................... 5

V.    COUNTERSTATEMENT OF SUMMARY JUDGMENT STANDARD ...................... 5

VI.   ARGUMENT ...................................................................................................... 6

      A.    The Individual Defendants Are Not Entitled to Summary Judgment .................... 7

            1.   Plaintiff Has Established a Constitutional Claim ............................................. 7

                 a.   Evans Had an Objectively Serious Medical Need ................................. 7

                 b.   The Officer Defendants Were Deliberately Indifferent
                      to Evans's Serious Medical Needs .......................................................... 9

                      i.    Nurse Novotney ......................................................................... 11

                      ii.   Sgt. Cunfer, Officer Zielecki and Officer Harner ......................... 13

                      iii.  Deputy Warden Nye ................................................................... 15

      B.    The Officer Defendants Are Not Entitled to Qualified Immunity .................... 17

      C.    Columbia County Is Not Entitled to Summary Judgment ................................. 19

            1.   The County May Be Held Liable for a Constitutional Violation
                 Resulting From A Policy, Practice, Custom, or Failure to Train ............. 19

            2.   Evans's Constitutional Rights Were Violated ............................................. 21

            3.   The County May Be Held Liable Under *Monell* for Its Longstanding
                 Restraint Chair Policies, Customs, and Practices ....................................... 21

4.   The County May Be Held Liable Under *Monell* for Its Failure to Train Its Correctional And Medical Staff in Proper Restraint Chair Usage..........25

5.   Summary Judgment Should Be Denied on The Supervisory Liability Claim Against Warden Varano .....................................................29

VII.   CONCLUSION…………………….…………………………………………….....29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page**

*A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.,* 372 F.3d 572 (3d Cir. 2004)...……………20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………….…….…..5, 6

*Beers-Capitol v. Whetzel*, 256 F.3d 28, 120 (3d Cir. 2001)………………….……………..9, 18

*Berg v. Cty. of Allegheny*, 219 F.3d 261 (3d Cir. 2000)…….…………………………….20, 23

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010).…………………………………………...8

*Bd. of County Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397  (1997)…...……………...…...20

*Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990)……………………………...…………20

*Bouriez v. Carnegie Mellon Univ,* 2005 WL 2106582 (W.D. Pa. Aug. 26, 2005)…………….…4

*Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524 (3d Cir. 2007)………………….…..…5

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir.1999)…………………...…………….18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………….……….5

*City of Canton v. Harris*, 489 U.S. 378 (1989)……………….…………....……………….20, 27

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)……………………...…………….20

*Dominguez v. Corr. Med. Servs.*, 555 F.3d 543 (6th Cir. 2009)…………………………….…11

*Estate of Bailey by Oare v. County of York*, 768 F.2d 503 (3d Cir. 1985)……….…………....20

*Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014)...…………….…………...…..10

*Estelle v. Gamble,* 429 U.S. 97 (1976)…..……………………………………………….......7

*Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ……………….…………...……7, 9, 15, 18, 26

*Foelker v. Outagamie Cty.*, 394 F.3d 510, (7th Cir. 2005)……………………………..…….9

*Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019)…………………………………………….23

*Freitag v. Bucks County*, 2022 WL 2703599 (E.D. Pa. July 12, 2022)………………….…28

*Gioffre v. Cty. of Bucks*, 2009 WL 3617742 (E.D. Pa. Nov. 2, 2009)……………………..……..19

*Gonzalez v. Cecil Cty.*, 221 F. Supp. 2d 611 (D. Md. 2002)………………………………...……..9

*Gonzalez v. Feinerman,* 663 F.3d 311, 313-14 (7th Cir. 2011) ………………………………..……..8

*Gruenke v. Seip,* 225 F.3d 290 (3d Cir. 2000)…………………………………………….……..18

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)……………….……………………..…………….17

*Hinneburg v. Miron*, 676 Fed. Appx. 483, 486–87 (6th Cir. 2017)……………………………......9

*Hope v. Pelzer*, 536 U.S. 730 (2002)…………………………………………………...…..……..17

*Hudak v. Miller*, 28 F. Supp. 2d 827 (S.D.N.Y. 1998)…………………………...…….……..11

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006)..……………………………..........................……..8

*Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017) ………………………………….…………….17

*Koehl v. Dalsheim*, 85 F.3d 86 (2d Cir. 1996)..……..………………………………………….……..8

*Lindsey v. SLT Los Angeles*, LLC, 447 F.3d 1138 (9th Cir. 2006)………………..……..……..16

*Lolli v. Cty. of Orange*, 351 F.3d 410 (9th Cir. 2003)…………………………..…………….……..9

*Marino v. Indus. Crafting Co.*, 358 F.3d 241 (3d Cir. 2004)…………………………………......6

*Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) ……………………….……………….……..10

*McKissick v. Cty. of York*, 2011 WL 5117621 (M.D. Pa. Oct. 25, 2011)…………..……………..28

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)……………….……………*passim*

*Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)…………………...7

*Montgomery v. Pinchak*, 294 F.3d 492 (3d Cir. 2002)…………………………………………….……..8

*Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir. 2013)……………………..……………….6

*Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003)…………………………….5, 17

*Nealman v. Laughlin, 20*16 WL 4539203 (M.D. Pa. Aug. 31, 2016)………...…………………..19

*Orlowski v. Milwaukee Cty.*, 872 F.3d 417 (7th Cir. 2017) …………….........................................9, 10

*Pearson v. Prison Health Serv.*, 850 F.3d 526 (3d Cir. 2017)…………………………………...14

*Phillips v. Roane Cty.*, 534 F.3d 531 (6th Cir. 2008)…………………………………………10

*Raub v. Cty. of Butler*, 2009 WL 577960 (W.D. Pa. March 5, 2009)……………………..…..10

*Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133 (2000)…..……………….………16

*Rivas v. City of Passaic*, 365  F.3d 181 (3d Cir. 2004)…………...…………….…………17, 18

*Roman v. City of Newark*, 914 F.3d 789 (3d Cir. 2019)…………………………………….23

*Ross v. Gilhuly*, 755 F.3d 185 (3d Cir. 2014)……………….……….…….……………….6

*Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011)……………………...………...……..17

*Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220 (3d Cir. 2000)…….…..……..4

*Sterling v. Borough of Minersville*, 232 F.3d 190 (3d Cir. 2000)……………………..…...18

*Tennison v. City and Cty. of San Francisco*, 570 F.3d 1078 (9th Cir. 2009)……………….......16

*Tolan v. Cotton*, 572 U.S. 650 (2014)……………..…..……………………..…….5, 11

*Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014)………………..…...5, 6, 21, 27

*United States v. Berrios*, 443 F. Supp. 408 (E.D. Pa. 1978)…………………………...………16

*United States v. Lacey*, 459 F. 2d 86 (2d Cir. 1972)……………………………………..…16

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008)……………………………………....10

*Wichterman v. City of Phila.*, 2019 WL 3216609 (E.D. Pa. July 17, 2019)………………………16

*Wilson v. United States*, 162 U.S. 613 (1896)……..……………………………...………16

*Woloszyn v. Cty. of Lawrence*, 396 F.3d 314 (3d Cir. 2005)…………………………..9

*Wright v. West*, 505 U.S. 277, 296 (1992);……………………………………………16

**Statutes**

42 U.S.C. § 1983……………………………………………………………3, 7, 18, 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUDY K. EVANS, Administratrix of the<br>Estate of TYLER JAY EVANS, Deceased | : | |
| | : | |
| Plaintiff, | : | DOCKET NO. 20-CV-00722-SES |
| | : | |
| v. | : | |
| | : | |
| COLUMBIA COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Shortly after 2:00 a.m. on June 2, 2019, Tyler Jay Evans ("Evans") – a 19-year-old man with severe intellectual disabilities and mental illness – died as a result of 22 continuous hours in a restraint chair at Columbia County Prison (the "Prison").  Evans was arrested for a probation violation after testing positive for methamphetamine following a domestic disturbance.  He was supposed to be on suicide watch, though a medical evaluation immediately before he was taken to prison concluded that he did not present a significant suicide risk.  Once restrained in the chair, Evans spent most of the next 22 hours agitated and in distress, and, as evidenced by the Prison's video, his condition clearly deteriorated during that time.

The Prison had a written restraint chair policy that provided, among other things, that "no inmate may remain in the chair for more than eight hours unless mandated by Mental Health representatives or the Warden."  It is undisputed that the Prison correctional staff did not regard this written policy as reflecting the Prison's custom and practice, which was that an inmate could remain in the chair indefinitely until he calmed down.  The Prison also had a written medical policy

that required, among other things, that an inmate in a restraint chair must receive hourly checks by healthcare personnel, including a check of vital signs (*i.e.*, pulse, blood pressure, respiratory rate and temperature).   It is undisputed that the Prison's leadership and medical staff were not aware of this written policy and did not follow it.  In fact, in June 2019, a health care professional was not present at all at the Prison between 9:30 p.m. and 5:30 a.m.  Consistent with the Prison's custom and practice, a nurse was at the Prison for approximately 16 of the 22 hours that Evans was in the restraint chair, and during that time, she did not check Evans's vital signs (or provide other basic nursing care) once.  After she left, the Prison's correctional staff was responsible for Evans's well-being.  The correctional officer assigned to constant watch duty of Evans after midnight on June 2 was a part-time, junior trainee who, despite being CPR trained, has testified that he lacked any training in how to identify a medical emergency and did not even know how to take a pulse.

There was also a large sticker on the back of the restraint chair that reads "WARNING: Use of the Emergency Restraint Chair without first reading and thoroughly understanding the instructions could cause injury or death."  Columbia County has been unable even to locate those instructions, and it is undisputed that no one who used the restraint chair with Evans ever read them.

Notwithstanding the many policy and training failures by the County, the individuals responsible for upholding Evans's constitutional right to adequate medical care still had enough training and common sense to prevent his needless and tragic death.  There is ample evidence that the nurse, Defendant Sarah Novotney, LPN, recognized by the evening of June 1 that Evans needed to be transferred back to the hospital or seen by a physician, yet she "abandoned" Evans, in the words of Plaintiff's correctional nursing expert, leaving his well-being in the hands of non-

medically trained correctional staff.  The correctional officer trainee, Defendant Officer Patrick Zielecki, whose only responsibility that night was Evans's well-being, literally watched for nearly an hour as Evans's life slipped away on the other side of the block's control unit window. When Officer Zielecki finally called his supervisor, Sergeant Jared Cunfer, for help, Sgt. Cunfer responded, checked Evans's pulse and felt nothing, yet delayed calling 911 for four minutes and delayed initiating CPR for 11 minutes on the stated basis that he was concerned that Evans may be "faking."

Plaintiff Judy Evans, Administratrix of the Estate of Tyler Evans, brings this action pursuant to 42 U.S.C. § 1983 arising from the death of her great-grandson.  Despite the overwhelming evidence supporting Plaintiff's claims, Defendants have moved for summary judgment.  Two separate motions have been filed, one on behalf of Columbia County, Warden David Varano, Deputy Warden George Nye, Sgt. Cunfer, Correctional Officer Zielecki, and Correctional Officer Brent Harner, and the other on behalf of Nurse Novotney.[1]  When the facts are viewed, as they must be, in the light most favorable to Plaintiff's claims, there is more than enough evidence to justify presentation of this case to a jury.  Defendants' motion should be denied.

---

[1]  Defendants also have moved for summary judgment on behalf of defendants Lt. David McCoy and Lt. Ryan Boatman.  Plaintiff does not oppose the motions as to these two defendants.

## II.     COUNTERSTATEMENT OF PROCEDURAL HISTORY

Plaintiff filed her Complaint on April 30, 2020.  Defendants moved to strike certain paragraphs of the Complaint pursuant to Fed. R. Civ. P. 12(f) and moved to dismiss the Wrongful Death and Survival Act causes of action pursuant to Fed. R. Civ. P. 12(b)(6).  Doc. 19.  The Court denied the motion by Memorandum and Order dated October 19, 2020 (Docs. 22 and 23).  An Amended Complaint withdrawing the Wrongful Death Act claim and joining two individual defendants was filed on May 12, 2021 (Doc. 37), and Defendants filed their Answer on July 15, 2022.  Following completion of fact discovery and service of Plaintiff's expert reports, Defendants' counsel withdrew their appearance for Defendant Novotney and new counsel entered on her behalf.  Docs. 68, 71 and 72.  Defendants served their expert reports on December 14 and 15, 2022, and the case is ready for trial once the instant motions are decided.

## III.    COUNTERSTATEMENT OF FACTS

Plaintiff is filing contemporaneously herewith Plaintiff's Responsive Statement to Columbia County Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Pl.'s Resp. to Columbia Co. SUF")[2] and Plaintiff's Responsive Statement to Statement of Undisputed Facts of Sarah Novotney, LPN in Support of Her Motion for Summary Judgment ("Pl.'s Resp. to Novotney SUF").

---

[2]  Plaintiff has denied a number of the County Defendants' averments in their Statement of Undisputed Material Facts on the basis that the evidence cited in support of the averment is admissible hearsay.  The County Defendants quote extensively from the arresting officer's police report and the probation officer's report.  Neither the police officer nor the probation officer was deposed in this case.  It is well-settled that hearsay statements cannot be considered on a motion for summary judgment unless they would be admitted at trial. *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220 (3d Cir. 2000); *see also Bouriez v. Carnegie Mellon Univ.*, 2005 WL 2106582, at *9 (W.D. Pa. Aug. 26, 2005) (holding that, when considering a motion for summary judgment, a court may only consider evidence which is admissible at trial, and that a party cannot rely on hearsay evidence when opposing a motion for summary judgment).

IV.    **COUNTERSTATEMENT OF ISSUES**

1.  SHOULD SUMMARY JUDGMENT IN FAVOR OF THE INDIVIDUAL DEFENDANTS BE DENIED BECAUSE THERE IS SUFFICIENT EVIDENCE THAT THEY ACTED WITH DELIBERATE INDIFFERENCE?

2.  ARE THE CORRECTIONAL OFFICER DEFENDANTS ENTITLED TO QUALIFIED IMMUNITY?

3.  SHOULD SUMMARY JUDGMENT IN FAVOR OF COLUMBIA COUNTY BE DENIED BECAUSE THERE IS SUFFICIENT EVIDENCE THAT A COUNTY POLICY, PRACTICE, CUSTOM, OR FAILURE TO TRAIN VIOLATED EVANS'S CONSTITUTIONAL RIGHTS?

V.    **COUNTERSTATEMENT OF SUMMARY JUDGMENT STANDARD**

A court may grant summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law." *Id.* When "articulating the factual context of the case," the Court "adhere[s] to the axiom that…'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *see also Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 535 (3d Cir. 2007)) (stating that the Court must "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor").

This standard means that "a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be

believed, and all justifiable inferences are to be drawn in his favor." *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir. 2013) (quoting *Marino v. Indus. Crafting Co.,* 358 F.3d 241, 247 (3d Cir. 2004)) (internal quotations and alterations omitted); *see also Ross v. Gilhuly*, 755 F.3d 185, 191 n.9 (3d Cir. 2014). "A motion for summary judgment is properly denied if 'a fair minded jury could return a verdict for the plaintiff on the evidence presented.'" *Thomas*, 749 F.3d at 222 (quoting *Anderson,* 477 U.S. at 252).

## VI.   ARGUMENT

Defendants collectively move for summary judgment on behalf of the individual defendants -- Warden David Varano, Deputy Warden George Nye, Sgt. Jared Cunfer, Correctional Officer Patrick Zielecki, Correctional Officer Brent Harner, and Nurse Sarah Novotney (the "Individual Defendants") – on the basis that the evidence does not support Plaintiff's claims of deliberate indifference to serious medical needs. All but one of the Individual Defendants (Nurse Novotney) also argue that they are entitled to qualified immunity.[3] Finally, Columbia County argues that the facts do not support a municipal liability claim and seeks summary judgment on the supervisory liability claims against Defendants Varano and Nye on the same basis.[4]

Defendants' arguments lack merit. The motions should be denied, and Plaintiff should be permitted to proceed to trial on all claims against them.

---

[3] Plaintiff will refer to the defendants who seek qualified immunity (*i.e.,* all of the Individual Defendants other than Nurse Novotney) as the "Officer Defendants."

[4] Plaintiff has also named Columbia County Prison as a defendant. Defendants have not raised any argument on summary judgment specific to Columbia County Prison, so Plaintiff will refer collectively to Columbia County and Columbia County Prison herein as the "County."

A.    **THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT**

1.    **Plaintiff Has Established A Constitutional Claim**

Under long-established Supreme Court precedent, Plaintiff's § 1983 claim against the Individual Defendants that they unconstitutionally denied medical care to Evans requires a showing that (1) Evans had a serious medical need and (2) the Individual Defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard applies to medical professionals and non-medically trained law enforcement officers alike. *Id.* at 104-05. The standard effectuates the constitutional requirement that prisoners be afforded, at a minimum, "adequate" medical care. *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citing *Estelle*, 429 U.S. at 105).

The legal inquiry includes both an objective prong and a subjective prong. First, the Court looks to whether there is "objective evidence that [a] plaintiff had serious need for medical care." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citation omitted). Second, the Court considers whether "prison officials ignored that evidence." *Id.* This "subjective" prong is "consistent with recklessness as that term is defined in criminal law." *Id.* (citation omitted). The recklessness standard does not require intentional or knowing action. *See Farmer v. Brennan,* 511 U.S. 825, 835 (1994) (noting that plaintiff need not prove defendants acted with the "very purpose of causing harm or with knowledge that harm will result"). Plaintiff has produced sufficient evidence at the summary judgment stage in support of both prongs as to the Individual Defendants.

a.  **Evans Had An Objectively Serious Medical Need**

Defendants do not dispute that the first prong of the *Estelle* standard is satisfied. The objectively serious medical condition that caused Plaintiff's death was, according to the

pathologist who performed the autopsy and Plaintiff's expert pathologist, an excited delirium syndrome due to methamphetamine toxicity and restraint chair confinement.  Exhibit K; Exhibit X at unnumbered page 6.[5]  Evans was displaying signs and symptoms of this syndrome, including agitation, yelling, increased physical activity, and these would typically be accompanied by abnormal heart rate, breathing, body temperature and blood pressure.  *Id.* at unnumbered page 5. The medical attention required was appropriate evaluation in the prison and transfer back to the hospital for sedation.  *Id.*

Courts have found medical needs objectively serious in situations much less grave than the one presented here.  *See*, *e.g.*, *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011) (inguinal hernia and chronic hernia-related pain); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (tooth decay requiring root canal); *Jett v. Penner*, 439 F.3d 1091, 1096-98 (9th Cir. 2006) (fractured thumb requiring orthopedic intervention); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (need for prescription eyeglasses to avoid double vision and loss of depth perception).

Understandably, where the condition at issue leads to death, the ultimate or potential outcome of the condition is highly probative of its objective seriousness.  *See Montgomery v. Pinchak*, 294 F.3d 492, 499-500 (3d Cir. 2002) (HIV and heart conditions constituted serious medical needs "because both conditions can be life threatening if not properly treated"); *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (3d Cir. 1987) (noting that "seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment").

---

[5] All Exhibits referenced herein are attached to Plaintiff's Responsive Statement to Columbia County Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment and will be cited as "Exhibit _."

Given these authorities, a jury plainly could find that a person who was detoxing from methamphetamines without a detox protocol, experiencing labored breathing and other symptoms of medical distress, was suffering an objectively serious medical condition, especially when that condition led to death.  *See Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 423 (7th Cir. 2017) (concluding that decedent had "tell-tale signs of a serious medical condition" where defendant could not wake decedent up and decedent had inconsistent breathing as these "are undoubtedly life-threatening medical conditions that are obvious to a layperson"); *Hinneburg v. Miron*, 676 Fed. Appx. 483, 486–87 (6th Cir. 2017) (endorsing district court's assumption that serious medical need was established where sleeping woman left in detox cell died); *cf. Foelker v. Outagamie Cty.*, 394 F.3d 510, 513 (7th Cir. 2005) (prisoner suffering withdrawal effects from denial of methadone had serious medical need even though not in "extreme distress"); *Gonzalez v. Cecil Cty.*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (given well known complications, heroin withdrawal was serious medical need).

### b. The Officer Defendants Were Deliberately Indifferent To Evans's Serious Medical Needs

Defendants do not typically admit their indifference to serious medical needs.  It is, therefore, well established that deliberate indifference at the summary judgment stage is shown principally, if not exclusively, through circumstantial evidence.  *See Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005) (quoting *Beers-Capitol v. Whetzel,* 256 F.3d 28, 120, 133 (3d Cir. 2001)) ("[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk"); *Lolli v. Cty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (citing *Farmer,* 511 U.S. at 842 (1994)) ("Much like recklessness in criminal law, deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a

defendant actually knew of a risk of harm."); *Raub v. Cty. of Butler*, No. 08-511, 2009 WL 577960, at *3 (W.D. Pa. March 5, 2009) ("Because a defendant's state of mind, like other facts, can be proved by circumstantial evidence, [plaintiff] need not allege that any Defendant admitted his consciousness of the risk of serious harm in order to avoid dismissal.").

Courts recognize that circumstantial evidence probative of deliberate indifference takes many different forms.  Thus, for example, a defendant's failure to comply with an established policy or protocol intended to preserve a prisoner's or detainee's safety is evidence of that defendant's deliberate indifference.  *Phillips v. Roane Cty.*, 534 F.3d 531, 541, 543-44 (6th Cir. 2008) ("[W]e find persuasive the correctional officers' disregard of prison protocols, which describe the actions that officers should take when an inmate makes certain medical complaints or exhibits certain medical symptoms."); *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) (noting that violation of protocols "certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm"); *cf. Estate of Booker v. Gomez*, 745 F.3d 405, 431-32 (10th Cir. 2014) (citing *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008)) (noting that, in light of their training, officers "were in a position to know of a substantial risk to [decedent's] health and safety").

Moreover, Defendants' contention that Plaintiff must prove deliberate indifference to a specific condition or diagnosis – *i.e.*, excited delirium – is wrong.  Medical conditions are often difficult to diagnose, particularly for those without medical training.  But certain signs and symptoms are patently obvious indicia of a medical problem, and it is those signs and symptoms that are the focus of Plaintiff's claim.  *See Orlowski*, 872 F.3d at 423 (noting that whether defendant believed decedent had sleep apnea "is not the question to be decided," as, instead, court must evaluate whether inconsistent breathing and failure to regain consciousness are serious); *see also*

10

*Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (noting "[i]t is not necessary" that nurse "was specifically aware" that plaintiff "could become a quadriplegic as a result of his condition, but rather" that nurse knew of "serious risks" accompanying heat related illnesses); *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("It should be noted that the knowledge which Hudak must show Dr. Miller had is not that Hudak had a brain aneurysm…but rather that Miller knew that Hudak had some serious medical problem which bore further investigation.").

In applying these principles, the Court must consider what the facts viewed in the light most favorable to Plaintiff establish as to each Individual Defendant. *Tolan*, 572 U.S. at 651.

### i.  **Nurse Novotney**

Novotney argues that "Plaintiff's claim is nothing more than a difference of opinion as to the care rendered and does not rise to the level of deliberate indifference." Novotney Mem. (Doc. 78) at 13. This is a gross mischaracterization of the evidence in this case.

Nurse Novotney is the only health care professional who saw Evans at any point during his 22 hours in the restraint chair, yet she did not comply with a single provision of the County's Medical Policy during her nearly 16-hour shift. Pl.'s Resp. to Columbia Co. SUF ¶¶ 23, 56. The Medical Policy required *hourly* vital sign checks; Novotney did not check them once. *Id.* ¶ 56; Pl.'s Resp. to Novotney SUF ¶ 62. The Medical Policy required helping the inmate to the restroom at "regular times"; Evans was not given access to a toilet a single time during Novotney's shift. Pl.'s Resp. to Columbia Co. SUF ¶ 56; Pl.'s Resp. to Novotney SUF ¶ 65. The Medical Policy requires that the inmate's position "be changed often"; that did not happen once. Pl.'s Resp. to Columbia Co. SUF ¶ 56; Pl.'s Resp. to Novotney SUF ¶ 68. The Medical Policy requires that healthcare personnel "will assess the inmate to see if restraints are still needed"; Novotney did not

do that once, despite the fact that she did not either document or testify that she recalled Evans making any suicidal threats.  Pl.'s Resp. to Columbia Co. SUF ¶ 56; Pl.'s Resp. to Novotney SUF at ¶¶ 69-70.  And while Evans was offered liquids to drink and food to eat at various points, he was not given *anything* to drink for the first eight hours of Novotney's shift, and his lips were bleeding due to dehydration no later than 10:30 p.m. on June 1.  *Id.* ¶ 66; Doc. 81-1 at 52.

Novotney's defense is that she had never seen the Medical Policy (*see, e.g.,* Doc. 78 at 14-15), but regardless of whether that is true, she is a *nurse*.  The Medical Policy provisions reflect basic guidelines of medical practice.  Based on her training alone, she knew the importance of taking vital signs (*see* Exhibit Z at 8), let alone making sure that Evans had enough to drink and was able to use the bathroom.  Novotney disregarded that training – and other training too, such as when she violated her scope of practice by providing Benadryl to Evans without an order from a health care professional with prescribing privileges.  Pl.'s Resp. to Novotney SUF ¶¶ 71-73.  A jury could find that disregarding her professional training in caring for Evans is evidence of deliberate indifference.

Whether it was her medical training or just common sense, Novotney grew concerned about Evans as her shift wore on without any signs of improvement in his behavior.  This prompted her to check Evans's medical records and call the hospital to inquire about the tox screen results. *Id.* ¶ 33.  Viewing the facts in the light most favorable to Plaintiff, a jury could conclude that Novotney acted with deliberate indifference by failing to heed the advice of the Geisinger nurse at around 6:30 p.m. to send Evans back to the hospital at that point.  *Id.*

Finally, a jury plainly could find that Novotney acted with deliberate indifference in abandoning Evans at the end of her shift.  *Id.* ¶ 81.  Novotney argues that "[a]t no time did [she] believe Mr. Evans needed additional care."  Doc. 78 at 15.  In fact, she admits that she knew very

well that he might.  Novotney knew that Evans would need to see a doctor if the Benadryl did not

calm him down and help him sleep, yet she concedes that she took "literally no steps to ensure that

a doctor would be called if the Benadryl was not effective."  Pl.'s Resp. to Novotney SUF ¶¶ 76-

81.

Nurse Novotney is not entitled to summary judgment.  A jury should decide whether her

conduct represented merely "poor judgment or negligent treatment" (Doc. 78 at 15) or deliberate

indifference.

### ii.  Sgt. Cunfer, Officer Zielecki and Officer Harner

The video of the last two hours of Evans's life creates a jury question on deliberate

indifference precluding summary judgment in favor of Sgt. Cunfer, Officer Zielecki and Officer

Harner.  Each was present during the check at 1:04 a.m. on June 2.  Pl.'s Resp. to Columbia Co.

SUF ¶ 104.  Plaintiff's corrections expert, Michael Graziano, summarized that check – and the

only video with audio that the Prison recorded during Evans's 22-hour ordeal (Video 18) – this

way:

> It does not require medical training to recognize that Evans needed medical
> attention – and, at a minimum, needed to be removed from restraints – by
> the time of the range of motion "attempt" at 0100.  Evans is visibly
> exhausted, stressed, bleeding and breathing abnormally.

Exhibit W at 18.

Evans's life slowly slipped away over the next 55 minutes (Video 19), as Zielecki and

Harner were off camera in the control unit doing nothing.  The official Prison timeline of events

based on the video review states that, at "1:38:50 am: Inmate Evans begins to show a labor like

[sic] breathing pattern."  Pl.'s Resp. to Columbia Co. SUF ¶ 120.  A jury should be permitted to

decide whether Officers Zielecki and Harner drew the same conclusion around that same time yet failed to call for help.[6]

Viewing the series of events starting at 2:01 a.m. in the light most favorable to Plaintiff, Zielecki checked on Evans three times in the space of 12 minutes – after not checking on him for 55 minutes – because he recognized that something was wrong. *Id.* ¶¶ 121-125. Yet, he waited 12 to 13 minutes to contact Sgt. Cunfer. *Id.* ¶ 125. The County Defendants' own review of the video acknowledges that Evans appeared to show "very little breathing" at 2:02:48 a.m. *Id.* ¶ 123. As Mr. Graziano points out, Zielecki "had received basic CPR training at his prior prison employer and, with that training couple with basic common sense, he had minimal competency to identify a medical emergency and call for help." Exhibit W at 19. This evidence creates a jury question as to whether Officer Zielecki wantonly denied or delayed Evans's access to medical care. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

A jury could conclude that, of these three correctional officers, Sgt. Cunfer bears particular responsibility. He was the most experienced and highest in the chain of command at the Prison when Evans arrived at the Prison and when he died. The comparison of Evans's condition on arrival at the Prison (Video 1) versus 21 hours later (Video 18) is striking. Sgt. Cunfer was in charge and present on both occasions and had the CPR training to recognize at midnight on June 2 that Evans's condition had deteriorated markedly since arriving at the Prison and he needed to

---

[6] The County Defendants argue that Plaintiff should be required to prove that Evans had a particular vulnerability to develop excited delirium. *See* County Defs' Mem. at 10-12. As stated *supra* pages 10-11, that is not the law. Nevertheless, Plaintiff's forensic pathology expert, Dr. Harry Kamerow, states that "excited delirium's relationship to sudden death has been recognized for many years" (citing a 1934 study) and often occurs in circumstances involving drug intoxication, patients with a history of mental illness and police custody. Exhibit X at unnumbered page 5. Likewise, Plaintiff's corrections expert, Mr. Graziano, notes that "[i]t was well-known in the field of corrections that indefinite mechanical restraint creates a risk of injury or death." Exhibit W at 17.

14

be seen by a doctor.  Yet, Sgt. Cunfer put Officer Zielecki, a trainee who had not even completed the Prison's Basic Life Support training – and says that he does not know how to check a pulse – on constant watch duty.  Mr. Graziano called that decision "inexplicable" and, more generally, Sgt. Cunfer's conduct "shocking."  Exhibit W at 18.

Finally, and most egregiously, Sgt. Cunfer checked for a pulse at 2:14 a.m., found none, yet did not call 911 until 2:18 a.m. and did not get Evans out of the chair so CPR could be initiated until 2:25 a.m.  Pl.'s Resp. to Columbia Co. SUF ¶¶ 127-130.  Sgt. Cunfer's failure both to call 911 and initiate CPR immediately at 2:14 a.m., when he knew that Evans was motionless and pulseless, presents, at a minimum, a jury question as to deliberate indifference.  Sgt. Cunfer has testified that he was more concerned about the possibility that Evans had decided to "fake" a medical emergency than the possibility that the young man who was not breathing and had no detectable pulse was having a real medical emergency.  *Id.* ¶ 131.  As stated above, the recklessness standard does not require intentional or knowing action.  *See Farmer,* 511 U.S. at 835.  Viewing Sgt. Cunfer's response (or lack thereof) after 2:14 a.m. in the light most favorable to Plaintiff, there is, at a minimum, a jury question as to whether Sgt. Cunfer acted with deliberate indifference.

### iii.  Deputy Warden Nye

Deputy Warden Nye was not at the Prison that day, but he was in charge and he bears personal responsibility worthy of consideration by the jury.  Indeed, a jury could conclude that he intentionally tried to minimize his responsibility by telling the Coroner just two months after Evans's death – and testified twice under oath thereafter – that no one contacted him about Evans after 10 a.m.  In fact, he received at least two more calls on June 1 regarding Evans, one from Lt. McCoy at 11:23 a.m. and the other from Lt. Boatman at 5:40 p.m.  Pl.'s Resp. to Columbia Co. SUF ¶ 85.

Mr. Graziano opines as follows:

> Deputy Warden Nye's failure of leadership during the incident set the tone for all of the other failures that happened on his watch.  If Lt. Boatman's testimony is true, and it is corroborated by the prison's phone records, Deputy Warden Nye authorized Evans' continued placement in the restraint chair after 13 hours based on a 53 second call, then denied under oath that he ever received such a call.  It is impossible that Deputy Warden Nye asked all of the questions that needed to be asked, and got the answers that he should have insisted upon, in a call of that duration, and then to fail to follow up later in the evening leads to the conclusion that he simply did not want to be bothered.

Exhibit W at 19.

While a jury may decide that Deputy Warden Nye simply forgot about these calls, viewing the facts in the light most favorable to Plaintiff, a jury could well conclude that Nye was not truthful with the Coroner, with the Inquest jury, or at his deposition.  A defendant's false testimony is compelling evidence of culpability.  As the Supreme Court explained in the context of an employment discrimination case, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up." *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 147 (2000).  This principle is not limited to the narrow context of proving discriminatory intent.  Rather, "[s]uch an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* (citing *Wright v. West*, 505 U.S. 277, 296 (1992); *Wilson v. United States*, 162 U.S. 613, 620-21 (1896)); *see also United States v. Berrios*, 443 F. Supp. 408, 410 (E.D. Pa. 1978) (quoting *United States v. Lacey*, 459 F. 2d 86, 89 (2d Cir. 1972)) ("[E]xculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").  In short, "evidence of falsehoods and other attacks on credibility are valuable forms of circumstantial evidence." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1149 (9th Cir. 2006); *see also Tennison v. City and Cty. of San*

*Francisco*, 570 F.3d 1078, 1089-90 (9th Cir. 2009) (defendants' reckless indifference to plaintiff's rights was proven by changing stories in deposition testimony).

**B.      THE OFFICER DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

The Officer Defendants argue that, even if the Court finds the issue of their individual liability "too close to call" (Doc. 80 at 21), they are entitled to immunity from suit on the ground that the rights asserted by plaintiff were not clearly established.  The question for purposes of the qualified immunity analysis is whether Evans's right to medical care in this situation is "sufficiently clear that 'a reasonable officer would understand that what he is doing violates that right.'" *Kedra v. Schroeter*, 876 F.3d 424, 449–50 (3d Cir. 2017) (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 200 (3d Cir. 2004)).

The issue is not whether there is directly analogous precedent to addressing the specific facts at issue in this case.  Instead, the "salient question" is whether the law as of June 1, 2019 gave them "fair warning" their actions were unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

A long line of Third Circuit cases illustrates the broad scope of situations in which a defendant government actors can be found to have had "fair warning," such that a qualified immunity defense fails.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 295-96 (3d Cir. 2014) (plaintiff could pursue due-process based fabrication of evidence claim despite lack of precedent establishing such cause of action on ground that "[t]he established-right prong of a qualified immunity defense does not demand that there had been a precise preview of the applicable legal analysis underlying the defense; rather, what is required is that government officials have fair and clear warning that their conduct is unlawful") (internal quotations omitted); *Schneyder v. Smith*,

653 F.3d 313, 329-31 (3d Cir. 2011) (holding that despite lack of any prior similar decision, prosecutor could be held liable under § 1983 due to "self-evident wrongfulness" of her conduct); *Rivas*, 365 F.3d at 200 (quoting *Hope*, 536 U.S. at 741) ("[I]n some cases 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'"); *Sterling v. Borough of Minersville*, 232 F.3d 190, 198 (3d Cir. 2000) (citing *Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir. 2000)) (holding that "constitutional violation was apparent" and officer was not entitled to qualified immunity despite "the fact that the very action in question had not previously been held to be unlawful").

There is little question that a reasonable correctional officer in the place of the Officer Defendants would know that the constitutional duty to provide "adequate" medical care, *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347, required calling for medical attention for inmate with labored breathing or calling 911 and providing CPR for an inmate who stopped moving and had no pulse.  It has been clear in the Third Circuit for decades that a correctional officer may not ignore evidence of a serious need for medical care, *Natale*, 318 F.3d at 582 (citing *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000)), or delay care for "non-medical reasons." *Id.* (citing *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347).

Indeed, the Third Circuit has suggested that if the summary judgment record includes sufficient evidence of deliberate indifference, then it would be virtually impossible for a defendant to credibly claim qualified immunity.  *See Beers–Capitol,* 256 F.3d at 143 n.15 ("Because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent."); *see also Carter v. City of Philadelphia,* 181 F.3d 339, 356 (3d Cir.1999) (holding at motion to dismiss

18

stage that if plaintiff succeeds in establishing defendants acted with deliberate indifference to plaintiff's constitutional rights, then defendant's conduct was not objectively reasonable and qualified immunity is not available); *Nealman v. Laughlin*, 15-cv1579, 2016 WL 4539203, at *7 (M.D. Pa. Aug. 31, 2016) (Conner, C.J.) (rejecting qualified immunity defense for correctional officer defendants on ground that "[t]here is no debate…that the suicide of a pretrial detainee may support a Fourteenth Amendment claim against custodial officers who are aware of and act with reckless indifference to a detainee's 'particularized vulnerability' to suicide"); *Gioffre v. Cty. of Bucks*, No. CIV. A. 08-4232, 2009 WL 3617742, at *6 (E.D. Pa. Nov. 2, 2009) (denying motion to dismiss on qualified immunity grounds based on adequate pleading of deliberate indifference to decedent's medical needs).

Accordingly, the Officer Defendants are not entitled to qualified immunity from suit.


### C.     COLUMBIA COUNTY IS NOT ENTITLED TO SUMMARY JUDGMENT

#### 1.  The County May Be Held Liable For A Constitutional Violation Resulting From A Policy, Practice, Custom, or Failure To Train

Plaintiff's claim against the County arises under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which provides that a municipal entity is liable for damages under § 1983 if a policy, practice, or custom of the entity causes a constitutional violation.  Under *Monell*, a municipal entity may be liable under § 1983 where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights.  *Id.* at 694.  To establish a *Monell* claim, a plaintiff need not point to an explicit policy or identify a specific "responsible decisionmaker." *Id.*  Thus, even in the absence of a specific written policy, "[p]ractices so permanent and well

settled as to have the force of law [are] ascribable to municipal decisionmakers" and may give rise to liability. *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990).[7]

With respect to the causation element of a municipal liability claim under *Monell*, the question is whether the entity's actions or inactions were a "moving force" in causing the claimed injury. *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). A "plaintiff can establish causation by 'demonstrat[ing] that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004) (quoting *Bd. of County Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 407 (1997)). The plaintiff must "demonstrate[d] a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850-51 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985)). Once a plaintiff makes the necessary showing, "[a]s long as the causal link between the alleged policy or custom and the constitutional injury is 'not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.'" *A.M.*, 372 F.3d at 581 (quoting *Bielevicz*, 915 F.2d at 851).

In addition, under *City of Canton v. Harris*, 489 U.S. 378 (1989), a municipality can be held liable for a constitutional violation based on its failure to train officers with deliberate indifference to the potential violation of constitutional rights. The deliberate indifference element of a failure-to-train claim does not always require a showing of previous incidents placing the

---

[7] The County acknowledges that a policy or custom may be established "by acquiescence in a longstanding practice or custom which constitutes 'standard operating procedure' of the local government entity.'" Doc. No. 80 at 19 (citations omitted). *See also Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) ("A 'custom' is 'an act that has not been formally approved by an appropriate decisionmaker' but is 'so widespread as to have the force of law.'").

municipality on notice of a risk of constitutional violations. *See Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014).

As explained below, Plaintiff has produced sufficient evidence to allow presentation of the *Monell* claim to a jury under multiple theories of liability.

### 2. Evans's Constitutional Rights Were Violated

The County does not dispute, nor could it, that Evans had a constitutional right to adequate medical care. Rather, the County's argument on this point – to which it devotes two sentences separated by three pages (*see* Doc. 80 at 18, 21) – is that the first *Monell* prong is not satisfied if the Court concludes that none of the Officer Defendants violated Evans's constitutional rights. The County is wrong.  It is well-settled that a municipality may be liable under *Monell* for depriving a detainee of adequate medical care even where no individual correctional officer or medical professional acted with deliberate indifference. *See, e.g.*, *Wichterman v. City of Phila.*, 2019 WL 3216609, at *8-9 (E.D. Pa. July 17, 2019) ("In this case, although there is no evidence that [the individual defendants] were deliberately indifferent in failing to provide medical care to [the decedent], a reasonable jury could still find that [the decedent's constitutional right to adequate medical care was violated if city policymakers were deliberately indifferent in failing to provide training to the [individual defendants].").

### 3. The County May Be Held Liable Under *Monell* For Its Longstanding Restraint Chair Policies, Customs, and Practices

The actions of an employee can be considered the result of a "policy or custom" rendering a governmental entity liable pursuant to § 1983 under three circumstances:

> A policy or custom may exist (i) where an officer or entity promulgates a policy and the complained of act is simply an implementation of that policy; (ii) where no specific rule has been announced but federal law has been violated by an act of the policymaker itself; or (iii) where the policymaker has failed to act

and the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (cleaned up).

In this case, it is undisputed that, setting aside what the Prison's written policies stated, its *actual* standard operating procedures with respect to restraint chair usage included the following:

- the restraint chair was routinely used by correctional staff who had never read the manufacturer's instructions, even though the warning sticker on the chair stated: "WARNING: Use of the Emergency Restraint Chair without first reading and thoroughly understanding the instructions could cause injury or death" (Pl.'s Resp. to Columbia Co. SUF ¶¶ 62-66);

- detainees would remain in the restraint chair for as long as it took them to "calm down," as determined by correctional staff, with no maximum duration of restraint (*Id.* ¶ 52);

- indefinite restraint chair confinement could be authorized by the Warden or his designee alone without any evaluation of the detainee by a mental health professional (*Id.* ¶ 60);

- restraint chair confinement was permitted during the third shift, when no health care professional was on duty at the Prison (*Id.* ¶ 61);

- even when medical personnel were present while a detainee was in a restraint chair, vital signs were never checked (*Id.* ¶¶ 57-59); and

- correctional officer trainees, even those who said that they did not know how to check for a pulse, were permitted to serve as the constant watch officer for a detainee in a restraint chair (*Id.* ¶ 134).

It is also undisputed that the senior policymaker at the Prison, Warden Varano, was personally aware and approved of these practices. *See, e.g., id.* ¶¶ 52-53, 134. It is also undisputed that the Prison used the chair frequently and, according to Warden Varano's calculations, an inmate had been restrained for more than eight hours approximately 10% of the time in the two years preceding Evans's death. ¶ 54. Accordingly, these standard operating procedures certainly meet

the definition of policies, customs, and practices sufficient to hold a government entity liable under § 1983.

The County argues that summary judgment should be entered because there is no evidence that its restraint chair custom and practices "resulted in the misuse of a restraint chair with resulting medical complications" – *i.e.*, a "pattern of underlying constitutional relations" that would demonstrate deliberate indifference. Doc. 80 at 19-20. The County ignores the Third Circuit's confirmation that policy and custom claims, on the one hand, and failure to train claims on the other hand, are distinct, with only the latter requiring a showing of deliberate indifference. *See Forrest v. Parry*, 930 F.3d 93, 105-106 (3d Cir. 2019) ("a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure to- supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected"); *see also Berg*, 219 F.3d at 276 (causation may be established by policy that facially violates federal law or action taken with deliberate indifference to its known or obvious consequences) (cleaned up). To survive summary judgment, Plaintiff need only show the causal nexus between the municipal policy or custom and the harm. *See Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (plaintiff must show that the government's policy or custom inflicted the injury in question).

There is ample evidence that Evans died as a direct result of the County's policy and custom of indefinite restraint chair confinement, without any vital signs checks or any upper limit on its duration, even during hours when no health care personnel was at the Prison and an inmate's right to adequate medical care was left in the hands of correctional officers unable to recognize or handle a medical emergency. Plaintiff's forensic pathology expert, Harry N. Kamerow, M.D., has opined that excited delirium syndrome presents with symptoms including "increased physical activity,"

"agitation," and vital signs indicating "tachycardia (a fast heart rate), tachypnea (fast breathing), hyperthermia (an increased body temperature) and of course increased blood pressure."  Exhibit X at unnumbered page 5.[8]  Plaintiff's correctional nursing care expert, Gail Normandin-Carpio, RN, has opined that vital sign checks and subjective assessment of his clinical condition (identified alarming levels of acute distress, bleeding lips, and eventually a change in his respiratory pattern) would have prompted transfer back to the hospital "long before the third shift came on duty." Exhibit Z at 7.  Both Dr. Kamerow and Plaintiff's correctional psychiatry expert, Mustafa A. Mufti, M.D., have opined that, while Evans may have remained in mechanical restraints at the hospital, he would have received both medical sedation and appropriate monitoring that would have prevented the onset or progression of excited delirium leading to death.  Exhibit X at unnumbered page 5; Exhibit Y at 5-6.  *See also* Exhibit W at 15 ("Tyler Evans died because Columbia County Prison did not have adequate policies to ensure safe use of the restraint chair and did not train its correctional or medical staff on the policies that it did have.").

At a minimum, a jury could conclude that, even if competent mental health or medical evaluations did not result in a transfer back to the hospital before Evans's cardiorespiratory arrest, having a health care professional on duty at the Prison once his breathing became labored would have resulted in a prompt call to 911 and initiation of CPR in time to prevent his death.  Exhibit X at unnumbered page 6.  A jury could also conclude that Evans's condition would not have

---

[8] Dr. Kamerow notes that Evans did not present to Geisinger Bloomsburg Hospital in "extremis" and "clearly Mr. Evans did not present with the signs or symptoms of excited delirium at that time because he had not been subjected to restraint of many hours duration."  Exhibit X at unnumbered page 5-6.  It was the restraints themselves in combination with the methamphetamines that caused the onset of excited delirium syndrome while he was at the Prison.  A competent mental health evaluation would have recognized the danger that this would occur.  Dr. Mufti has opined that "[g]iven Ms. Evans's intellectual disability, psychiatric illness and intoxication, the correctional officers employed a technique that was extremely unlikely to produce the desired result of reducing his distress."  Exhibit Y at 5.

deteriorated to the point that emergency medical assistance would be needed if either (a) a nurse had remained at the Prison after 9:30 p.m. and performed even a rudimentary clinical assessment including vital signs thereafter or (b) the Prison adopted the upper limit of restraint chair confinement recommended by the manufacturer – or any limit short of 22 hours.  Indeed, even if the correctional staff still regarded Evans as presenting a risk to himself or others once that time limit was hit, the most likely scenario is that he simply would have been sent back to the hospital.

### 4.   The County May Be Held Liable Under *Monell* For Its Failure To Train Its Correctional And Medical Staff In Proper Restraint Chair Usage

There is overwhelming evidence in this case of a *Monell* violation for failure to train.  The evidence is undisputed that the County failed to train its correctional or medical staff on its own written policies regarding restraint chair usage.  Not a single witness, including the Warden and Deputy Warden, testified that he or she was familiar with the written policies regarding the duration of restraint.  Pl.'s Resp. to Columbia Co. SUF ¶ 51.  Neither Nurse Novotney nor any other Prison employee, including the Warden and Deputy Warden, testified that he or she was familiar with the Prison's written policies regarding the required medical care for persons in a restraint chair.  *Id.* ¶¶ 58-60.  Not a single witness, including the Warden and Deputy Warden, testified that he or she had ever seen the restraint chair manufacturer's instructions.  *Id.* ¶¶ 64-66. Correctional staff were not trained in how to perform a medical assessment of a person in a restraint chair during third shift, when no health care professional was at the Prison.  *See, e.g., id.* ¶¶ 99-104.  Finally, no one at the Prison testified that they had any understanding that prolonged restraint chair confinement created a risk of serious injury or death.  *Id.* ¶ 67.

As a result of the County's longstanding practice of failing to train its staff on any of this, Evans spent the last 22 hours of his life in a restraint chair, detoxing from methamphetamines without any detox protocol, agitated and yelling, without having his vital signs checked once.  And

for the last four and a half hours of his life, Evans's constitutional right to adequate medical care was at the mercy of correctional staff who lacked the training: (1) to understand what medical assessment was required under the Prison's own policies and, just as importantly, why it was required; (2) to perform that assessment; and (3) to seek immediate medical assistance when the required assessment would have revealed that his life was in danger.  Indeed, the County's training of its correctional staff was so deficient that, if Officer Zielecki's testimony is to be believed, the correctional officer whose only responsibility was Evans's well-being literally watched Evans die having no idea how either to recognize labored breathing or to check for a pulse.  *Id.* SUF ¶¶ 99-126.  The County's training of even its senior correctional staff was so shockingly poor that, if Sgt. Cunfer's testimony is to be believed, CPR was delayed on his orders for 11 minutes after he could not detect a pulse because he thought it was possible that Evans was "faking it."  *Id.* ¶¶ 127-131.[9]

The County contends that "Plaintiff has not identified any specific training that [the Prison] failed to provide that could reasonably been expected to prevent [Evans's] death."  Doc. 80 at 22. The County is wrong.  As explained at length by Plaintiff's experts, the specific training that the Prison failed to provide includes, for starters, training on <u>the Prison's own written policies</u> concerning duration of restraint and the medical supervision required for persons in the restraint

---

[9] A jury should get to decide whether Zielecki and Cunfer were telling the truth.  A jury could well conclude, for example, that Zielecki's testimony that he does not know how to take a pulse notwithstanding his CPR training was not truthful.  If the jury concludes that Zielecki and Cunfer were not, then this would be highly probative that they acted with deliberate indifference.  If the jury finds their testimony credible, then this would be highly probative of a *Monell* claim.  The jury could also find one of them credible and the other not.  Moreover, a jury could consistently find that the Officer Defendants recklessly disregarded a threat to Evans's life *and* that the County's failure to properly train them prevented those officers from knowing what to do in the event they encountered a detainee with this presentation.  Deliberate indifference is akin to recklessness and does not require proof of intent or knowledge.  *Farmer*, 511 U.S. at 835.  In any event, these are questions for a jury to decide at trial, not for the Court to decide on summary judgment.

chair.   The additional training that the Prison failed to provide was on the manufacturer's instructions for use of the chair and basic national correctional and correctional health care standards on restraint chair use.   As explained *supra* pages 23-24, there is strong evidence that training correctional and medical staff in these policies "reasonably could have been expected to prevent Evans's death."

The County also contends that there is insufficient evidence that the County acted with deliberate indifference because there is no evidence that the failure to train resulted in prior incidents of adverse medical conditions.   Doc. 80 at 22.   This argument lacks merit.   The Third Circuit's decision in *Thomas*, 749 F.3d at 217 is instructive.    In that case, the plaintiff, an inmate at a county correctional facility, was assaulted and injured by a group of inmates in the presence of correctional officers.   He asserted that the County was liable as a result of its failure to train officers in conflict de-escalation and intervention techniques.   *Id.* at 219.   The district court granted summary judgment to the County, but the Third Circuit reversed.   *Id.*

Although failure-to-train claims typically require a pattern of similar constitutional violations, the court found that the plaintiff's allegations fit within the "single incident liability" concept where "the need for training 'can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.'"   *Id.* at 223 (quoting *City of Canton*, 489 U.S. at 389 n.10).   Because, in part, the plaintiff had offered expert opinion evidence "that the failure to provide conflict de-escalation and intervention training was a careless and dangerous practice not aligned with prevailing standards," the court ruled that a reasonable jury could find that the city's failure to ensure the training of its officers on such practices was deliberately indifferent.   *Id.* at 225.   Likewise, here, Plaintiff has produced reports from correctional and medical experts that the County failed to train its correctional and medical staff

in accordance with correctional standards.  *See* Exhibits W and Z.  *See also McKissick v. Cty. of York*, 2011 WL 5117621, at *2, *16 (M.D. Pa. Oct. 25, 2011) (denying summary judgment as to *Monell* theory against private medical provider on ground that "the record lacks evidence to show that [provider] had procedures in place to ensure that...policies were implemented and followed").

It strains credulity for Defendants to argue that the need for training on restraint chair procedures is not obvious where there is a prominent warning on the sticker that "[u]se of the Emergency Restraint Chair without first reading and thoroughly understanding the instructions could cause injury or death."  *See Freitag v. Bucks County*, 2022 WL 2703599, at *12 (E.D. Pa. July 12, 2022) ("[A]n obvious, if not inevitable, consequence of inmate monitors failing to conduct their observations is that inmates particularly vulnerable to self-harm will have their Eighth Amendment right violated."); *Wichterman*, 2019 WL 3216609, at *10 (denying summary judgment where "plaintiff [did] not identify a pattern of constitutional violations in support of his failure to train claim" where "the need to train officers to recognize signs of overdose and contact medical personnel to assist when a detainee is semi-conscious was 'so patently obvious' that municipal policymakers' failure to train was deliberate indifference to the predictable consequence of failing to treat an overdosing detainee.").  As Plaintiff's corrections expert, Mr. Graziano, has opined in his report, "[i]t was well-known in the field of corrections that indefinite mechanical restraint creates a risk of injury or death."  Exhibit W at 17.  Plaintiff's correctional nursing expert, Ms. Normandin-Carpio, agrees that the safety risks of failing to use restraint chairs in compliance with national correctional health standards regarding their use are "well-known in the Correctional field."  Exhibit Z at 6-7.

     **5.   Summary Judgment Should Be Denied On The Supervisory Liability Claim Against Warden Varano**

Summary judgment should not be entered in favor of Warden Varano because, as set forth above, he personally approved or and directed the unconstitutional policies that are the subject of Plaintiff's *Monell* claims.

## VII.   CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendants' motions and enter the Orders proposed herewith.

     Respectfully submitted,

     **YOUMAN & CAPUTO, LLC**

Dated:  January 27, 2023     BY:  _____

     DAVID J. CAPUTO, ESQUIRE
     Two Logan Square
     100-120 N. 18th Street, 1925
     Philadelphia, PA 19103
     (215) 302-1999
     dcaputo@youmancaputo.com

     *Attorneys for the Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, David J. Caputo, hereby certify that the foregoing pleading is in compliance with Local Rule 7.8(b)(3) and the Court's Order dated January 17, 2023 (Doc. 85). The brief contains 9,322 words (excluding the Cover Page, Captions, Table of Contents, Table of Authorities, Signature Block, and Certifications) as calculated by Microsoft Office Word.

Dated:  January 27, 2023

_____
David J. Caputo, Esquire

## CERTIFICATE OF SERVICE

I, David J. Caputo, counsel for Plaintiff, certify that on this date, a copy of Plaintiff's Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment was served via the Court's Electronic Filing System upon the following counsel of record for all defendants:

David J. MacMain, Esquire
Stephen G. Rhoads, Esquire
MacMain Leinhauser
433 W. Market Street, Suite 200
West Chester, PA 19382

***Attorneys for Columbia County, Columbia County Prison, Warden David Varano, Deputy Warden George Nye, Sgt. Jared Cunfer, Correctional Officer Patrick Zielecki, Correctional Officer Brent Harner, Lt. David McCoy and Lt. Ryan Boatman***

John R. Ninosky, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA 17011

***Attorney for Defendant Sarah Novotney***

Dated:  January 27, 2023

David J. Caputo, Esquire