UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUDY K. EVANS, Administratrix of the Estate of Tyler Jay Evans, Deceased, | : : : : | CIVIL NO: 1:20-CV-00722 |
| Plaintiff, | : : | |
| v. | : : | (Magistrate Judge Schwab) |
| COLUMBIA COUNTY, *et al.,* | : : | |
| Defendants. | : : | |

## MEMORANDUM OPINION

**I.  Introduction.**

Tyler Jay Evans ("Tyler") died at the Columbia County Prison after being restrained in a restraint chair.  The plaintiff, Judy K. Evans, the Administratrix of Tyler's estate, brought this action claiming that the defendants violated Tyler's constitutional rights.  Currently pending are two motions for summary judgment—one filed by a nurse and the other filed by the remaining identified defendants.  For the reasons discussed below, we will deny the nurse's motion, and we will grant in part and deny in part the remaining identified defendants' motion.  We will also dismiss the unidentified Doe defendants.

## II.  Background and Procedural History.

Evans began this action by filing a complaint.  On May 12, 2021, she filed an amended complaint naming Columbia County; the following officials and officers who at the time worked at the Columbia County Prison: Warden David Varano, Deputy Warden George Nye, Sergeant Jared Cunfer, Correctional Officer Patrick Zielecki, Correctional Officer Brent Harner, Lieutenant David McCoy, Lieutenant Ryan Boatman, and Corrections Officers John Does 1–8; and the following medical professionals who at the time worked at the Columbia County Prison: Nurse Serena Novotney and Medical John Does 1–10.

The amended complaint sets forth Tyler's background, his arrest on June 1, 2019, his trip to the hospital emergency room, and his discharge from the hospital to the Columbia County Prison.  According to the amended complaint, Tyler was placed in a restraint chair at the prison at approximately 4:06 a.m. on June 1, 2019, and although the restraint chair (with Tyler in it) was moved to several locations in the prison, Tyler remained in the restraint chair until 2:25 a.m. on June 2, 2019, when he was removed from the restraint chair after becoming unresponsive.  Tyler "remained unresponsive and in cardiac arrest when paramedics arrived on the block and took over the resuscitative efforts." *Doc. 38* at ¶ 206.  He was pronounced dead at 3:13 a.m. on June 2, 2019.

2

The amended complaint also sets forth the Columbia County Prison's policy regarding the use of restraint chairs, and it details how that policy was allegedly not followed in Tyler's case.

The amended complaint lists one cause of action—an action under Pennsylvania's Survival Act, 42 Pa. C.S.A. § 8302.  It then sets forth claims for relief set forth in two counts.

Count I contains claims against the individual defendants (*i.e.*, all defendants other than Columbia County) based on the Eighth Amendment and/or the Due Process Clause of the Fourteenth Amendment.  More specifically, Evans asserts that the individual defendants subjected Tyler "to gratuitous infliction of wanton and unnecessary pain" in violation of his rights. *Doc. 38* ¶ 222.  Evans also asserts that the individual defendants were deliberately indifferent to Tyler's serious medical needs in violation of his rights. *Id*. ¶ 223.

Count II contains claims against Columbia County based on the Eighth Amendment and/or the Due Process Clause of the Fourteenth Amendment.  More specifically, Evans asserts that Columbia County "failed to establish and enforce policies, practices and procedures to ensure that inmates at Columbia County Prison were not restrained inappropriately, without good cause, and for excessive lengths of time in the restraint chair." *See doc. 38* ¶ 225.  Evans also asserts that Columbia County "failed to ensure through proper training, supervision and

discipline that the individual defendants complied with established policies, practices and procedures (a) for addressing the serious medical needs of inmates in restraint chairs for prolonged lengths of time and (b) for avoiding the gratuitous infliction of wanton and unnecessary infliction of pain caused by inappropriate and prolonged restraint chair confinement." *Id.* ¶¶ 223, 226.[1]

---

[1] Claims involving use of mechanical restraints, such as a restraint chair, are often appropriately framed as excessive force claims. *See Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (concluding "under *Hope* [*v. Pelzer*, 536 U.S. 730 (2002)], that Young's claims should be analyzed under the excessive force test"). They may also be framed as conditions-of-confinement claims. *See Thomas v. Tice*, 948 F.3d 133, 142 n.6 (3d Cir. 2020) (noting that the use of mechanical restraints may be considered as a conditions-of-confinement claim). Further, a claim involving the use of such restraints may be framed as a medical claim. *See Brown v. Tice*, No. 4:20-CV-00698, 2022 WL 1158611, at *5 (M.D. Pa. Apr. 19, 2022) (construing claim regarding a restraint-chair incident as "an assertion of deliberate indifference to serious medical needs"). Here, because Evans refers to both the gratuitous infliction of wanton and unnecessary pain and deliberate indifference to Tyler's serious medical needs, we construe the amended complaint as pleading two distinct types of claims: (1) either excessive-force claims or conditions-of-confinement claims; and (2) medical claims. Although it is not clear if the first type of claim is an excessive force claim or a conditions-of-confinement claim, we note that Evans mentions the use of force and excessive force in some of the other allegations of her amended complaint. *See doc. 38* ¶¶ 6, 34, 41, 99. And the operative language that she uses—"gratuitous infliction of wanton and unnecessary pain"—is the same language that the Third Circuit has concluded the Supreme Court had used when applying its Eighth Amendment excessive force jurisprudence in the context of mechanical restraints, *see Young*, 801 F.3d at 179–80 (concluding that when the Supreme Court in *Hope*, 536 U.S. at 738, "held that Hope's punitive treatment amounted to the gratuitous infliction of wanton and unnecessary pain that was clearly prohibited[,]" the Court was applying "its excessive force jurisprudence for the first time to a prisoner's allegation that his placement in mechanical restraints was unconstitutional" (internal citation and quotations marks omitted)). Thus, it appears that Evans may have intended to plead the first type of claim as an excessive force claim. We need not make that

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.  Case management deadlines were set, the parties had the opportunity to conduct discovery.

On December 14, 2022, defendant Novotney filed a motion for summary judgment, and the next day, defendants Columbia County, Varano, Nye, Cunfer, Zielecki, Harner, McCoy, and Boatman (collectively referred to as the "Columbia County defendants") filed a motion for summary judgment.[2]  Those motions have been fully briefed.  The parties engaged in settlement negotiations both before and after the motions for summary judgment were filed.  Those negotiations were unsuccessful, and trial is scheduled for May 6, 2024.  We now address the pending motions for summary judgment.

## III.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

determination, however, because, as set forth below, the defendants have only briefed their motions for summary judgment as to the medical claims.

[2] The Columbia County defendants' motion for summary judgment was purportedly also brought on behalf of the Columbia County Prison. *See doc. 79* at 1.  But the Columbia County Prison is not named as a defendant in the amended complaint. *See doc. 38 passim*.  Thus, the Columbia County Prison is not a defendant in this case.

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.

R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N.*

7

*Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

8

**IV. Discussion.**

Evans brings her claims under 42 U.S.C. § 1983. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.,* 422 F.3d 141, 146 (3d Cir. 2005). Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.* To establish a claim under § 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

The defendants do not argue that they were not acting under color of state law for purposes of 42 U.S.C. § 1983. Thus, the inquiry is whether Evans has come forward with evidence from which a reasonable trier of fact could conclude that the defendants violated Tyler's constitutional rights. We first address Nurse Novotney's motion for summary judgment, and then we address the Columbia County defendants' motion for summary judgment.

**A. Nurse Novotney's Motion for Summary Judgment**.

Nurse Novotney moves for summary judgment as to the medical claim against her.[3]  We first set forth the standards applicable to such claim.  Then we set forth the material facts that govern Nurse Novotney's motion for summary judgment.  Finally, applying the applicable to standards to the facts, we conclude that Nurse Novotney is not entitled to summary judgment.

**1. Standards Regarding Medical Claims by Prisoners and Detainees.**

At noted above, in her amended complaint, Evans invokes both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.  The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.  But "the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.'" *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (footnote omitted) (quoting *Graham v. Connor,* 490 U.S. 386, 392 n. 6 (1989)).  It does not apply to pretrial detainees. *See Bistrian v. Levi*, 912 F.3d 79, 91 n.19 (3d Cir. 2018) ("The Fifth Amendment protects pretrial detainees, while the Eighth Amendment protects post-trial convicts.").

---

[3] As set forth above, we construe the amended complaint as containing two types of claims.  In her brief in support of her motion for summary judgment, Nurse Novotney addresses only the medical claim against her.

Rather, the Due Process Clause of either the Fifth Amendment or the Fourteenth Amendment protects pretrial detainees. *Id.*

Nurse Novotney asserts that because Tyler was a pretrial detainee, Evans's claim is for a violation of the Fourteenth Amendment. *See doc. 78 at 9.* Evans does not respond to this argument. Thus, we will assume for purposes of Nurse Novotney's motion for summary judgment that Tyler was a pretrial detainee, and we will analyze the claim as a due process claim.

"The Third Circuit's standard for evaluating a pretrial detainee's claim of inadequate medical treatment under the Due Process Clause is not entirely clear." *Beauchamps v. Bechtold*, No. 1:22-CV-01279, 2023 WL 5017208, at *3 (M.D. Pa. Aug. 7, 2023) (Wilson, J.). The due process rights of pretrial detainees are "at least as great" as the Eighth Amendment protections available to convicted prisoners. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983). In other words, the Eighth Amendment "establishe[s] a floor." *Hubbard*, 399 F.3d at 165–66. But, in the context of the provision of medical care, "[t]here is an open question of 'how much more protection unconvicted prisoners should receive' under the Fourteenth Amendment" than convicted prisoners receive under the Eighth Amendment. *Mattern v. City of Sea Isle*, 657 F. App'x 134, 138 n.5 (3d Cir. 2016) (quoting *Kost v. Kozakiewicz,* 1 F.3d 176, 188 n.10 (3d Cir. 1993)).

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. 429 U.S. 97, 104 (1976).  The Third Circuit has previously "found no reason to apply a different standard than that set forth in *Estelle* (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment) when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987)).  More recently, in other contexts, however, both the Supreme Court and the Third Circuit have held that the standard under the Cruel and Unusual Punishment Clause of the Eighth Amendment, which is applicable to convicted persons, is different from the standard under the Due Process Clause, which is applicable to pretrials detainees. *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97, 400–01 (2015) (contrasting the rights of convicted prisoners under the Eighth Amendment not to be subject to cruel and unusual punishment with the rights of pretrial detainees under the Due Process Clause not to be punished at all, and holding that to establish an excessive force claim, unlike a convicted prisoner, who must show that the defendant acted with the subjective intent to maliciously and sadistically cause harm, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable"); *Hubbard*, 399 F.3d at

12

166–67 (noting that the Eighth Amendment prohibits cruel and unusual punishment, but pretrial detainees cannot be punished at all, and reversing and remanding in a case brought by pretrial detainees regarding conditions of confinement because the district court improperly analyzed their claim under the Eighth Amendment, rather than the Due Process Clause of the Fourteenth Amendment).

Recognizing that medical claims brought by pretrial detainees are substantive due process claims, not Eighth Amendment claims, judges in this district have nevertheless generally continued to apply Eighth Amendment standards to such claims. *See, e.g.*, *White v. Dauphin Cnty.*, No. 1:22-CV-1241, 2023 WL 6392735, at *8 (M.D. Pa. Sept. 29, 2023) (Conner, J.) (applying Eighth Amendment standards to medical claim of a pretrial detainee); *Giddings v. Rogers*, No. 1:22-CV-00097, 2023 WL 2395470, at *4 (M.D. Pa. Mar. 6, 2023) (Kane, J.) (same); *Beauchamps*, 2023 WL 5017208, at *3 (Wilson, J.) (same); *Wong v. Betti*, No. 1:22-CV-01063, 2023 WL 4980211, at *6 (M.D. Pa. Aug. 3, 2023) (Rambo, J.) (same); *Brown v. Glover*, No. 4:22-CV-01154, 2023 WL 3997975, at *2 (M.D. Pa. June 14, 2023) (Brann, C.J.) (same); *Peters v. Prime Care Med. Inc.*, No. 3:22-CV-1542, 2023 WL 3396926, at *3 (M.D. Pa. May 11, 2023) (Mariani, J.) (same); *Loughney v. Corr. Care, Inc.*, No. CV 3:19-1101, 2021 WL 4447635, at *2 n.5 (M.D. Pa. Sept. 28, 2021) (Mannion, J.) (same).

Similarly, the Third Circuit has continued to rely on Eighth Amendment standards when addressing medical claims of pretrial detainees. *See e.g. Thomas v. City of Harrisburg*, 88 F.4th 275, 281 n.23 (3d Cir. 2023) ("Because the Fourteenth Amendment affords pretrial detainees protections at least as great as those available to inmates under the Eighth Amendment, we will review Sherelle Thomas's claims for failure to render medical care under the Fourteenth Amendment by applying the same standard used to evaluate claims brought under the Eighth Amendment."); *Palakovic v. Wetzel*, 854 F.3d 209, 223, 227–233 (3d Cir. 2017) (concluding that "when a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment" and addressing that claim as well as a more general claim of deliberate indifference to a serious need for mental healthcare under Eighth Amendment standards).[4]

---

[4] Some other circuits have concluded otherwise. *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (concluding that *Kingsley* "is irreconcilable with precedent requiring pretrial detainees to meet a subjective standard to succeed on claims under the Fourteenth Amendment for prison officials' deliberate indifference to excessive risks of harm to the inmate" and noting that the Second, Sixth, Seventh, and Ninth Circuits have also so held).

Considering the above, and given that both Nurse Novotney and Evans rely on Eighth Amendment standards, we will apply the Eighth Amendment standard to Evans's medical claim against Nurse Novotney.

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103. To establish an Eighth Amendment medical claim, a plaintiff must show that "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff." *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023).

A medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981) (table)). Additionally, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle,* 429 U.S. at 103).  Further, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

Deliberate indifference under the Eighth Amendment is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 840 (1994).  "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009).  To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See id,* at 835 (holding that "deliberate indifference describes a state of mind more blameworthy than negligence")*; Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004) ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation."); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002) (claims of

16

medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).  Instead, deliberate indifference represents a higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

"Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993) (citations omitted).  And courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Palakovic*, 854 F.3d at 228 (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).  "Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim." *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Employees*, 732 F. Supp. 2d 458, 472 (M.D. Pa. 2010).

Thus,"[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227.  "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Id.*

17

The Third Circuit has found deliberate indifference where a prison official:
"(1) knows of a prisoner's need for medical treatment but intentionally refuses to
provide it; (2) delays necessary medical treatment based on a non-medical reason;
or (3) prevents a prisoner from receiving needed or recommended medical
treatment." *Rouse,* 182 F.3d at 197.  The Third Circuit has also held that
"[n]eedless suffering resulting from the denial of simple medical care, which does
not serve any penological purpose, . . . violates the Eighth Amendment." *Atkinson
v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).  "For instance, prison officials may
not, with deliberate indifference to the serious medical needs of the inmate, opt for
'an easier and less efficacious treatment' of the inmate's condition." *Palakovic*,
854 F.3d at 228 (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978).  "Nor
may 'prison authorities deny reasonable requests for medical treatment . . . [when]
such denial exposes the inmate to undue suffering or the threat of tangible residual
injury.'" *Id*. (quoting *Monmouth Cty. Corr. Inst.*, 834 F.2d at 346).  Thus, "[a]
'failure to provide adequate care . . . [that] was deliberate, and motivated by non-
medical factors' is actionable under the Eighth Amendment, but 'inadequate care
[that was a result of an error in medical judgment' is not." *Parkell v. Danberg*,
833 F.3d 313, 337 (3d Cir. 2016) (quoting *Durmer,* 991 F.2d at 69).

"[T]here is a critical distinction 'between cases where the complaint alleges
a complete denial of medical care and those alleging inadequate medical

treatment.'" *Pearson*, 850 F.3d at 535 (quoting *United States ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  "Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,' when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id*. (quoting *Monmouth Cty. Corr. Inst.*, 834 F.2d at 346).  And "there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim." *Id*. at 536.  "The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury." *Id*.  "The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony." *Id*.  But a claim that medical care was delayed or denied completely "must be approached differently than an adequacy of care claim." *Id*. at 537.  "Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Id*.  "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id*.

## 2. The Material Facts.

Local Rule 56.1 requires a party moving for summary judgment to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1.  The Rule, in turn, requires the non-moving party to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [by the moving party], as to which it is contended that there exists a genuine issue to be tried." *Id.*  The "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements," and "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Id.*  "Local Rule 56.1 was promulgated to bring greater efficiency to the work of the judges of the Middle District." *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018).  "[T]he Rule 'is essential to the Court's resolution of a summary judgment motion' due to its role in 'organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.'" *Id*. (citations omitted).

20

Here, in accordance with M.D. L.R. Pa. 56.1, Nurse Novotney filed a statement of material facts with citations to the record, *see doc. 77*, and supporting documents, *see doc. 77-1–77-4*.  Evans filed a response to Nurse Novotney's statement of material facts, *see doc. 90*, and supporting documents, *see doc. 89-1*. In addition to responding to Nurse Novotney's statement of material facts, Evans set forth additional material facts, s*ee doc. 90*, to which Nurse Novotney then responded, *see doc. 92*.

Where the party asserting a fact has not pointed to record evidence to support the fact, we do not include that fact in the statement of material facts set forth below.  Similarly, where a party denying a fact has not pointed to record evidence to support that denial, provided the fact is supported by record evidence, we consider the fact at issue to be undisputed.  Further, considering our duty to "construe all facts and inferences in favor of the nonmoving party[,]" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)), where there is a genuine dispute about a fact, we set forth the fact as set forth by Evans, the nonmoving party.

Considering the above, the following are the material facts upon which we analyze Nurse Novotney's motion for summary judgment.[5]

---

[5] In addition to responding to Nurse Novotney's statement of facts and setting forth additional specific facts, Evans asserts that she "incorporates her Response to Columbia County Defendants' Statement of Undisputed Facts

Shortly after midnight on Saturday, June 1, 2019, Tyler was arrested following a reported domestic dispute involving him and his stepfather. *Doc.77 ¶ 1; Doc. 90 ¶ 1.* He was transported to the Briar Creek Township Police Station where a urinalysis was administered. *Doc.77 ¶ 2; Doc. 90 ¶ 2.* The urinalysis was positive for methamphetamine, and a decision was made to take Tyler into custody at the Columbia County Prison. *Doc.77 ¶ 3; Doc. 90 ¶ 3.*

According to the police report, as Tyler was being transported to the Columbia County Prison, he began making suicidal comments. *Doc.77 ¶ 4; Doc. 90 ¶ 4.*[6] Also, according to the police report,[7] the arresting officer contacted a

---

(including exhibits) as if set forth in full." *Doc. 90 ¶ 84.* Nurse Novotney responds that "[a]ny facts asserted by Plaintiff against a Co-Defendant which are not specifically asserted against [her] are not pertinent or material to [her] Motion for Summary Judgment." *Doc. 92 ¶ 84.* We agree with Nurse Novotney in this regard. Evans had the opportunity to set forth the facts material to Nurse Novotney's motion, and she did so. Her catch-all attempt to incorporate other facts, without specifying exactly which ones are material to Nurse Novotney's motion, does not comply with M.D. Pa. L. R. 56.1.

[6] In support of this fact, Nurse Novotney cites to Evans's amended complaint. *See doc. 77 ¶ 4 (citing doc. 38 (amended complaint) ¶ 66).* In her amended complaint, Evans alleges: "According to the police report, as Officer Kressler and Probation Officer Letteer began to drive Tyler Evans to Columbia County Prison at 2:25 a.m., he began making suicidal comments." *Doc. 38 ¶ 66.* Nurse Novotney did not, however, set forth the above fact with the initial qualifier—"According to the police report"— pleaded in the amended complaint. *See doc. 77 ¶ 4.* And Evans denies this statement asserting that "[t]he averments of this paragraph are not supported by admissible evidence as required by LR 56.1, because the record citation is to the Amended Complaint's reference to the police report, and statements made in the police report are hearsay when offered for the truth of the matter asserted." *Doc. 90 ¶ 4.* We are cognizant of the qualifier, and

crisis worker who recommended that Tyler be transported to the Geisinger
Bloomsburg Hospital emergency room for evaluation of a possible involuntary
commitment pursuant to § 302 of Pennsylvania's Mental Health Procedures Act.
*Doc.77 ¶ 5*; *Doc. 90 ¶ 5.*

At the Geisinger Bloomsburg Hospital, Tyler was evaluated by Jed Thomas
Ritter, M.D. who ultimately concluded that it was less likely that Tyler had plans to
harm himself and more likely that there was an element of secondary gain in his
suicidal threats. *Doc.77 ¶ 6*; *Doc. 90 ¶ 6.*  Ultimately, Tyler was discharged from
the hospital and cleared for incarceration. *Doc.77 ¶ 7*; *Doc. 90 ¶ 7.*  Upon
admission to the Columbia County Prison, Tyler was placed in a restraint chair by
correctional staff. *Doc.77 ¶ 8*; *Doc. 90 ¶ 8.*

Nurse Novotney completed her training as a licensed practical nurse at the
Penn State University—Hazleton campus in December 2015. *Doc.77 ¶ 9*; *Doc. 90
¶ 9.*  She has been licensed as a nurse in Pennsylvania since early January of 2016.
*Doc.77 ¶ 10*; *Doc. 90 ¶ 10.*  She was employed full-time as a nurse at the Columbia
County Prison from July 2017 through December 2020. *Doc.77 ¶ 10*; *Doc. 90 ¶ 10.*

---

we note that regardless of whether Tyler actually made suicidal comments at this
time, this statement of fact helps to explain why certain nondefendants purportedly
took the actions that they did before Tyler arrived at the prison.  We do not
understand Evans to be objecting to use of this statement for that purpose.

[7] Here again, in response to Evans's objection, we add to the initial qualifier
"According to the police report." *See supra* note 6.

Nurse Novotney's direct supervisor there was Nurse Lottie Neiswender. *Doc.77* ¶ 11; *Doc. 90* ¶ 11.  Nurse Neiswender provided Nurse Novotney's initial training at the Columbia County Prison. *Doc.77* ¶ 12; *Doc. 90* ¶ 12.

During her nursing education to become a licensed practical nurse, Nurse Novotney would not have been trained on the use of a restraint chair. *Doc.77* ¶ 13; *Doc. 90* ¶ 13.  Registered nursing programs also do not include the use of restraint chairs in the education curriculum. *Doc.77* ¶ 13; *Doc. 90* ¶ 13.  And Nurse Novotney was not trained at the Columbia County Prison on the use of the restraint chair or on any potential health risks associated with the use of the restraint chair. *Doc.77* ¶ 14; *Doc. 90* ¶ 14.  There were also no in-service trainings for the use of a restraint chair at the Columbia County Prison. *Doc.77* ¶ 15; *Doc. 90* ¶ 15.  Nurse Novotney was not given any policies concerning restraint-chair usage. *Doc.77* ¶ 16; *Doc. 90* ¶ 16.  Her understanding of her responsibilities for inmates and restraint chairs was that she was to check the restraints after every time that correctional officers performed range-of-motion exercises with the inmate, and she was to make sure the circulation for the inmate was appropriate. *Doc.77* ¶ 17; *Doc. 90* ¶ 17.

Generally, there is a nurse on duty at the Columbia County Prison from 5:30 a.m. until approximately 9:30 p.m. *Doc.77* ¶ 18; *Doc. 90* ¶ 18.  On June 1, 2019, Nurse Novotney began her shift at approximately 5:30 a.m. *Doc.77* ¶ 19; *Doc. 90*

¶ 19.  She was the only healthcare professional on duty for her shift. *Doc.77* ¶ 20; *Doc. 90* ¶ 20.  She was informed that Tyler was in the restraint chair due to his behavior. *Doc.77* ¶ 21; *Doc. 90* ¶ 21.  She was also informed that he had been medically cleared for incarceration by the hospital. *Doc.77* ¶ 22; *Doc. 90* ¶ 22.  And Sergeant Cunfer told her that Tyler was suicidal and had taken methamphetamines. *Doc.77* ¶ 23; *Doc. 90* ¶ 23.

At approximately 6:39 a.m., Nurse Novotney checked Tyler's restraints, and he was talking coherently. *Doc.77* ¶ 24; *Doc. 90* ¶ 24.  Tyler told Nurse Novotney that he simply wanted to go to sleep. *Doc.77* ¶ 25; *Doc. 90* ¶ 25.  Nurse Novotney next checked Tyler's restraints at approximately 10:54 a.m. *Doc.77* ¶ 26; *Doc. 90* ¶ 26.  And she again checked his restraints at 1:48 p.m.[8] *Doc.77* ¶ 27; *Doc. 90* ¶ 27.  Tyler's behavior was the same as during the prior checks, and he denied using any drugs before he was arrested. *Doc.77* ¶¶ 28, 29; *Doc. 90* ¶¶ 28, 29.

Nurse Novotney next checked Tyler's restraints at approximately 3:43 p.m. *Doc.77* ¶ 30; *Doc. 90* ¶ 30.  Tyler also had his range-of-motion exercises at that time. *Doc.77* ¶ 31; *Doc. 90* ¶ 31.  Additionally, Officer Rutherford offered Tyler water, and Tyler drank two full cups without assistance. *Doc.77* ¶ 35; *Doc. 90* ¶ 35.  Tyler's behavior was again the same as previously noted. *Doc.77* ¶ 32; *Doc. 90*

---

[8] Nurse Novotney sometimes uses military time.  For the sake of consistency and ease of reference, when military time is used, we convert it to standard time.

¶ 32.[9]  Nurse Novotney reviewed Tyler's prior treatment records at the Columbia County Prison to try and get an answer for his behavior. *Doc.77* ¶ 34; *Doc. 90* ¶ 34.

Nurse Novotney checked Tyler's restraints again at approximately 5:56 p.m. *Doc.77* ¶ 36; *Doc. 90* ¶ 36.  At that time, Tyler stated that he wanted to smoke a cigarette. *Doc.77* ¶ 37; *Doc. 90* ¶ 37.

At approximately 6:38 p.m., Nurse Novotney called the Geisinger Bloomsburg Hospital's emergency department to learn the results of Tyler's toxicology report. *Doc.77* ¶ 38; *Doc. 90* ¶ 38.  She called the hospital because Tyler was still agitated, and she was concerned about his behavior. *Doc.77* ¶ 39; *Doc. 90* ¶ 39.  Additionally, hospital personnel had a higher level of training than Nurse Novotney, which was another reason she made the phone call. *Doc.77* ¶ 40; *Doc. 90* ¶ 40.

---

[9] According to Nurse Novotney, she had no concern that Tyler's time in the restraint chair was creating risk to either his mental or physical health. *Doc. 77* ¶ 33.  Evans denies this assertion, pointing to, among other things, Nurse Novotney's deposition testimony that she was concerned about Tyler's behavior. *Doc. 90* ¶ 33.  Here, it is not clear that the parties are talking about the same time frame.  But we must draw all inferences in the light favorable to Evans, as the non-moving party.  Thus, for purposes of Nurse Novotney's motion for summary judgment, there is a genuine dispute about whether, at least as some point in time during her shift, she had a concern about Tyler's behavior, and given that and considering the material facts in the light most favorable to Evans, a reasonable trier of fact could conclude that she had a concern that Tyler's time in the restraint cause was creating a risk to his mental or physical health.

It was Nurse Novotney's judgment that Tyler's condition remained essentially constant throughout her shift. *Doc.77* ¶ 41; *Doc. 90* ¶ 41. She acknowledged, however, that although the nurse at the Geisinger Bloomsburg Hospital told her that Tyler's behavior while at the hospital had been fine, his behavior while at the prison was not fine. *Doc. 90* ¶ 41. The nurse at the Geisinger Bloomsburg Hospital suggested to Nurse Novotney that she should send Tyler back to the hospital if she was concerned about his behavior. *Doc. 90* ¶ 33. And Nurse Novotney testified that she could send an inmate to the emergency room if she had a medical concern. *Doc.77* ¶ 42; *Doc. 90* ¶ 42.

At approximately 8:35 p.m., Nurse Novotney checked Tyler's restraints for the final time during her shift. *Doc.77* ¶ 43; *Doc. 90* ¶ 43. She noted that he had some red irritation as a result of the straps. *Doc.77* ¶ 44; *Doc. 90* ¶ 44. She asked Tyler if he wanted a Boost nutritional drink since he had refused his meal tray. *Doc.77* ¶ 45; *Doc. 90* ¶ 45. Tyler was asked if he wanted strawberry, chocolate, or vanilla, and he responded that he wanted vanilla. *Doc.77* ¶ 46; *Doc. 90* ¶ 46. He received the vanilla Boost nutritional drink at approximately 8:38 p.m. *Doc.77* ¶ 47; *Doc. 90* ¶ 47. Nurse Novotney asked the officers to adjust the wrist restraint straps due to Tyler's skin being red and irritated. *Doc.77* ¶ 48; *Doc. 90* ¶ 48. She also noticed that Tyler's shoulder near his collarbone was red from the shoulder strap restraints. *Doc.77* ¶ 49; *Doc. 90* ¶ 49. She believed this was caused by

Tyler's constant movement and the straps rubbing on his skin. *Doc.77 ¶* 50; *Doc.*

*90 ¶* 50.

At approximately 9:11 p.m., Nurse Novotney called her supervisor, Nurse

Neiswender. *Doc.77 ¶* 51; *Doc. 90 ¶* 51.  Nurse Neiswender suggested that Tyler

be given Benadryl to see if that would help calm him down. *Doc.77 ¶* 52; *Doc. 90*

*¶* 52.  At 9:22 p.m., Benadryl was provided to Tyler. *Doc.77 ¶* 53; *Doc. 90 ¶* 53.[10]

---

[10] Evans asserts that it was a violation of Pennsylvania law for Tyler to be given Benadryl without an order from a medical provider who possessed a state license to prescribe medication. *Doc. 90 ¶* 71.  In support of that assertion, Evans cites to the expert report of Gail Normandin-Carpio, RN, RLC, LNC.  In the page of that report cited by Evans, after recounting that Nurse Novotney was instructed "to provide an over the counter (OTC) medication for the purposed of sedating [Tyler][,]" Normandin-Carpio states:

> Nurse Novotney's conduct reflected a basic lack of competence.  For example, in the correctional application of care and under the standards even over the counter medications are only administered on a medical provider's verbal or written order who possess state licensure to prescribe.  Nurse Novotney was responsible for knowing and understanding her nursing scope of practice, her limitations of licensure as a LPN, and prescribing laws of Pennsylvania.  This is a first year Nursing program foundational tenant.

*Doc. 89-1* at 298.  Although this statement may support an inference that it was outside the standard of care to give over-the-counter Benadryl to a prisoner without an order from a medical provider who is licensed to prescribe medication, we fail to see how it supports an inference that it was a violation of Pennsylvania law to do so.  And while Nurse Novotney admits that no medical provider with prescribing authority gave a verbal or written order for Tyler to receive Benadryl and that she was not provided an order to dispense Benadryl to Tyler from anyone other than her supervisor, she notes it is unknown what authority her supervisor utilized to instruct her to dispense Benadryl to Tyler. *See doc. 92 ¶* 72.  And she points to the

Nurse Novotney had no understanding of the potential interactions between Benadryl and methamphetamines. *Doc. 90* ¶ 74; *Doc. 92* ¶ 74.  But she recognized that if the Benadryl was not effective, the next step would be to call a doctor. *Doc. 90* ¶ 75; *Doc. 92* ¶ 75.[11]  Nurse Novotney left the Columbia County Prison between 9:30 p.m. and 9:45 p.m., which was the end of her shift on June 1, 2019. *Doc.77* ¶ 57; *Doc. 90* ¶ 57.

After 2:00 a.m., on July 2, 2019, Tyler was ultimately found pulseless and unfortunately, he could not be resuscitated. *Doc.77* ¶ 59; *Doc. 90* ¶ 59.  The Coroner's findings were that Tyler's cause of death was due to complications of an excited state associated with methamphetamine toxicity and restraint chair confinement. *Doc.77* ¶ 60; *Doc. 90* ¶ 60.

---

report of her expert—Kimberly Pearson, MHA, MBA, RN, CCHP—who opines that Nurse Novotney acted within the scope of her practice as an LPN in working under her supervisor. *See doc. 77-3* at 14–15.

[11] Evans asserts that Nurse Novotney recognized that if the Benadryl was not effective to calm Tyler down and help him sleep, the next step was to have him seen by a doctor. *Doc. 90* ¶ 75.  Nurse Novotney denies this statement asserting that she did not testify that the next step would be for Tyler to been seen by a physician. *Doc. 92* ¶ 75.  Both Evans and Nurse Novotney rely on the same portion of Nurse Novotney's deposition testimony to support the assertion and the denial. As relevant to his issue, Nurse Novotney testified:

> Q.  You knew that if the Benadryl was not effective, that the next step was to call a doctor, correct?
> A.  Yes.

*Doc. 77-2* at 41 (Nurse Novotney's dep. at 150).  We frame the statement in accordance with Nurse Novotney's testimony.

Regardless of the training that Nurse Novotney received from Columbia County, she had the necessary training as an LPN "to take and record vital signs and to understand the role that vital signs play in basic medical assessments." *Doc. 90* ¶ 61; *Doc. 92* ¶ 61.[12] But during the entire roughly 16 hours of her shift on June 1, 2019, Nurse Novotney did not check Tyler's vital signs once. *Doc. 90* ¶ 62; *Doc. 92* ¶ 62.[13] She also did not assess Tyler's respiratory status during her shift on June 1, 2019. *Doc. 90* ¶ 63; *Doc. 92* ¶ 63.[14] Tyler was not given anything to drink after 5:30 a.m. until approximately 1:41 p.m., which was nine and a half hours after being placed in the restraint chair and eight hours into Nurse Novotney's

---

[12] Although Nurse Novotney admits this statement of fact, she further asserts that at no time did Tyler appear to be in medical distress or in the need of additional medical treatment. *Doc. 92* ¶ 61. As set forth above, *see supra* note 9, and below, *see infra* note14, there is a genuine factual dispute in this regard.

[13] Again, although Nurse Novotney admits this statement of fact, she further asserts that at no time did Tyler appear to be in medical distress or in the need of additional medical treatment. *Doc. 92* ¶ 61. As set forth above, *see supra* notes 9, 12, and below, *see infra* note 14, there is a genuine factual dispute in this regard.

[14] Nurse Novotney denies this statement asserting that she assessed Tyler six times during her shift and that his "respiratory status would be readily apparent based upon observation." *Doc. 92* ¶ 63. But she points to nothing to support her denial. *Id.* Conversely, although Nurse Novotney asserts—supported by her deposition testimony—that at no time did Tyler appear to her to be in medical distress and at no time did Tyler appear to need medical treatment, Evans disputes these statements, and based on the evidence that Evans cites there is a genuine factual dispute regarding these statements. *Doc. 77* ¶¶ 55, 56; *Doc. 90* ¶¶ 55, 56.

shift. *Doc. 90* ¶ 66; *Doc. 92* ¶ 66.[15]  Nurse Novotney did not specifically assess Tyler's hydration status during her shift on June 1, 2019, but she knew that Tyler received hydration on at least two occasions. *Doc. 90* ¶ 64; *Doc. 92* ¶ 64.  Tyler was not given an opportunity to use toilet facilities during Nurse Novotney's shift on June 1, 2019. *Doc. 90* ¶ 65; *Doc. 92* ¶ 65.[16]  Tyler was cooperative with the officers during each restraint check. *Doc. 90* ¶ 67; *Doc. 92* ¶ 67.  Although Tyler underwent range-of-motion exercises, Tyler's body positioning was not changed once. *Doc. 90* ¶ 68; *Doc. 92* ¶ 68.

Nurse Novotney did not document that Tyler made any suicidal threats while in the restraint chair. *Doc. 90* ¶ 69; *Doc. 92* ¶ 69.  Nor did she testify that she ever

---

[15] Nurse Novotney does not dispute this fact, but she further asserts that "it is not possible to know if Mr. Evans refused water." *Doc. 92* ¶ 66.  Although Nurse Novotney may not have personal knowledge of whether Tyler refused water from the corrections officers, the officers would know.  But Nurse Novotney has not pointed to any deposition testimony from the officers, or any notations by the officers in the prison log, that supports a suggestion that Tyler refused water during this time.

[16] Nurse Novotney denies this statement, but she has not pointed to any evidence to support her denial. *See doc. 92* ¶ 65.  Rather, she asserts that "[i]t is not possible to know of what discussions were had between Mr. Evans and correctional staff and whether Mr. Evans refused opportunities to use the toilet." *Id*.  But again, Nurse Novotney has not pointed to any deposition testimony from the officers, or any notations by the officers in the prison log, that contradicts this statement of fact.

heard Tyler make any suicidal threats. *Doc. 90* ¶ 70; *Doc. 92* ¶ 70.  At no time did Tyler complain of being in pain to Nurse Novotney. *Doc.77* ¶ 55; *Doc. 90* ¶ 55.[17]

Although Nurse Novotney knew that after her shift ended, no health-care professional was scheduled to be at the prison, a physician is available to be called. *Doc. 90* ¶ 76; *Doc. 92* ¶ 76.  After her shift ended on June 1, Nurse Novotney did not remain at the prison to determine whether Tyler calmed down and went to sleep after receiving Benadryl. *Doc. 90* ¶ 77; *Doc. 92* ¶ 77.  And she did not tell any of the correctional officers to call her or to call a doctor if Tyler did not calm down after receiving Benadryl. *Doc. 90* ¶¶ 78, 79; *Doc. 92* ¶¶ 78, 79.  Nurse Novotney took no steps to ensure that a doctor would be called if the Benadryl was not effective. *Doc. 90* ¶ 80; *Doc. 92* ¶ 80.[18]  She "abandoned [Tyler] in direct

---

[17] Evans denies this statement, and she points to evidence that she contends supports her denial. *See doc. 90* ¶ 54.  But because the evidence that she points to does not address what, if anything, Tyler said to Nurse Novotney regarding being in pain, Evans's denial is not supported by record evidence.

[18] The parties dispute whether Tyler calmed down after receiving Benadryl. *Doc. 90* ¶ 82; *Doc. 92* ¶ 82.  They dispute what the video shows.  As we do not have the entirety of the video of Tyler during this time, we cannot say whether he calmed down after receiving the Benadryl.  But we note that he can be seen at various times after given the Benadryl still agitated and thrashing. *See e.g., doc. 91*—Videos 12–15.

violation of her duty as an LPN knowing that medical attention was required."

*Doc. 90* ¶ 81.[19]

### 3.  Nurse Novotney is not entitled to summary judgment.

Nurse Novotney contends that she is entitled to summary judgment as to the medical claim against her because Evans cannot demonstrate that she was deliberately indifferent to a serious medical need on the part of Tyler.  Although this is a close question, we conclude that viewing the evidence in the light most favorable to Evans, as the nonmoving party, a reasonable trier of fact could conclude that Nurse Novotney was deliberately indifferent to Tyler's serious medical needs.

Nurse Novotney asserts that the evidence presented by Evans establishes nothing more than a difference of opinion as to whether the appropriate care was provided to Tyler and such a difference of opinion does not rise to the level of deliberate indifference.  In asserting that Evans has not shown that she was deliberately indifferent, Nurse Novotney emphasizes that she knew that Tyler had been evaluated at the hospital before being confined at the Columbia County

---

[19] In support of this assertion, Evans quotes the expert report of Normandin-Carpio. *Doc. 90* ¶ 81 (quoting *Doc. 89-1* at 298).  Nurse Novotney denies this assertion citing generally to the expert report of Pearson. *Doc. 92* ¶ 81.  As set forth above, *see supra* notes 9, 12–14, there is a genuine factual dispute about whether Nurse Novotney knew that Tyler required medical attention.  Again, because Evans is the nonmoving party, we accept her version of the events.

Prison, that she evaluated Tyler at least six times during her shift, that Tyler was provided fluids and a nutritional drink, that his condition remained constant throughout her shift, that Tyler did not complain of pain to her, and that when Tyler began to have some irritation from the restraint chair's straps, she requested that the straps be loosened. She also notes that due to her concern that Tyler remained agitated, she called the hospital, she called her supervising nurse, and she followed the instructions of her supervising nurse to give Tyler Benadryl. She further asserts that she was not trained on the prison policy regarding the use of restraints, and she asserts that she completed the tasks—checking that Tyler's circulation was not impaired after officers conducted range-of-motion exercises— that she thought was required. Finally, according to Nurse Novotney, at no time did she believe that Tyler appeared in medical distress or that he needed additional treatment.

Based on all the circumstances and based on Nurse Novotney's testimony, a reasonable factfinder may well conclude that she was not deliberately indifferent to Tyler's serious medical needs. Nevertheless, considering the material facts set forth above, a reasonable trier of fact also could conclude that Nurse Novotney was deliberately indifferent to Tyler's serious medical needs. This is a close call. There are facts and circumstances that may support an inference that Nurse Novotney was not deliberately indifferent, *e.g.*, Nurse Novotney's shift ended

hours before Tyler condition changed drastically and he died, and Nurse Novotney did contact her supervising nurse for instructions.  Nevertheless, viewed in the light most favorable to Evans as the nonmoving party, there are also facts and circumstances that support an inference that Nurse Novotney was deliberately indifferent, *e.g.*, Nurse Novotney was concerned given that Tyler had not calmed down after being in the restraint chair for many hours, but she nevertheless provided no medical treatment except over-the-counter Benadryl, and she provided the Benadryl without any instructions to the officers on the scene to follow up by contacting a doctor if the Benadryl did not work.  Given these conflicting inferences, it is for the trier of fact to determine whether Nurse Novotney was deliberately indifferent to Tyler's serious medical needs.  Accordingly, we will deny Nurse Novotney's motion for summary judgment.

### B.  The Columbia County Defendants' Motion for Summary Judgment.

At the outset, we note that Evans does not oppose the motion for summary judgment as to defendants McCoy and Boatman. *See doc. 88* at 9 n.1.  Thus, we will grant summary judgment in favor of defendants McCoy and Boatman as to all claims against them.

The remaining Columbia County Defendants fall into two groups: (1) the remaining individual Columbia County defendants (i.e., defendants Varano, Nye, Cunfer, Zielecki, and Harner; and (2) Columbia County.  After setting forth the

35

material facts that govern the Columbia County defendants' motion for summary judgment, we address the individual Columbia County defendants' request for summary judgment, and then we address Columbia County's request for summary judgment.

### 1.  The Material Facts.

Here, in accordance with M.D. L.R. Pa. 56.1, the Columbia County defendants filed a statement of material facts with citations to the record, *see doc. 81*, and supporting documents, *see doc. 81-1*.  Evans filed a response to the Columbia County defendants' statement of material facts, *see doc. 89*, and supporting documents, *see doc. 89-1*.  In addition to responding to the Columbia County defendants' statement of material facts, Evans set forth additional material facts, s*ee id*., to which the County defendants then responded, *see doc. 110*.

As we did in connection with Nurse Novotney's motion for summary judgment, we note that where the party asserting a fact has not pointed to record evidence to support the fact, we do not include that fact in the statement of material facts set forth below.  And where a party denying a fact has not pointed to record evidence to support that denial, provided that fact is supported by record evidence,

we consider the fact at issue to be undisputed.[20]  And again, considering our duty

to "construe all facts and inferences in favor of the nonmoving party[,]" *Peroza-*

*Benitez*, 994 F.3d at 164 (quoting *Santini*, 795 F.3d at 419), where there is a

genuine dispute about a fact, we set forth the fact as set forth by Evans, the

nonmoving party.  Also, Evans objected—based on hearsay and relevance—to

certain of the facts set forth by the Columbia County defendants, and the Columbia

County defendants have not addressed such objections.  Where there is an

outstanding, unopposed objection, we do not consider the fact at issue.

Considering the above, the following facts are the material facts for purposes of the

Columbia County defendants' pending summary judgment motion.[21]

---

[20] As to some facts set forth by Evans, she points to video to support the fact.
In some cases, the Columbia County defendants deny the fact without pointing to
any evidence to support their denial.  But where it appears that the denial is
nevertheless based on the video, we note that we have viewed the video.

[21] In addition to responding to the Columbia County defendants' statement
of facts and setting forth additional specific facts, Evans asserts that she
"incorporates her Response to Novotney SUF as if set forth in full." *Doc. 89* ¶ 139.
Evans had the opportunity to set forth the facts material to the Columbia County
defendants' motion, and she did so.  Her catch-all attempt to incorporate other
facts, without specifying exactly which ones are material to the Columbia County
defendants' motion, does not comply with M.D. Pa. L. R. 56.1.

### a. General Overview and How Tyler arrived at the Columbia County Prison.

Tyler, who was Evans's great-grandson, died on June 2, 2019, while incarcerated at the Columbia County Prison. *Doc. 81* ¶ 1; *Doc. 89* ¶ 1.  Defendant Columbia County is a municipal government in the Commonwealth of Pennsylvania, which operates the Columbia County Prison. *Doc. 89* ¶ 36; *Doc. 110* ¶ 36.  At all relevant times, Defendant Varano was employed by Columbia County as the Warden of the Columbia County Prison, and he was the final policymaker for Columbia County regarding all correctional matters at the Columbia County Prison. *Doc. 89* ¶ 37; *Doc. 110* ¶ 37.  At all relevant times, Defendant Nye was employed by Columbia County as the Deputy Warden of the Columbia County Prison. *Doc. 89* ¶ 38; *Doc. 110* ¶ 38.  At all relevant times, Defendant Novotney was a licensed practical nurse employed by Columbia County whose duty and responsibility was to provide medical care to inmates at the Columbia County Prison. *Doc. 89* ¶ 39; *Doc. 110* ¶ 39.  At all relevant times, Defendant Cunfer was employed by Columbia County as a correctional officer holding the position of sergeant and third-shift commander at the Columbia County Prison. *Doc. 89* ¶ 40; *Doc. 110* ¶ 40.  At all relevant times, Defendant Zielecki was employed by Columbia County as a correctional officer at the Columbia County Prison. *Doc. 89* ¶ 41; *Doc. 110* ¶ 41.  At all relevant times, Defendant Harner was employed by

Columbia County as a correctional officer at the Columbia County Prison. *Doc. 89 ¶ 42; Doc. 110 ¶ 42.*

At the time of his incarceration at the Columbia County Prison, Tyler was a 19-year-old man with intellectual disabilities and mental illness. *Doc. 81 ¶ 2; Doc. 89 ¶ 2.* He was arrested by Briar Township Police at 1:00 am on Saturday, June 1, 2019. *Doc. 81 ¶ 3; Doc. 89 ¶ 3.* Because drug use would constitute a parole violation for which Tyler could be incarcerated, the police consulted with Tyler's probation officer who requested that they take Tyler to the Briar Creek Police Station to perform a urinalysis. *Doc. 81 ¶ 6; Doc. 89 ¶ 6.* The urinalysis results indicated the presence of methamphetamines, amphetamines, and THC in Tyler's system. *Doc. 81 ¶ 7; Doc. 89 ¶ 7.*

The arresting officer took Tyler to Geisinger Bloomsburg Hospital for a § 302 mental health evaluation. *Doc. 81 ¶ 10; Doc. 89 ¶ 10.* Dr. Jed Thomas Ritter eventually determined that Tyler was not presently suicidal, that he could be released to police custody for transport to the prison, and that he was to be placed on a 24-hour suicide watch at the prison. *Doc. 81 ¶ 13; Doc. 89 ¶¶ 13, 68; Doc. 110 ¶ 68.*

**b. Events at the Columbia County Prison and Tyler's Death.**

Upon arrival at the Columbia County Prison, Tyler was placed in a restraint chair. *Doc. 81* ¶ 20; *Doc. 89* ¶ 20.  Although Tyler was discharged from the hospital to be placed on a 24-hour suicide watch, there was no directive that he be placed in a restraint chair. *Doc. 89* ¶ 68; *Doc. 110* ¶ 68.  When Tyler arrived at the prison shortly after 4:00 a.m. on Saturday, June 1, 2019, he was initially seated in the restraint chair in a transport belt and handcuffs for several minutes without making any attempt to harm himself or the officers. *Doc. 89* ¶ 69; *Doc. 110* ¶ 69. Sergeant Cunfer was the Shift Commander at the Columbia County Prison at this time, and, at his direction, Tyler was placed in the restraint chair. *Doc. 89* ¶ 70; *Doc. 110* ¶ 70.  There is video of Tyler shortly after he arrived at the Columbia County Prison which shows him being strapped into the restraint chair and which shows him seated in the restraint chair and his body is jerking (it is not clear if these movements are voluntary or involuntary). *See Doc. 91* at Video 1.[22]

Generally,[23] over the next 22 hours, Tyler was observed by staff at the Columbia County Prison, and there is video of Tyler for much of the time that he

---

[22] What has been docketed as Document 91 is a hard drive—filed under seal—that contains twenty separate video clips of Tyler while at the Columbia County Prison.

[23] The facts set forth in this paragraph are from the Columbia County defendants' statement of material facts.  They are not disputed by Evans.  In her statement of additional facts, Evans has, however, has set forth a more specific

was at the Columbia County Prison. *Doc. 81* ¶¶ 23; 35; *Doc. 89* ¶¶ 23, 35.

Although he refused meals, Tyler was given water and protein drinks. *Doc. 81*

¶ 24; *Doc. 89* ¶ 24.  On various occasions over those 22 hours, Tyler was allowed

range-of-motion exercises when one extremity at a time was removed from

restraints for a very short period. *Doc. 81* ¶ 26; *Doc. 89* ¶ 26.  Range-of-motion

exercises were typically followed by a very brief check of the restraints. *Doc. 81*

¶ 26; *Doc. 89* ¶ 26.  Tyler was cooperative when his extremities were removed

from restraints. *Doc. 81* ¶ 26; *Doc. 89* ¶ 26.

     More specifically, Tyler was in the restraint chair at the Columbia County

Prison from 4:15 a.m. on June 1, 2019, until 2:25 a.m. on June 2, 2019. *Doc. 89*

¶ 23.  At approximately 4:23 a.m. on June 1, 2019, Tyler was moved in the

restraint chair to a cell on E-Block where he was out of view of a camera. *Doc. 89*

¶ 71; *Doc. 110* ¶ 71.  No nurse was on duty after Tyler was placed in the restraint

chair until approximately 5:30 a.m., when Nurse Novotney's shift started. *Doc. 89*

¶ 23.  During the time that Nurse Novotney was on duty, she was the only nurse at

the prison. *Id.*  The first time that Tyler was seen by any medical professional was

at 6:39 a.m., when Nurse Novotney performed a restraint check that took less than

_____

recitation of what happened at the prison.  The more specific recitation starts with
the next paragraph of this Memorandum Opinion.

30 seconds. *Doc. 89* ¶ 72; *Doc. 110* ¶ 72.[24]   No range-of-motion exercises were done at this time. *Doc. 89* ¶ 73; *Doc. 110* ¶ 73.   After 6:39 a.m., although there was an officer outside the cell door, no one entered the cell to check on Tyler for more than four hours. *Doc. 89* ¶ 74; *Doc. 110* ¶ 74.

Warden Varano was off duty that weekend, and his designee was Deputy Warden Nye. *Doc. 89* ¶ 75; *Doc. 110* ¶ 75.   At approximately 7:30 a.m., Sergeant Cunfer notified Deputy Warden Nye that Tyler had been placed in the restraint chair. *Doc. 89* ¶ 76; *Doc. 110* ¶ 76.   At approximately 8:00 a.m., Lieutenant McCoy took over as shift commander, and he remained on duty for the next eight hours. *Doc. 89* ¶ 77; *Doc. 110* ¶ 77.   At approximately 10:00 a.m., Lieutenant McCoy contacted Deputy Warden Nye and asked for permission to move Tyler to an area of E-block where he would be visible from the guard bubble. *Doc. 89* ¶ 78; *Doc. 110* ¶ 78.

---

[24] Although the Columbia County defendants contend that Nurse Novotney's restraint check took longer than 30 seconds, *see doc. 110* ¶ 72, the video does not support that assertion, *see doc. 91* at Video 3.   But even though the actual time Nurse Novotney was checking Tyler's restraints was less than 30 seconds, as the defendants note, Nurse Novotney observed Tyler for longer than the time it took to check his restraints.   On the video, Nurse Novotney can be seen observing Tyler from the doorway of the cell he was in for some additional brief time. *See doc. 91* at Video 3.   The same is true of some of Nurse Novotney's other restraint checks: although the checks lasted only a very brief time, Nurse Novotney can be seen on the video observing Tyler and sometimes apparently conversing with him very briefly. *Id.* at Videos 5, 7, 10.

At approximately 10:50 a.m., several correctional officers wheeled Tyler (still in the restraint chair) out of the cell and down to a shower area at the other end of the floor. *Doc. 89* ¶ 79; *Doc. 110* ¶ 79.  The shower area was accessible via a gated door, and portions were visible on the surveillance camera. *Doc. 89* ¶ 80; *Doc. 110* ¶ 80.  The guards placed the restraint chair in the shower area, with Tyler's back to the camera, and closed the gate behind him at approximately 10:56 a.m. *Doc. 89* ¶ 81; *Doc. 110* ¶ 81.  Tyler remained partially visible on camera through the gate. *Doc. 89* ¶ 81; *Doc. 110* ¶ 81.  Tyler remained in that area until approximately 6:25 p.m. *Doc. 89* ¶ 82; *Doc. 110* ¶ 82.  Over the seven and half hours that Tyler was in that area, correctional officers performed range-of-motion exercises, and Nurse Novotney performed restraint checks lasting 30 seconds or less at approximately 1:45 p.m., 3:45 p.m., and 5:56 p.m. *Doc. 89* ¶ 83; *Doc. 110* ¶ 83.

There was another shift change at 4:00 p.m., and Lieutenant Boatman took over as shift commander. *Doc. 89* ¶ 84; *Doc. 110* ¶ 84.  At approximately 6:25 p.m., Tyler was moved—while still in the restraint chair—to the day-room area outside of the shower room and across the block from the guard bubble. *Doc. 89* ¶ 87; *Doc. 110* ¶ 87.

At 6:35 p.m., Nurse Novotney called Geisinger Bloomsburg Hospital to check on the results of the toxicology screen that had been performed during the

emergency room visit approximately 16 hours earlier. *Doc. 89* ¶ 88; *Doc. 110* ¶ 88. According to Nurse Novotney, during this call, a nurse at Geisinger Bloomsburg Hospital told her that Tyler's behavior at the hospital had been fine. *Doc. 89* ¶ 89; *Doc. 110* ¶ 89.  The nurse at Geisinger Bloomsburg Hospital also suggested to Nurse Novotney that she should send Tyler back to the hospital if she was concerned about his behavior. *Doc. 89* ¶ 28.[25]

Correctional officers performed range-of-motion exercises, and Nurse Novotney performed another very brief restraint check at approximately 8:10 p.m. *Doc. 89* ¶ 91; *Doc. 110* ¶ 91.  This is the only time that Nurse Novotney is seen on the video in the last three hours of her shift. *Doc. 89* ¶ 92; *Doc. 110* ¶ 92.  Tyler was given a protein shake at approximately 8:35 p.m. and Benadryl at 9:22 p.m.

---

[25] In paragraph 90 of her additional material facts, Evans asserts that during this call, the nurse at Geisinger Bloomsburg Hospital told Nurse Novotney that she should send Tyler back to the hospital.  *Doc. 89* ¶ 90.  In this paragraph, the only evidence that Evans cites to support this assertion is two pages from Nurse Novotney's deposition testimony. *See id* (citing pages 130–31 of Nurse Novotney's deposition).  But those pages do not support the assertion set forth by Evans.  And the Columbia County defendants point to another page of Nurse Novotney's deposition testimony where she testified that the nurse at Geisinger Bloomsburg Hospital did not tell her that she should sent Tyler back to the hospital. *Doc. 110* ¶ 90 (citing page 134 of Nurse Novotney deposition).  Nevertheless, in her response to paragraph 28 of the Columbia County defendants' statement of material fact, Evans cites to the deposition testimony of the nurse at the Geisinger Bloomsburg Hospital that she suggested to Nurse Novotney that she should send Tyler back to the hospital if she was concerned about his behavior. *See doc. 89* ¶ 28.  Given that Evans is the nonmoving party, we accept this fact as true for purposes of the Columbia County defendants' motion for summary judgment.

*Doc. 89* ¶ 93; *Doc. 110* ¶ 93.  He was cooperative on both occasions as he had been during all the restraint checks to that point. *Doc. 89* ¶ 94; *Doc. 110* ¶ 94.

No nurse was on duty after Nurse Novotney's shift ended at 9:30 p.m. *Doc. 89* ¶ 23.  Range-of-motion exercises were given, without any health-care professional present, at approximately 10:10 p.m. and 11:20 p.m., and between 10:30 p.m. and 10:45 p.m., Tyler was moved back into a cell for eight minutes before being returned to the day room area. *Doc. 89* ¶ 95; *Doc. 110* ¶ 95.  At 10:30 p.m. and 11:25 p.m., the correctional officer on constant watch noted that Tyler's lips were bleeding. *Doc. 89* ¶ 96; *Doc. 110* ¶ 96.

The third shift came back on duty at midnight, and Sergeant Cunfer was again the shift commander. *Doc. 89* ¶ 97; *Doc. 110* ¶ 97.  Sergeant Cunfer assigned Officer Zielecki to constant-watch-officer duty and Officer Harner to E-Block. *Doc. 89* ¶ 98; *Doc. 110* ¶ 98.

Officer Zielecki worked part-time, had been employed at the prison for only four months, and had just six months of prior corrections experience. *Doc. 89* ¶ 99; *Doc. 110* ¶ 99.  Based on his hours worked, he was still a trainee, and he had not even completed the prison's basic-life-support training, but he did have CPR training. *Doc. 89* ¶ 100; *Doc. 110* ¶ 100.  Officer Zielecki had been a constant watch officer on two prior occasions, but never for an inmate who was in a restraint chair. *Doc. 89* ¶ 101; *Doc. 110* ¶ 101.  He had no training on the risks of

45

injury or death associated with prolonged restraint. *Doc. 89* ¶ 102; *Doc. 110* ¶ 102. He had no training on how to recognize a medical emergency. *Doc. 89* ¶ 103; *Doc. 110* ¶ 103.  And he did not know how to take a pulse. *Doc. 89* ¶ 104; *Doc. 110* ¶ 104.

As the Constant Watch Officer, Officer Zielecki's sole responsibility was to watch Tyler. *Doc. 89* ¶ 105; *Doc. 110* ¶ 105.  Other than a very brief check at 12:48 a.m., Officer Zielecki did nothing other than watch Tyler from the control unit for the first hour of his shift. *Doc. 89* ¶ 106; *Doc. 110* ¶ 106.

At approximately 1:04 a.m. on June 2, 2019, Sergeant Cunfer, Officer Zielecki, Officer Harner, and others entered the dayroom of E-block to check on Tyler. *Doc. 89* ¶ 107; *Doc. 110* ¶ 107.  Approximately 90 seconds of this interaction (from roughly 1:05:19 a.m. to 1:06:53 a.m.) was recorded on a hand-held video camera with audio. *Doc. 89* ¶ 108; *Doc. 110* ¶ 108.  Tyler had been continuously restrained for nearly 21 hours, and he was exhausted and not breathing normally. *Doc. 89* ¶ 109; *Doc. 110* ¶ 109.  The blood on his lips that had first been documented more than two hours earlier was visible. *Doc. 89* ¶ 110; *Doc. 110* ¶ 110.

Sergeant Cunfer asked Tyler whether he wanted range-of-motion exercises or water, and Tyler did not make an audible response. *Doc. 89* ¶ 111; *Doc. 110* ¶ 111.  At Sergeant Cunfer's direction, an officer poured some water in Tyler's

mouth, causing Tyler to choke and become more agitated. *Doc. 89* ¶ 112; *Doc. 110* ¶ 112.  The officers asked several more questions, but they did not get a response that they could understand. *Doc. 89* ¶ 113; *Doc. 110* ¶ 113.  When Tyler calmed down briefly, Sergeant Cunfer again directed an officer to pour more water into his mouth, once again causing Tyler to become more agitated. *Doc. 89* ¶ 114; *Doc. 110* ¶ 114.  Tyler's condition had very obviously deteriorated as compared with 21 hours earlier, when Sergeant Cunfer ordered that he be placed in the restraint chair. *Doc. 89* ¶ 115; *Doc. 110* ¶ 115.[26]

At 1:07 a.m., the officers exited the dayroom. *Doc. 89* ¶ 116; *Doc. 110* ¶ 116.  Officer Zielecki documented on the Restraint Log that Tyler "refused range of motion showed aggressive behavior given water." *Doc. 89* ¶ 117; *Doc. 110* ¶ 117.  Officer Zielecki returned to the control unit, and, he later testified, he resumed watching Tyler from there. *Doc. 89* ¶ 118; *Doc. 110* ¶ 118.

Tyler's medical condition progressively worsened over the next hour as his breathing became shallow and labored. *Doc. 89* ¶ 119; *Doc. 110* ¶ 119.  The County has acknowledged that it is apparent from looking at the video that Evans's respiratory condition worsened over this hour. *Doc. 89* ¶ 120; *Doc. 110* ¶ 120.  The timeline of events prepared by the prison—based on the video—states "1:38:50

---

[26] The Columbia County defendants deny this statement, but they have not cited to any evidence to support such denial.

am: Inmate Evans begins to show a labor like [sic] breathing pattern." *Doc. 89*

¶ 20; *Doc. 110* ¶ 120.

After the 1:04 a.m. check, Officer Zielecki did not exit the control unit to

check on Tyler again until 2:01 a.m. *Doc. 89* ¶ 121; *Doc. 110* ¶ 121.  At 2:01 a.m.,

Officer Zielecki jostled Tyler[27] then returned to the control unit and did not call for

help. *Doc. 89* ¶ 122; *Doc. 110* ¶ 122.  The County defendants' own review of the

video acknowledges that Tyler appeared to show "very little breathing" at 2:02:48

a.m. *Doc. 89* ¶ 123; *Doc. 110* ¶ 123.  Officer Zielecki next checked on Tyler at

2:05 a.m., again jostled Tyler without a response, and again returned to the control

unit and did not call for help. *Doc. 89* ¶ 124; *Doc. 110* ¶ 124.[28]

---

[27] Evans asserts that Officer Zielecki "got no response" from Tyler. *Doc. 89* ¶ 122.  The Columbia County defendants deny "that Officer Zielecki 'got no response' as Officer Zielecki testified that he 'saw his [Tyler's] chest moving' at this time." *Doc. 110* ¶ 122.  It is unclear from the video whether Tyler responded to Officer Zielecki jostling him.

[28] The Columbia County defendants purport to deny this statement asserting that Officer Zielecki testified that Tyler's condition was "semi-responsive." *Doc. 100* ¶ 124.  Regardless of Officer Zielecki's testimony, the video shows that he did not get a response from Tyler. *See doc. 91*–Video 20.  "In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Columbia County defendants also deny that Officer Zielecki did not call for help, and they assert that, "Officer Zielecki testified that he summoned Sgt. Cunfer after checking on Evans at 2:05 a.m." *Doc. 110* ¶ 124.  They do not, however, point the court to where in the record Officer Zielecki so testified.  Rather, within the pages of Officer Zielecki's testimony that Evans cites,

Officer Zielecki next checked on Tyler at 2:12 a.m., again jostled Tyler without a response, but this time he finally summoned Sergeant Cunfer. *Doc. 89 ¶ 125; Doc. 110 ¶ 125.*[29]

Officer Zielecki testified that he never was concerned about Tyler's well-being despite these events. *Doc. 89 ¶ 126; Doc. 110 ¶ 126.* At 2:14 a.m., Sergeant Cunfer arrived on the scene, checked Tyler's pulse, and felt nothing. *Doc. 89 ¶ 127; Doc. 110 ¶ 127.* Sergeant Cunfer told Officer Zielecki to pour water in Tyler's mouth, and he had an officer ready with OC spray based on the possibility that Tyler may have been "faking this." *Doc. 89 ¶ 128; Doc. 110 ¶ 128.* 911 was not called until Sergeant Cunfer called at 2:18 a.m. *Doc. 89 ¶ 129; Doc. 110 ¶ 129.* Finally, at 2:25 a.m., at Sergeant Cunfer's direction, the officers removed Tyler from the restraint chair, laid him on the floor, and initiated CPR. *Doc. 89 ¶ 130; Doc. 110 ¶ 130.* Once Tyler was removed from the restraint chair, Officer Zielecki and Sergeant Cunfer alternated giving Tyler CPR until EMS arrived. *Doc. 81 ¶ 32;*

---

Officer Zielecki testified that he did not call Sergeant Cunfer at that point. *See doc. 89 ¶ 124* (citing Officer Zielecki's deposition testimony at pages 169–72).

[29] The Columbia County defendants purport to deny this statement. Although they admit "that Officer Zielecki next checked on Evans at 2:12 a.m. and touched him with no response[,]" they further assert that "Sgt. Cunfer appeared to observe Evans one minute later." *Doc. 110 ¶ 125.* This appears to harken back to their earlier unsupported assertion, *see supra* note 28, that Officer Zielecki summoned Sgt. Cunfer after checking on Tyler at 2:05 a.m. We note that the video shows that, after the 2:12 a.m. check, Officer Zielecki exited the screen at approximately 2:13:41 a.m. and Sergeant Cunfer appeared on the screen at approximately 2:13:45 a.m. *See doc. 91–Video 20.*

*Doc. 89* ¶ 32.  Sergeant Cunfer has testified that his delay in ordering that CPR be initiated was based on a concern that Tyler may have been "faking" it. *Doc. 89* ¶ 131; *Doc. 110* ¶ 131.

Paramedics arrived at 2:28 a.m. and initiated medical treatment. *Doc. 81* ¶ 32, *89* ¶¶ 32, 132; *Doc. 110* ¶ 132.  Tyler could not be resuscitated, and he was pronounced dead at the Columbia County Prison. *Doc. 81* ¶ 32; *89* ¶¶ 32, 133; *Doc. 110* ¶ 133.  The autopsy report identified the cause of Tyler's death as "Complications of an Excited State Associated with Methamphetamine Toxicity and Restraint Chair Confinement." *Doc. 81* ¶ 33; *Doc. 89* ¶ 33.[30]

---

[30] The Columbia County defendants assert that a Coroner's Inquest was held on February 3, 2020, and after a full day of testimony by various corrections officers involved in Tyler's care, the intake nurse and discharging physicians at the Geisinger Bloomsburg Hospital, the physician who performed the autopsy, and the presentation of other evidence, the Inquest jury determined that Tyler's manner of death was accidental and none of the Columbia County Prison staff did anything that was intentional. *Doc. 81* ¶ 34.  Although Evans admits that the Inquest jury found Tyler's death to be accidental, she further asserts:

> By way of further response, the finding of the Inquest jury is completely inadmissible in this Section 1983 action for multiple reasons, including the very different legal questions presented at the Inquest and the procedural rules that governed the proceeding, including no Rules of Evidence, no cross examination, no judge, and no participation by any party other than the Coroner and his designee.

*Id*. (citing the transcript of the Coroner's Inquest).  Because the Columbia County defendants have not responded to Evans's assertion that the finding of the Inquest jury is inadmissible, without deciding that issue, we do not consider the Inquest's jury's finding in connection with the pending summary judgment motion.

### c. The Restraint Chair.

As of June 2019, the Columbia County Prison had utilized a restraint chair on inmates for many years. *Doc. 89* ¶ 43; *Doc. 110* ¶ 43.  The restraint chair in which Tyler was restrained had a warning sticker on the back of the chair that stated: "WARNING: Use of the Emergency Restraint Chair without first reading and thoroughly understanding the instructions could cause injury or death." *Doc. 89* ¶ 62; *Doc. 110* ¶ 62.  As of June 2019, the Columbia County Prison did not have the instructions to which this warning refers. *Doc. 89* ¶ 63; *Doc. 110* ¶ 63. None of the individual defendants—nor any witness who worked at the prison and was deposed in this case—had ever seen or read the instructions to which this warning refers. *Doc. 89* ¶ 64; *Doc. 110* ¶ 64.

Columbia County identified Safety Restraint Chair, Inc. ("SRS") as the company from whom the Columbia County Prison acquired the restraint chair. *Doc. 89* ¶ 65; *Doc. 110* ¶ 65.  In response to a subpoena, SRS produced chair instructions that state:

> <u>Caution:</u> Belts and straps may need to be loosened to insure adequate blood flow.  The Safety Restraint Chair must always be used in the upright position, leaving the chair on its side or back may cause injury or death to the detainee.  Detainees should not be left in the Safety Restraint Chair for more than two hours.
>
> This time limit was established to allow for the detainee to calm down or sober up, and if needed it allows for the handlers to see [sic] medical psychological help for the detainee. This two hour

limit may be extended, but only under **direct** medical
supervision (Doctor/Nurse). This extended time period must not
exceed eight hours and range of motion exercises must be
performed regularly. Therefore we do not recommend anyone
be left in the Safety Restraint Chair for more than ten hours
total.

*Doc. 89* ¶ 66 (emphasis in original); *Doc. 110* ¶ 66.

### d.  The policy and custom regarding restraint-chair usage at the Columbia County Prison.

In June 2019, the Columbia County Prison had a Restraint Usage Procedure
(Policy No. 085-2010) in effect that governed use of its restraint chair. *Doc. 89*
¶ 44; *Doc. 110* ¶ 44.  The Columbia County Prison originally adopted Policy No.
085-2010 on August 30, 2010, and, as of June 2019, the most recent revision was
approved on October 23, 2015. *Doc. 89* ¶ 45; *Doc. 110* ¶ 45.  Policy No. 085-2010
was approved by Warden Varano. *Doc. 89* ¶ 46; *Doc. 110* ¶ 46.

According to Policy No. 085-2010, the restraint chair must "never [be] used
as a form of punishment and is designed to allow an inmate to either sober up or
calm down." *Doc. 89* ¶ 47; *Doc. 110* ¶ 47.  Policy No. 085-2010 states that use of
the restraint chair "allows correctional staff to seek medical or psychological help
for the detainee as the situation dictates." *Doc. 89* ¶ 48; *Doc. 110* ¶ 48.  Policy No.
085-2010 provides further, *inter alia*, that:

> • "If no medical staff available [sic] on site, they will be called
> in. If medical staff are unavailable, the watch commander can
> check the restraints."

     • "Medical treatment, if needed, shall be provided in a timely manner."

*Doc. 89* ¶ 49; *Doc. 110* ¶ 49.  The time limits for restraint under Policy No. 085-

2010 were as follows:

     • "The time limit for anyone placed in the chair will be two (2) hours."

     • "All restraints will be checked by a staff member hourly."

     • "The time limit may be extended but only under direct medical supervision or at the direction of the Warden."

     • "No inmate may remain in the chair for more than eight hours unless mandated by Mental Health representatives or the Warden."

     • "Range of motion exercises must be performed regularly."

*Doc. 89* ¶ 50; *Doc. 110* ¶ 50.  None of the individual defendants was familiar with

the time limitations for restraint chair usage set forth in Policy No. 85-2010. *Doc.*

*89* ¶ 51; *Doc. 110* ¶ 51.

     The established practice at the Columbia County Prison was that an inmate

would remain in the restraint chair for as long as it took for the inmate to calm

down without any upper limit placed on the length of time an inmate could be

restrained. *Doc. 89* ¶ 52; *Doc. 110* ¶ 52.  It was also generally established practice

that, contrary to the time limitations in the written policy, the Warden—or his

designee—was notified upon placement in the restraint chair and then every eight

hours thereafter. *Doc. 89* ¶ 53; *Doc. 110* ¶ 53.  According to Warden Varano, the

Columbia County Prison used the restraint chair on 124 occasions, and the duration

of restraint exceeded eight hours roughly 10% of the time. *Doc. 89* ¶ 54; *Doc. 110*

¶ 54. Shift Commander Lt. David McCoy testified that, if at any time Tyler had

calmed down and shown himself to be under control and collected, they would

have removed him from the chair. *Doc. 81* ¶ 27; *Doc. 89* ¶ 27.[31]

Restraint chair confinement was permitted during the third shift, when no

health care professional was on duty at the prison. *Doc. 89* ¶ 61; *Doc. 110* ¶ 61.[32]

---

[31] The Columbia County defendants also assert:

> None of the CCP corrections officers—or Nurse Sarah
> Novotney who monitored Tyler during her 16 hours shift but
> was off-duty at the time of Tyler's death—believed or
> suspected that Tyler was in any medical distress or needed
> medical attention; rather, they each relied on the doctors and
> mental health professionals at [Geisinger Bloomsburg Hospital]
> who told CCP staff that Tyler was medically cleared but
> remained at risk of suicide or other acts of self-harm.

*Doc. 81* ¶ 28. The only evidence to which the Columbia County defendants cite in
support of this assertion is the "Inmate Observation Record – 24 Hour" for Tyler
for June 1, 2019 and June 2, 2019. *Id*. (citing *doc. 81-1* at 48–52). Evans responds,
however, that "[t]he record citation does not support this averment." *Doc. 89* ¶ 28.
We agree.

[32] Evans also asserts that indefinite restraint chair confinement could be
authorized by the Warden or his designee alone without any evaluation of the
detainee by a mental health professional. *Doc. 89* ¶ 60. In support of that assertion,
Evans cites to various pages—pages 69–70 ,78, 79—of Warden Varano's
deposition. *Id*. The Columbia County defendants respond that "Warden Varano
did not testify at the cited reference regarding 'indefinite' confinement being
authorized without regard for input from a mental health professional." *Doc. 110*
¶ 60. Evans has not provided the court with page 69 of Warden Varano's
deposition. *See doc. 89-1* at 159–186 (excerpts from Warden Varano's deposition
but not containing a page 69). And the other pages of Warden Varano's deposition
cited by Evans do not support her assertion.

Correctional officer trainees, even those who said that they did not know how to check for a pulse, were permitted to serve as the constant watch officer for a detainee in a restraint chair. *Doc. 89* ¶ 134; *Doc. 110* ¶ 134.  Finally, no one at the prison testified that they had any understanding that prolonged restraint chair confinement created a risk of serious injury or death. *Doc. 89* ¶ 67; *Doc. 110* ¶ 67.

A nurse was physically at the Columbia County Prison for less than 16 of the more than 22 hours that Evans was in the restraint chair. *Doc. 89* ¶ 23.  While she was on duty, Nurse Novotney performed a total of six cursory restraint checks between 6:39 a.m. and 8:30 p.m., each lasting 30 seconds or less, including just one in the first six and a half hours that Evans was in the chair. *Id.*  After Nurse Novotney left the prison at 9:30 p.m., there was no nurse or other person with medical training at the prison. *Id.*

### e. Medical Policy Regarding the Use of Restraints at the Columbia County Prison.

In June 2019, Columbia County Prison had a Medical Policy (Policy No. 041-2010) ("Medical Policy") that included specific policies for restraints. *Doc. 89* ¶ 55; *Doc. 110* ¶ 55.  The Medical Policy required that "Healthcare personnel check on the inmate hourly while in restraints adhering to the following guidelines":

• Check the inmate's vital signs.

• Check the inmate's arms and legs range of motion or ability to move.

• The inmates' [sic] position will be changed often, making sure his/her body is positioned in correct alignment.

• The inmate will be offered liquids to drink and food to eat. Personnel will help the inmate to eat and drink if the restraints keep him from doing it himself.

• The inmate will also be helped to the restroom facilities at regular times.

• Check the inmate for signs and symptoms of pain and discomfort.

• The inmate's skin will be checked to make sure the restraints are not causing sores or bruising.

• Personnel will also observe for any signs of injury or impaired circulation problems.

• Healthcare personnel will assess the inmate to see if restraints are still needed.

• Healthcare personnel will perform the following duties after medical restraints have been used.

• Check the inmate's vital signs.

• The inmate will be given the opportunity to talk to caregivers who will explain and help them understand what happened.

• Caregivers may suggest ways to develop self-control in the inmate. Measures will be taken to prevent the same or similar incidents that made restraints necessary from happening again.

*Doc. 89* ¶ 56; *Doc. 110* ¶ 56; *Doc. 89-1* (Medical Policy) at 10–11. Although he had approved the Medical Policy, Warden Varano testified that he was unaware of its contents as of June 2019. *Doc. 89* ¶ 57; *Doc. 110* ¶ 57.

Nurse Novotney, a licensed practical nurse who had worked at the prison for nearly two years as of June 2019 and who had been trained by the nursing supervisor, had never seen the Medical Policy, and she was completely unaware of the requirements for medical assessments of individuals in restraint chairs. *Doc. 89* ¶ 58; *Doc. 110* ¶ 58.  Nor were the officer defendants familiar with the Medical Policy's requirements for restraint-chair usage. *Doc. 89* ¶ 59; *Doc. 110* ¶ 59.

### f.  The Calls to Deputy Warden Nye.

Deputy Warden Nye testified that he did not receive another call about Tyler after 10:00 a.m. on June 1 until the early morning hours of June 2, after EMS had been called. *Doc. 89* ¶ 85; *Doc. 110* ¶ 85.  Deputy Warden Nye made the same statement on August 19, 2019, to the Columbia County Coroner during his investigation, and he also testified to this at the Coroner's Inquest. *Doc. 89* ¶ 85; *Doc. 110* ¶ 85.  Deputy Warden Nye's testimony was contradicted by two witnesses and the prison's phone records, which reflect at least two additional calls on June 1, 2019, regarding Tyler. *Doc. 89* ¶ 86; *Doc. 110* ¶ 86.  Lieutenant McCoy testified to a call at approximately 11:00 a.m., and Lieutenant Boatman testified to a call at approximately 6:00 p.m. or 6:30 p.m. *Doc. 89* ¶ 86; *Doc. 110* ¶ 86.  Prison phone records corroborate this testimony and establish the times of the calls as 11:23 a.m. and 5:40 p.m., respectively. *Doc. 89* ¶ 86; *Doc. 110* ¶ 86.

### g.  Expert Reports.

Evans has produced and attached to her statement of additional material facts four expert reports: (1) an expert report from Michael L. Graziano, who is an expert in corrections and has nearly 35 years of experience working in the New York State Correctional system; (2) an expert report from Harry N. Kamerow, M.D., M.S., FCAP, ASCP, ASC, PAP, who is a forensic pathologist and a staff pathologist at Mount Nittany Medical Center in State College, PA; (3) an expert report from Mustafa A. Mufti, who is a psychiatrist with specific expertise in correctional psychiatry; (4) an expert report from Gail Normandin-Carpio, RN, RLC, LNC, who is an expert in correctional nursing with extensive experience ranging from direct clinical care in correctional settings to managerial and consulting roles. *Doc. 89* ¶¶ 135–38; *Doc. 110* ¶¶ 135–38.[33]

## 2.  The Individual Columbia County Defendants.

Before proceeding to analyze whether the individual Columbia County defendants are entitled to summary judgment, we must determine as to which claims these defendants are properly seeking summary judgment.  Then we must determine what standard applies to the claims for which they are seeking summary

---

[33] Although Evans does not set forth any opinions of these experts in her statement of additional facts, she does cite to expert testimony in her brief in opposition.  The Columbia County defendants' have not objected to Evans setting forth expert testimony in this manner.

judgment.  Once we have determined these threshold issues, we address whether
the individual Columbia County defendants are entitled to summary judgment on
the merits.  Finally, we address whether these defendants are entitled to qualified
immunity.

### a. The individual Columbia County defendants properly seek summary judgment only as to the medical claims against them.

The Columbia County defendants' motion for summary judgment seeks
summary judgment as to all claims. *See doc. 97.*  But the Columbia County
defendants have not briefed why they should be granted summary judgment as to
all the claims against them.  As set forth above, the amended complaint pleads two
separate types of claims against the individual defendants—medical claims and
either excessive force or conditions-of-confinement claims.  But in connection with
their summary judgment motion, the individual Columbia County defendants
construe Evans's claims against them as denial-of-medical-care claims. *See doc. 80*
at 9 (asserting that Evans alleges two claims: one a medical claim against the
individual defendants and the other a *Monell* claim against the County).  They
address in their briefs those medical claims, but they do not specifically[34] address

---

[34] In a section of their brief addressing the claims against defendants Varano
and Nye, the Columbia County defendants make a passing reference to excessive
force. *See doc.* 80 at 21.  But they have not briefed the standards that apply to an
excessive force claim in this context.  Rather, as set forth above, the Columbia

any claims against them other than the medical claims.  Thus, we conclude that the individual Columbia County defendants are moving for summary judgment only as to the medical claims against them.

Our conclusion that the individual Columbia County defendants are moving for summary judgment only as to the medical claims against them is reinforced by the fact that they have not addressed whether Tyler is a pretrial detainee or a convicted prisoner. [35]  The answer to that question, as discussed above, is not important as to medical claims, but it is important as to the standards that apply to either an excessive force or conditions-of-confinement claim.

At first blush, it appears that Tyler was a pretrial detainee as he had been arrested and taken to a county jail.  But we note that there may be an issue lurking beneath the surface in that regard.  As noted earlier, Evans pleads her claims as

---

County defendants construe the claims against them as medical claims, and they only brief the standards applicable to such claims.  An argument that is not developed is forfeited. *See New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 493 n.2 (3d Cir. 2020) ("As this argument was vaguely presented without factual or legal support, it is forfeited for lack of development."); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (noting that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived").  Despite their passing references to excessive force, the Columbia County defendants do not squarely argue that they are entitled to summary judgment as to any excessive force claim.  Thus, we will not consider whether they are entitled to summary judgment as to any excessive force claim.

[35] Evans has also not addressed this question.

Eighth Amendment and/or Fourteenth Amendment claims.  And in Evans's response to the Columbia County defendants' statement of material facts, she asserts that Tyler "was taken into custody for a suspected parole violation for being under the influence of a controlled substance." *Doc. 89* ¶ 3.[36]  The parties do not address whether a parolee or probationer arrested and brought to a county jail is considered a pretrial detainee or a convicted prisoner. *Compare e.g., White v. Lycoming Cnty. Prison*, No. 1:21-CV-00781, 2023 WL 4865985, at *5 (M.D. Pa. July 31, 2023) (finding "that absent allegations that a parole violation hearing was held, it appears that Plaintiff [a parolee who was arrested and held in a county prison] was purely a pretrial detainee at the time of the alleged conduct"), *with Ogden v. Mifflin County*, 1:06-CV-2299, 2008 WL 4601931 *1, *3 n.4 (M.D. Pa. Oct. 15, 2008) (concluding that the cause of action of Ogden, a parolee who had been arrested and transported to county jail, "is properly raised under the Eighth Amendment, which applies to a failure-to-protect claim advanced by an incarcerated parolee, as opposed to the Fourteenth Amendment's Due Process Clause, which governs a failure-to-protect claim raised by a pretrial detainee").

Whether Tyler was a pretrial detainee or a convicted prisoner is important as to claims other than medical claims.  Unlike with medical claims, where, in the

---

[36] The underlying documents that Evans cites though refer to Tyler as being on probation. *See Doc. 38* (Amended Complaint) ¶¶ 55–58; *Doc. 81-1* at 40 (Police Report).

Third Circuit, the same standards that apply to convicted prisoners apply to pretrial detainees, as to other types of claims—excessive force or conditions-of-confinement claims—different standards apply to convicted prisoners than to pretrial detainees.  Excessive force claims under the Eighth Amendment have a subjective element. *See Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (holding "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm").  Whereas a pretrial detainee's excessive force claim is measured by an objective standard. *See Kingsley*, 576 U.S. at 39697 (holding that to establish an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable"). Conditions-of-confinement claims are also judged by different standards depending on whether brought under the Eighth Amendment or the Due Process Clause. *Compare Farmer*, 511 U.S. at 847 (holding "that a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"), *with Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017) (summarizing that "detention

officials' restrictions on pretrial detainees will constitute punishment prohibited by the Due Process Clause when: (1) there is a showing of express intent to punish on the part of [those] [ ] officials; (2) the restriction or condition is not rationally related to a legitimate non-punitive government purpose, i.e., if it is arbitrary or purposeless; or (3) the restriction is excessive in light of that purpose" (internal citation and quotation marks omitted)).

Because the individual Columbia County defendants do not specifically address any claims other than the medical claims, including what standards apply to such claims, we will only address whether the individual County defendants are entitled to summary judgment as to Evans's medical claims.

### b. The general *Estelle* standard applies to Evans's medical claims against the individual Columbia County defendants.

In connection with Nurse Novotney's motion for summary judgment, we set forth the standards applicable to medical claims based on the Eighth Amendment and *Estelle*, which, as previously discussed, apply not only to convicted prisoners under the Eighth Amendment but to pretrial detainees under the Due Process Clause. The individual Columbia County defendants assert, however, that a slightly different standard applies. They analyze the medical claims under the framework set forth by the Third Circuit when a plaintiff claims that prison

officials failed to prevent a prisoner or detainee from committing suicide.  Under that framework—the vulnerability framework—"whether a pre-trial detainee or a convicted prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Palakovic*, 854 F.3d at 223–24 (internal quotation marks and footnote omitted).

The Third Circuit has characterized the vulnerability framework as "simply a more specific application of the general rule set forth in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976), which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners." *Id*. at 222 (explaining its decision in *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (3d Cir. 1991)).  "In essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" *Id.* (quoting *Colburn*, 946 F.2d at 1023).

"[T]he vulnerability to suicide framework applies when a plaintiff seeks to hold prison officials accountable for failing to prevent a prison suicide." *Id*. at 224. "It does not, however, preclude other types of claims, even if those claims also relate to an individual who committed suicide while in prison." *Id*. at 224–25.

Other types of claims can include "a more general claim under *Estelle*" of deliberate indifference to serious medical needs. *See id.* at 227.  And the two types of claims are distinct. *See DeJesus v. Delaware through Delaware Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("Because these are two different claims, and the District Court did not examine one of them, namely Plaintiffs' claim of deliberate indifference to a serious medical need, we will remand.").

Here, we are not dealing with a suicide, and the Columbia County defendants have not briefed the applicability of the vulnerability framework to claims not involving suicide.  Rather, they merely assert that Evans must show that Tyler had a particular vulnerability to develop excited delirium.  The vulnerability framework may be applicable outside of the suicide context where the claim is that the defendants were deliberately indifferent to a substantial risk to the detainee's future health. *See Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 329 (3d Cir. 2020) (addressing immigration detainee's argument "that the Government deprived them of substantive due process when it acted with deliberate indifference to their serious medical need (*i.e.*, their vulnerability to COVID-19 because of their ages and medical conditions)" but focusing on whether the detainees have shown deliberate indifference).  Nevertheless, Evans did not specifically plead her medical claims under the vulnerability framework, and in her brief in opposition, she proceeds under the more general deliberate indifference to a serious medical

65

need as set forth in *Estelle*. *See doc. 88* at 13–23.  '"Of course, the party who brings a suit is master to decide what law he will rely upon."' *Hope*, 972 F.3d at 323 (quoting *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)); *see also Palakovic*, 854 F.3d at 227  ("As masters of their complaint, the Palakovics wished to bring this claim without regard to Brandon's particular vulnerability (or lack thereof) to suicide, and instead wished to pursue a more general claim under *Estelle* that the SCI Cresson officials were deliberately indifferent to Brandon's serious need for adequate mental healthcare and that this indifference led to injury in the form of deterioration of Brandon's condition ultimately leading to his suicide.  In other words, they were, once again, *not* attempting to directly claim that the prison officials should be held liable for failing to prevent Brandon's suicide.").  Because Evans pleaded and briefed her medical claims under the more general *Estelle* standard, that is the standard we will use to analyze her medical claims.[37]

---

[37] In a footnote in her brief, Evans briefly addresses the Columbia County defendants' argument that she must prove that Tyler had a particular vulnerability to develop excited delirium. *Id*. at 20 n.6. She asserts "that is not the law." *Id*. (pointing to her prior discussion of the deliberate indifference to a serious medical need standard set forth in *Estelle*).  She also notes, however, the opinions of two of her experts. *Id*. ("Nevertheless, Plaintiff's forensic pathology expert, Dr. Harry Kamerow, states that 'excited delirium's relationship to sudden death has been recognized for many years' (citing a 1934 study) and often occurs in circumstances involving drug intoxication, patients with a history of mental illness and police custody.  Exhibit X as unnumbered page 5.  Likewise, Plaintiff's corrections

### c. Evans has presented evidence from which a reasonable trier of fact could conclude that Tyler had a serious medical need.

Under the first prong of the *Estelle* standard, Evans must show that Tyler had a serious medical need.  As set forth above in connection with Nurse Novotney's motion for summary judgment, a medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Lanzaro*, 834 F.2d at 347 (quoting *Pace*, 479 F. Supp. at 458 (D.N.J. 1979)).  "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id.*  Thus, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle,* 429 U.S. at 103).  Further, a medical need is serious if it is life threatening without proper care. *See Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002) (agreeing that Montgomery's heart condition and HIV were serious medical needs because they could "be life threatening if not properly treated").

---

expert, Mr. Graziano, notes that "[i]t was well-known in the field of corrections that indefinite mechanical restraint creates a risk of injury or death.' Exhibit W at 17.").  As set forth above, we will analyze Evans's medical claims under the *Estelle* standard, not the vulnerability framework.

In her brief in opposition, Evans contends that "[t]he defendants do not dispute that the first prong of the *Estelle* standard is satisfied." *Doc. 88* at 13. As discussed above, the Columbia County defendants analyze Evans's medical claims in accordance with the vulnerability framework, and, thus, they assert that Evans has not shown that Tyler had a particular vulnerability to develop excited delirium. But as discussed above, that is not how Evans frames her medical claims. Rather she asserts a more general *Estelle* claim, under which the first prong is whether Tyler had a serious medical need. The Columbia County defendants do not address that question in their opening brief.[38]

Although Evans argues that the defendants did not address the first prong of *Estelle*, she nevertheless argues that Tyler had an objectively serious medical need. *Id*. at 13–15. In this regard, she points out that both the pathologist who performed the autopsy on Tyler and her expert pathologist opined that the cause of Tyler's death was "excited delirium syndrome due to methamphetamine toxicity and restraint chair confinement." *Id*. at 14. She asserts that Tyler "was displaying signs and symptoms of this syndrome, including agitation, yelling, increased physical activity, and these would typically be accompanied by abnormal heart rate,

---

[38] In their reply brief, the Columbia County defendants do purport to address whether Tyler had a serious medical need. But in their argument in this regard, they muddle the objective question of whether Tyler had a serious medical need with the subjective question of whether they knew that Tyler had a serious medical need. *See doc. 101* at 5–8.

breathing, body temperature and blood pressure." *Id*.  She also notes that a condition that could or does lead to death "is highly probative of its objective seriousness." *Id*.  And she concludes that "a jury plainly could find that a person who was detoxing from methamphetamines without a detox protocol, experiencing labored breathing and other symptoms of medical distress, was suffering an objectively serious medical condition, especially when that condition led to death." *Id*. at 15.

Considering the material facts set forth above and the video of Tyler at the Columbia County Prison, we conclude that Evans has set forth facts from which a reasonable trier of fact could conclude that Tyler had a serious medical need.  We note, however, that Evans does not purport to pinpoint the precise point at which Tyler developed a serious medical need.  And neither do the Columbia County defendants.

### d.  Defendants Zielecki, Harner, and Cunfer.

Having concluded that Evans has set forth facts from which a reasonable trier of fact could conclude that Tyler had a serious medical need, we turn to whether she has set forth facts that defendants Zielecki, Harner, and Cunfer were deliberately indifferent to Tyler's serious medical need.

As set forth earlier, deliberate indifference under the Eighth Amendment is a subjective standard. *Farmer*, 511 U.S. at 840. "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles,* 571 F.3d at 330. To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

"But to demonstrate a defendant's deliberate indifference an inmate need not show that the defendant intentionally sought to cause the inmate harm or acted with knowledge that harm to the inmate probably would result from the defendant's act or failure to act." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015). "Though purposeful conduct would show at least deliberate indifference, an inmate satisfies her burden to make that showing if she demonstrates that the defendant acted or failed to act despite having knowledge that her actions or inaction, as the case may be, would subject the inmate to a substantial risk of serious harm." *Id.* "The proof necessary to show that there was a substantial risk of harm is less demanding than the proof needed to show that there was a probable risk of harm." *Id.*

70

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation and quotation omitted). "In inadequate medical care cases, [the Third Circuit] specifically found deliberate indifference where objective evidence of a serious need for care is ignored and where 'necessary medical treatment is delayed for non-medical reasons.'" *Thomas*, 88 F.4th at 281 (quoting *Natale*, 318 F.3d at 582).

Although, as noted above, Evans does not pinpoint when Tyler purportedly began to suffer a serious medical need, in connection with her argument that defendants Zielecki, Harner, and Cunfer were deliberately indifferent to that serious medical need, she focuses on the last hours of Tyler's life. *Doc. 88* at 19 ("The video of the last two hours of [Tyler's] life creates a jury question on deliberate indifference precluding summary judgment in favor of Sgt. Cunfer, Officer Zielecki and Officer Harner."). She points out that "[e]ach was present during the check at 1:04 a.m. on June 2." *Id*. And her corrections expert, Michael Graziano, opined: "It does not require medical training to recognize that Evans needed medical attention—and, at a minimum, needed to be removed from restraints—by the time of the range of motion 'attempt' at 0100. Evans is visibly

exhausted, stressed, bleeding and breathing abnormally." *Id*.  As to Officers

Zielecki and Harner, Evans continues:

> [Tyler's] life slowly slipped away over the next 55 minutes, as
> Zielecki and Harner were off camera in the control unit doing
> nothing.  The official Prison timeline of events based on the
> video review states that, at "1:38:50 am: Inmate Evans begins
> to show a labor like [sic] breathing pattern." A jury should be
> permitted to decide whether Officers Zielecki and Harner drew
> the same conclusion around that same time yet failed to call for
> help.
>
> Viewing the series of events starting at 2:01 a.m. in the
> light most favorable to Plaintiff, Zielecki checked on Evans
> three times in the space of 12 minutes—after not checking on
> him for 55 minutes—because he recognized that something was
> wrong.  Yet, he waited 12 to 13 minutes to contact Sgt. Cunfer.
> The County Defendants' own review of the video
> acknowledges that Evans appeared to show "very little
> breathing" at 2:02:48 a.m.  As Mr. Graziano points out,
> Zielecki "had received basic CPR training at his prior prison
> employer and, with that training couple[d] with basic common
> sense, he had minimal competency to identify a medical
> emergency and call for help."  This evidence creates a jury
> question as to whether Officer Zielecki wantonly denied or
> delayed Evans's access to medical care.

*Id*. at 19–20 (internal citations omitted).  And as to Sergeant Cunfer, Evans asserts:

> A jury could conclude that, of these three correctional officers,
> Sgt. Cunfer bears particular responsibility.  He was the most
> experienced and highest in the chain of command at the Prison
> when Evans arrived at the Prison and when he died.  The
> comparison of Evans's condition on arrival at the Prison versus
> 21 hours later is striking.  Sgt. Cunfer was in charge and present
> on both occasions and had the CPR training to recognize at
> midnight on June 2 that Evans's condition had deteriorated
> markedly since arriving at the Prison and he needed to be seen
> by a doctor.  Yet, Sgt. Cunfer put Officer Zielecki, a trainee

who had not even completed the Prison's Basic Life Support training—and says that he does not know how to check a pulse—on constant watch duty.  Mr. Graziano called that decision "inexplicable" and, more generally, Sgt. Cunfer's conduct "shocking."

Finally, and most egregiously, Sgt. Cunfer checked for a pulse at 2:14 a.m., found none, yet did not call 911 until 2:18 a.m. and did not get Evans out of the chair so CPR could be initiated until 2:25 a.m.  Sgt. Cunfer's failure both to call 911 and initiate CPR immediately at 2:14 a.m., when he knew that Evans was motionless and pulseless, presents, at a minimum, a jury question as to deliberate indifference.  Sgt. Cunfer has testified that he was more concerned about the possibility that Evans had decided to "fake" a medical emergency than the possibility that the young man who was not breathing and had no detectable pulse was having a real medical emergency.  As stated above, the recklessness standard does not require intentional or knowing action.  Viewing Sgt. Cunfer's response (or lack thereof) after 2:14 a.m. in the light most favorable to Plaintiff, there is, at a minimum, a jury question as to whether Sgt. Cunfer acted with deliberate indifference.

*Id*. at 20–21 (internal citation omitted).

Construing the material facts in light most favorable to Evans, the above is a fair summary of what a reasonable trier of fact may conclude happened in the last hours of Tyler's life.  Given this, a reasonable trier of fact could conclude that defendants Zielecki, Harner, and Cunfer were deliberately indifferent to a serious medical need on the part of Tyler.

The defendants[39] nevertheless contend that they were not deliberately indifferent for numerous reasons, but in so arguing they often rely on their version of the events, not on the materials facts as set forth in the light most favorable to Evans.  We nevertheless address the defendants' arguments that they were not deliberately indifferent.

The defendants contend that there is no evidence that Tyler's symptoms of agitation worsened or presented differently during his incarceration.  But based on the material facts set forth above and the video, a reasonable trier of fact could conclude that at some point it became clear that the restraint chair was not an effective means of calming Tyler's agitation, nevertheless he was not taken out of the chair, and defendants ignored his labored breathing and delayed calling for or providing medical care after his condition substantially worsened.  And as the material facts and the video show, Tyler's condition certainly did change: by the early morning hours of June 2, 2019, he was laboring to breathe, he became only semi-responsive, and then nonresponsive.

Similarly, in their reply brief, defendants Zielecki, Harner, and Cunfer contend that there is no evidence that they subjectively knew of a medical need. They emphasize that "they all testified that in the time they observed Evans, his

_____

[39] Where all the individual Columbia County defendants—not just Zielecki, Harner, and Cunfer—make an argument, for ease of reference, we simply refer to the defendants.

behavior never changed to the point that they thought he was experiencing anything other then [sic] what they were told via the hospital's discharge instructions—coming down off a bad methamphetamine trip." *Doc. 101* at 8–9. Again, construing the facts that in the light favorable to Evans, she has presented evidence that these defendants watched without doing anything while Tyler was laboring to breathe and while he became nonresponsive. Thus, she has presented evidence from which a reasonable trier could conclude that they were deliberately indifferent.

The defendants also contend that they and Nurse Novotney "continuously monitored Tyler, provided him sustenance, spoke with him, encouraged him, and hoped that he would calm down and cease his threats of self-harm, so they could remove him from the restraints." *Doc. 80* at 18. This, they contend, is the opposite of deliberate indifference. Although that is the defendants' version of events, for purposes of the pending motion to summary judgment, we must view the facts in the light most favorable to Evans as the nonmoving party. And when viewed in that light, for the reasons already set forth, a reasonable trier of fact could conclude that defendants Zielecki, Harner, and Cunfer were deliberately indifferent to Tyler's serious medical need.

The defendants also argue that they relied on the medical judgment of Dr. Ritter and Nurse Novotney. This argument falters at the outset because the

75

defendants have not pointed to any evidence to support it.[40]  Moreover, Nurse

Novotney was not at the prison after approximately 9:30 p.m. on June 1, 2019.

And as to Dr. Ritter, there is no evidence that Dr. Ritter directed that a restraint

chair be used, and a reasonable trier of fact could conclude that at some point—

certainly by the time Tyler's conditioned worsened and he began having labored

breathing—nothing Dr. Ritter said or did at the hospital nearly 20 hours earlier was

a basis for the defendants' failure to act.

Trying to force Evans's claim into the vulnerability framework, the

defendants contend that there is no evidence that they knew of Tyler's

vulnerability for developing excited delirium.  And in their reply brief—perhaps

recognizing that the vulnerability framework is not the appropriate framework for

the claim at issue—the defendants shift the focus of their argument, asserting that

because excited delirium is a rare and controversial diagnosis, they did not know,

nor should they have known, that Tyler was slowly developing this condition and

therefore had a serious medical need.  But regardless of whether they knew of

excited delirium, Evans has presented evidence from which a reasonable trier of

---

[40] In their statement of facts, the Columbia County defendants assert that they "relied on the doctors and mental health professionals at GBH who told CCP staff that Tyler was medically cleared but remained at risk for suicide or other acts of self-harm." *Doc. 81* ¶ 28.  The only evidence to which the Columbia County defendants point to support this assertion is the "Inmate Observation Record-24 Hour." *Id.*  As pointed out by Evans, however, that document does not support the assertion. *See doc. 89* ¶ 28.

facts could conclude that by, at least, the early morning hours of June 2, 2019, Tyler's condition had changed, and he had an obvious need for medical treatment. In this regard, we note that "[a] condition can be 'obvious' to a layperson even where he or she is unable to diagnose or properly identify the cause of an observed ailment." *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 423 (7th Cir. 2017).

In her brief in opposition, Evans contends that "a defendant's failure to comply with an established policy or protocol intended to preserve a prisoner's or detainee's safety is evidence of that defendant's deliberate indifference." *Doc. 88* at 16 (citing cases from outside the Third Circuit in support of that proposition). The defendants respond that while failing to comply with policies may amount to negligence, it does not equate to a constitutional violation. *Doc. 101* at 13 (citing cases from within the Third Circuit in support of that proposition).  Although "failure to adhere to a prison policy does not alone amount to a constitutional violation[,]" *Watley v. Pike Cnty.*, No. 3:17-CV-1539, 2018 WL 6018903, at *11 (M.D. Pa. Nov. 16, 2018), that does not mean that violation of a prison policy is irrelevant to the question of the defendant's mental state, *see Thomas*, 88 F.4th at 283 (considering—in connection with whether the plaintiff had adequately pleaded deliberate indifference—that the defendants' decision to take the arrestee, who had ingested a large amount of cocaine, to the booking center instead of a hospital "was in direct violation of the department policy cited in the Complaint, which states

that individuals who have consumed narcotics should be taken to the hospital if the narcotic consumed could jeopardize their health" (footnote omitted)); *Chavarriaga*, 806 F.3d at 232 (concluding that "the allegation that the prison personnel did not follow the regulations gives some support to an inference that the search was malicious"). We note, however, that while Evans relies on the lack of compliance with policy in relation to her arguments regarding Nurse Novotney, she does not specifically rely on lack of compliance with policy in relation to her arguments regarding defendants Zielecki, Harner, and Cunfer.

The defendants also suggest that they were not deliberately indifferent because they prevented Tyler him committing from suicide. Preventing suicide is good, but doing so does not necessarily mean that the defendants were not deliberately indifferent to a serious medical need other than the risk of suicide, which is what Evans is claiming here.[41]

---

[41] The defendants also include a section in their brief purportedly regarding personal involvement. They do not, however, argue that any of the defendants in particular were not personally involved. Rather, after stating that Evans characterizes their lack of affirmative action as the cause of Tyler's death, they assert:

> However, for the same reasons as cited above, the alleged inaction by these individuals fails to support a claim of deliberate indifference for Tyler's alleged need for medical treatment. At most, such allegations only support a claim of negligence which is insufficient to establish liability for a constitutional violation under § 1983.

In sum, viewing the evidence in the light most favorable to Evans, there is a genuine, material factual dispute about whether defendants Zielecki, Harner, and Cunfer were deliberately indifferent to Tyler's serious medical needs. Accordingly, they are not entitled to summary judgment as to Evans's medical claims against them.

### e. Defendants Varano and Nye.

We turn next to the medical claims against defendants Varano and Nye. These defendants present several muddled arguments for why they should be granted summary judgment.

At one point in their brief, the Columbia County defendants assert: "Even though Plaintiff named Warden Varano and Deputy Warden Nye individually, there are no allegations in the Complaint that either of them had any personal involvement with Tyler during his incarceration.  Rather, the sole claim against them is a *Monell* claim." *See doc. 80* at 27.  At the outset, because we are at the summary-judgment stage, the proper focus is on the materials fact, set forth in the in light most favorable to Evans, not, as the defendants assert, on what is alleged in

---

*Doc. 80* at 19.  This argument adds nothing to their argument that they were not deliberately indifferent.  Moreover, the defendants' focus on allegations is misplaced given that we are past the pleading stage and at the summary-judgment stage of the case.

the complaint.  Moreover, a *Monell* claim is a claim against a municipality or other similar entity. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." (quoting *Monell*, 436 U.S. at 692).  A claim against individuals in their personal capacities—such as Evans's claims against defendants Varano and Nye—are not *Monell* claims. *See Mervilus v. Union Cnty.*, 73 F.4th 185, 197 n.5 (3d Cir. 2023) ("First, Mervilus sued Vaniska in his personal capacity, and thus he is an improper *Monell* defendant.").

At another point in their brief, these defendants frame the claims against them as supervisory liability claims.  Defendant Varano, who asserts that he was not present at the Columbia County Prison and was never informed of the use of the restraint chair, and defendant Nye, who asserts that he determined in his own discretion that continued use of the restraint chair was warranted in order to keep

Tyler from harming himself or others, contend Evans is claiming that they as supervisory defendants failed to train others in the proper use of the restraint chair.

The Third Circuit has "recognized that 'there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

Defendants Varano and Nye do not address the standards applicable to supervisory liability. Nor do they make any argument for why they should be granted summary judgment on that basis. Rather, they simply assert that the restraint chair was used appropriately in Tyler's case for the express purpose of allowing him to calm down following the recommendation of the doctor from the Geisinger Bloomsburg Hospital that Tyler needed time to calm down and for the effects of the methamphetamine to wear off and in accordance with the Columbia County Prison's policy regarding use of the restraint chair. They fail, however, to point to record evidence for their factual assertions. And the material facts set

forth above do not support the assertion that the restraint chair was used in
accordance with the prison's policy.

Evans asserts that Warden Varano is liable under the policy-and-practice
strand of supervisory liability as "he personally approved or and directed the
unconstitutional policies that are the subject of Plaintiff's *Monell* claims." *Doc. 88*
at 35.  Because Warden Varano does not address the standards applicable to such a
supervisory claim, we conclude that he has not shown that he is entitled to
summary judgment.

As to Deputy Warden Nye, Evans does not set forth that he was a
policymaker.  Rather, pointing to various phone calls that Deputy Warden Nye
received—but later denied receiving—Evans appears to be seeking to hold Deputy
Warden Nye liable under the strand of supervisory liability under which
supervisors "can be liable if they participated in violating plaintiff's rights, directed
others to violate them, or, as the persons in charge, had knowledge of and
acquiesced in their subordinates' violations.'" *Parkell*, 833 F.3d at 330 (quoting
*Santiago*, 629 F.3d at 129 n.5).  But Deputy Warden Nye does not specifically
address Evans' arguments in this regard.  Thus, we conclude that he has not shown
that he is entitled to summary judgment.[42]

---

[42] As explained above, although defendants Varano and Nye make passing
references to the appropriate use of the restraint chair and excessive force, we are

### f. Qualified Immunity.

The individual Columbia County defendants contend that they are entitled to qualified immunity. Given that we have already determined that Lieutenants McCoy and Boatman are entitled to summary judgment as to all claims against them, we need not address qualified immunity as to these defendants. Thus, we address qualified immunity only as to defendants Varano, Nye, Zielecki, Harner, and Cunfer. And, as we have stressed, we are addressing only the medical claims against these defendants. Thus, we address only whether they are entitled to qualified immunity as to those claims.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity ensures that before officers are subjected to suit, they have notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

---

addressing only the medical claims against the individual Columbia County defendants.

83

distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

"To determine whether a right was 'clearly established,' we conduct a two-part inquiry." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). "First, we must 'define the right allegedly violated at the appropriate level of specificity.'" *Id*. (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)). "This requires us to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Saucier*, 533 U.S. at 201). "Second, we must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. (quoting *Saucier*, 533 U.S. at 202). "This is an 'objective (albeit fact-specific) question,' where '[an

officer]'s subjective beliefs . . . are irrelevant.'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).  In other words, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *Id*. (internal citations omitted).  "It is not enough that the rule is suggested by then-existing precedent." *Id*.  Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*.

If the law did not put the defendant on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

"Defendants bear the burden of establishing qualified immunity." *White v. Dauphin Cnty.*, No. 1:22-CV-1241, 2023 WL 6392735, at *4 (M.D. Pa. Sept. 29, 2023).  "Officials demonstrate they are entitled to qualified immunity only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with recognized legal standards." *E. D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019). The remaining individual Columbia County defendants, however, make only a cursory argument in their brief in support of their motion for summary judgment as to why they are entitled to summary judgment based on qualified immunity.  After setting forth the standards applicable to qualified immunity, the individual Columbia County defendants argue that they are entitled to qualified immunity because they did nothing wrong:

> As detailed above, the individual County Defendants acted in good faith during Tyler's confinement.  There is no evidence that they consciously disregarded a known risk of Tyler's vulnerability to an adverse medical condition or knowingly violated a constitutional standard.  Instead, the evidence shows that the County Defendants used the restraint chair in compliance with the CCP Policy for its use, namely, "to allow an inmate to either sober up or calm down."

> The undisputed evidence demonstrates that the actions of all of the individual County Defendants were lawful and appropriate, and thus, it was not "clearly established" that the Defendants' actions in this case were improper.  Therefore, they should be afforded qualified immunity.

86

*Doc. 80* at 22–23.  In addition to relying on the vulnerability framework, which—as we have explained—is not applicable here, this argument asserts that the restraint chair was used in compliance with the Columbia County Prison's policy, which—when construing the material facts set forth above in the light most favorable to Evans—it was not.

Further, "when a defendant asserts the defense of qualified immunity, it is necessary to determine whether a reasonable official in the position of that defendant would have known that his or her actions were unconstitutional in light of the clearly established law and the information the official possessed." *Rouse v. Plantier*, 182 F.3d 192, 200 (3d Cir. 1999).  "[T]he determination of whether a government official has acted in an objectively reasonable manner demands a highly individualized inquiry." *Id*.  Because "[q]ualified immunity is an individual defense[,]" we must "independently analyze the conduct of each officer." *Thomas*, 88 F.4th at 281 n.29.  Yet, the remaining individual Columbia County defendants make no attempt to argue why each of them is entitled to qualified immunity.  It may be understandable to consider the conduct of defendants Zielecki, Harner, and Cunfer together since they were all there during Tyler's last hours of life, but Warden Varano and Deputy Warden Nye were not.  As set forth above, the claims against Warden Varano and Deputy Warden Nye are supervisory claims.  And just as the Columbia County defendants made no specific argument for why Warden

Varano or Deputy Warden Nye are entitled to summary judgment on the merits as to the medical claim against them, they make no specific argument for why they are entitled to qualified immunity.  And given the lack of any specific argument regarding Warden Varano and Deputy Warden Nye and qualified immunity, we conclude that they have not shown that they are entitled to qualified immunity.

We thus turn to whether defendants Zielecki, Harner, and Cunfer are entitled to qualified immunity.  Evans asserts that "[i]t has been clear in the Third Circuit for decades that a correctional officer may not ignore evidence of a serious need for medical care, or delay care for 'non-medical reasons.'" *Doc. 88* at 24 (internal citations omitted).  We agree.  "For more than forty years under *Estelle*, it has been clear that a prison official violates the constitutional rights of an inmate by showing deliberate indifference to the inmate's existing serious medical need." *Adami v. Cnty. of Bucks*, No. CV 19-2187, 2022 WL 1073072, at *6–7 (E.D. Pa. Apr. 8, 2022).  And the Third Circuit has long applied that standard to pretrial detainees. *See e.g. Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  "Put simply, a detainee's right to adequate medical care is clearly established." *Rossman v. PrimeCare Med. Inc.*, No. 4:21-CV-00703, 2022 WL 1019991, at *5 (M.D. Pa. Apr. 5, 2022).

The defendants reply that Evans defines the right at issue at too high a level of generality.  Although they do not set forth specifically how they think the court

88

should define the right at issue, they criticize Evans for not citing to a restraint-chair case.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021).  Still, "the facts of the existing precedent need not perfectly match the circumstances of the dispute in which the question arises." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017). "A public official does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." *Peroza-Benitez*, 994 F.3d at 166 (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)).

"Instead, the law requires only that the right 'is sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Thomas*, 88 F.4th at 284 (quoting *Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023)). "That standard is met when a violation is 'so obvious' it becomes likewise evident that a clearly established right is in play, 'even in the absence of closely analogous precedent.'" *Id*.  "As a result, qualified immunity is not appropriate when the case in question presents 'extreme circumstances' to which 'a general constitutional rule already identified in the decisional law may apply with obvious clarity.'" *Id*.

Here, construing the facts in the light most favorable to Evans, defendants Zielecki, Harner, and Cunfer watched as Tyler's medical condition deteriorated, he began to have trouble breathing, and he became nonresponsive, but they did not call for help or attempt to provide aid to Tyler until sometime after he became nonresponsive.  A reasonable officer in those circumstances would understand that the requirement that he not be deliberately indifferent to a detainee's serious medical needs required some action.  A reasonable officer would understand that regardless of whether the detainee was in a restraint chair.  Moreover, we have determined that there is a genuine issue of material fact as to whether defendants Zielecki, Harner, and Cunfer were deliberately indifferent to Tyler's serious medical needs.  Given this, we cannot conclude that a reasonable officer in their positions could have concluded that their actions complied with the law. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) ("Because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent; a reasonable YDC worker could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiffs and failing to adequately respond to that risk.  Conduct that is deliberately indifferent to an excessive risk to YDC residents cannot be objectively reasonable conduct.").

90

In sum, defendants Varano, Nye, Zielecki, Harner, and Cunfer have not shown that they are entitled to qualified immunity.

### 3. Columbia County.

Evans presents claims against Columbia County.  As set forth above, we concluded that the individual Columbia County defendants only properly briefed Evans's medical claims against them, and, accordingly, we addressed only the medical claims against the individual Columbia County defendants.  Similarly, we construe Columbia County's briefs as only properly briefing the medical claim against it.  In this regard, we note that Columbia County refers to the claim against it as "derivative" of the medical claims against the individual defendants, and its arguments are tied to the medical claims against the individual defendants. *Doc. 80* at 9, 18, 20, 26, 27.  Accordingly, we address only the medical claim against Columbia County.

A municipality, such as Columbia County, cannot be held liable under 42 U.S.C. § 1983 for the unconstitutional acts of its employees on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691.  Rather, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick,* 563 U.S. at 60 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)). "[A] § 1983 claim against a municipality may proceed in two ways."

91

*Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).  One way for a plaintiff to present a claim against a municipality is to assert "that an unconstitutional policy or custom of the municipality led to his or her injuries." *Id*.  Another way for a plaintiff to present a claim against a municipality is to assert that his or her injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Id*. (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).  This "latter venue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its . . . officers." *Id*.  A plaintiff asserting a municipal liability claim based on a failure or inadequacy of training, supervision, or discipline does not need to show an unconstitutional policy. *Estate of Roman*, 914 F.3d at 798.  Rather, she must show that the municipality's failure to train, supervise, or discipline amounted "to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 106.

Evans asserts both types of claims against Columbia County.  We will address each in turn.  Before we do so, however, we address—and reject— Columbia County's contention that it cannot be liable because Tyler's rights were not violated.  As set forth above, we have concluded that defendants Varano, Nye, Zielecki, Harner, and Cunfer are not entitled to summary judgment as to Evans's

medical claims against them.  Thus, Columbia County has not shown that Tyler's rights were not violated.[43]

### a. Policy-or-Custom Claim.

To establish a claim against a municipal entity under the policy-or-custom strand of municipal liability, a plaintiff must show "that 'a [local] government's policy or custom . . . inflict[ed] the injury' in question." *Estate of Roman*, 914 F.3d at 798 (quoting *Monell*, 436 U.S. at 694).  "'Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Id*. (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in original) (internal quotation marks omitted)).  "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Id*. (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).  A plaintiff "must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).  Further, "a plaintiff [asserting] that a policy or custom led to his or her injuries must be

---

[43] In any event, we note that "'a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.'" *Mervilus*, 73 F.4th at 196 (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (emphasis in original)).

referring to an unconstitutional policy or custom[.]" *Forrest*, 930 F.3d at 106.  And

whether asserting a policy or a custom, "a plaintiff must show that an official who

has the power to make policy is responsible for either the affirmative proclamation

of a policy or acquiescence in a well-settled custom." *Bielevicz*, 915 F.2d at 850.

Showing a policy or custom is not enough. *Estate of Roman*, 914 F.3d at

798.  "A plaintiff must also [show] that the policy or custom was the 'proximate

cause' of his injuries." *Id*.  "He may do so by "demonstrating an 'affirmative link'

between the policy or custom and the particular constitutional violation he

alleges." *Id*. (quoting *Bielevicz,* 915 F.2d at 850).  "This is done for a custom if [the

plaintiff] demonstrates that [the municipality] had knowledge of 'similar unlawful

conduct in the past, . . . failed to take precautions against future violations, and that

[its] failure, at least in part, led to [his] injury.'" *Id*. (quoting *Bielevicz,* 915 F.2d at

851).

Here, Evans asserts that a custom of Columbia County caused a violation of

Tyler's right to medical care.  More specifically, Evans asserts the following as

Columbia County's custom with respect to using the restraint chair:

> • the restraint chair was routinely used by correctional staff
> who had never read the manufacturer's instructions, even
> though the warning sticker on the chair stated: "WARNING:
> Use of the Emergency Restraint Chair without first reading and
> thoroughly understanding the instructions could cause injury or
> death" (Pl.'s Resp. to Columbia Co. SUF ¶¶ 62-66);

94

• detainees would remain in the restraint chair for as long as it took them to "calm down," as determined by correctional staff, with no maximum duration of restraint (*Id.* ¶ 52);

• indefinite restraint chair confinement could be authorized by the Warden or his designee alone without any evaluation of the detainee by a mental health professional (*Id.* ¶ 60);

• restraint chair confinement was permitted during the third shift, when no health care professional was on duty at the Prison (*Id.* ¶ 61);

• even when medical personnel were present while a detainee was in a restraint chair, vital signs were never checked (*Id.* ¶¶ 57-59); and

• correctional officer trainees, even those who said that they did not know how to check for a pulse, were permitted to serve as the constant watch officer for a detainee in a restraint chair (*Id.* ¶ 134).

*Doc. 88* at 28.

Evans also asserts that Warden Varano, the senior policymaker at the Columbia County Prison, was personally aware of and approved the above practices. *Id.* And, she asserts, the restraint chair was used frequently at the Columbia County Prison, and, in the two years before Tyler's death, a prisoner had been restrained in the restraint chair for more than eight hours approximately 10% of the time the restraint chair was used. *Id.* In sum, Evans contends that Tyler "died as a direct result of the County's policy and custom of indefinite restraint chair confinement, without any vital signs checks or any upper limit on its duration, even during hours when no health care personnel was at the Prison and an

inmate's right to adequate medical care was left in the hands of correctional

officers unable to recognize or handle a medical emergency." *Id*. at 30.

Columbia County contends that Evans's custom claim fails because there is

no evidence of a prior pattern of similar incidents involving use of the restraint

chair resulting in medical complications or a history of inmates suffering from

excited delirium.  Evans responds that by focusing on the need for a pattern of

similar incidents, Columbia County incorrectly asserts that in connection with her

policy-or-custom claim that she must show deliberate indifference.  Citing *Forrest*,

Evans points out that the Third Circuit has drawn a clear distinction between

policy-or-custom claims, on the one hand, and failure-to-train claims, on the other

hand.  In *Forrest*, the Third Circuit explained the distinction between the two types

of claims:

> . . . [R]ecall that the onus of demonstrating an official policy or
> custom only fall on a plaintiff whose municipal liability claim
> is predicated on an unconstitutional policy or custom, but that
> such a plaintiff need not show deliberate indifference on the
> part of the municipality.  On the other hand, a plaintiff
> advancing a claim predicated on a municipality's failure or
> inadequacy in training, supervision, or otherwise is spared from
> demonstrating the existence of an unconstitutional policy or
> custom but must make the deliberate indifference showing.

930 F.3d at 117–18.  Based on the above, we agree with Evans that she does not

need to show deliberate indifference in connection with her policy-or-custom

claim.  And, at times in its briefing, Columbia County blurs the lines between policy-or-custom claims and failure-to-train claims.

Nevertheless, as previewed above, when, as here, we are dealing with a custom, to show that the custom was the proximate cause of his or her injuries, a plaintiff must "demonstrates that [the municipality] had knowledge of 'similar unlawful conduct in the past, . . .failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury.'" *Estate of Roman*, 914 F.3d at 798 (quoting *Bielevicz,* 915 F.2d at 851).  It is in this context that we view Columbia County's contention that Evans's custom claim fails because there is no evidence of a prior pattern of similar incidents involving use of the restraint chair resulting in medical complications or a history of inmates suffering from excited delirium.  In other words, we construe Columbia County to be arguing that absent a prior pattern or similar incidents, Evans has not shown a custom or that a custom proximately caused Tyler's injury.

Evans contends that Tyler "died as a direct result of the County's policy and custom of indefinite restraint chair confinement, without any vital signs checks or any upper limit on its duration, even during hours when no health care personnel was at the Prison and an inmate's right to adequate medical care was left in the hands of correctional officers unable to recognize or handle a medical emergency." *Doc. 88* at 30.  But as to several components of that custom, Evans has not pointed

97

to evidence to support an inference that the practice was so well-settled and permanent such that Columbia County must have known about it and acquiesced in it. In this regard, although there is evidence that Tyler's vital signs were not checked while he was in the restraint chair, Evans does not point to evidence that such a failure had ever happened before. Similarly, although Tyler's medical care was arguably left in the hands of correctional officers who were purportedly unable to recognize a medical emergency, Evans does not point to evidence that that had ever happened before.

Moreover, although Evans asserts that Warden Varano, the senior policymaker at the Columbia County Prison, was personally aware of and approved the practices that constitute the purported custom, the evidence that she points to does not support that assertion. *Id.* In this regard, Evans points to the following three paragraphs of her statement of additional material facts:

> • The established practice at Columbia County Prison was that an inmate would remain in the restraint chair for as long as it took for the inmate to calm down without any upper limit placed on the length of time an inmate could be restrained.

> • It was also generally established practice that, contrary to the time limitations in the written policy, the Warden or his designee was notified upon placement in the restraint chair and then every eight hours thereafter.

> • Correctional officer trainees, even those who said that they did not know how to check for a pulse, were permitted to serve as the constant watch officer for a detainee in a restraint chair.

*Doc. 89* ¶¶ 52, 53, 134 (citations of the record omitted).  The first two of these statements of fact touch on only two of the prongs of Evans's custom claim, and the final one says nothing about whether there was an established practice or, if there was such a practice, what Warden Varano knew or should have known about that practice.  In sum, Evans has not presented evidence that what she purports was the custom at the Columbia County prison was so well-settled and permanent as to virtually amount to law or that Columbia County acquiesced in a well-settled practice that led to Tyler's injury.

Accordingly, we conclude that Columbia County is entitled to summary judgment as to Evans's policy-or-custom medical claim.

**b.  Failure-to-Train Claim.**

Although we conclude that Columbia County is entitled to summary judgment as to Evans's policy-or-custom claim, we reach a different conclusion as to Evans's claim that Columbia County's failure to train its officers resulted in a violation of Tyler's right to medical care.

A plaintiff may assert a claim against a municipality by showing that his or her injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest*, 930 F.3d at 105 (quoting *Estate of Roman*, 914 F.3d at 798).  As explained above, a plaintiff asserting a

99

municipal liability claim based on a failure or inadequacy of training, supervision, or discipline does not need to show an unconstitutional policy. *Estate of Roman*, 914 F.3d at 798.  Rather, he must show that the municipality's failure to train, supervise, or discipline "its employees 'reflects a deliberate or conscious choice.'" *Id*. (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)).  In this regard, the plaintiff must show "a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 106.  This requires a showing that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id*.  Only when the failure to train amounts to deliberate indifference "'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Connick*, 563 U.S. at 61 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Evans has presented evidence of a lack of training.  As the material facts set forth above show:

> • None of the individual defendants—or any witness who worked at the prison and was deposed in this case—had ever seen or read the manufacturer's instructions regarding the restraint chair;

> • None of the individual defendants was familiar with the time limitations for restraint chair usage set forth in Policy No. 85-2010.

> • Nurse Novotney had never seen the Medical Policy, and she was completely unaware of the requirements for medical assessments of individuals in restraint chairs.

> • Nor were the officer defendants familiar with the Medical Policy's requirements for restraint-chair usage.

> • Officer Zielecki had no training on the risks of injury or death associated with prolonged restraint, he had no training on how to recognize a medical emergency, and he did not know how to take a pulse.

> • No one at the prison testified that they had any understanding that prolonged restraint chair confinement created a risk of serious injury or death.

*See Doc. 89* ¶¶ 51, 58, 59, 64, 67, 102–04; *Doc. 110* ¶¶ 51, 58, 59, 64, 67, 102–04. In sum, Evans has pointed to evidence that Columbia County failed to train prison staff on the danger of usage of the restraint chair, its written policies regarding use of the restraint chair, its written medical policy regarding inmates in restraints, as well as on how to respond if an inmate in a restraint chair has a medical emergency.

Columbia County contends, however, that Evans has not presented evidence that it was deliberately indifferent.  In this regard, Columbia County contends that there is no evidence of a prior pattern of similar incidents involving use of the restraint chair resulting in medical complications.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). "Thus,
when [municipal] policymakers are on actual or constructive notice that a
particular omission in their training program causes [municipal] employees to
violate citizens' constitutional rights, the [municipality] may be deemed
deliberately indifferent if the policymakers choose to retain that program."
*Connick*, 563 U.S. at 61. To show deliberate indifference, a plaintiff usually must
show a "pattern of similar constitutional violations by untrained employees." *Id*. at
62. "A pattern of violations puts municipal decisionmakers on notice that a new
program is necessary, and '[t]heir continued adherence to an approach that they
know or should know has failed to prevent tortious conduct by employees may
establish the conscious disregard for the consequences of their action—the
"deliberate indifference"—necessary to trigger municipal liability.'" *Thomas v.
Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Brown*, 520 U.S. at
407). "Without notice that a course of training is deficient in a particular respect,
decisionmakers can hardly be said to have deliberately chosen a training program
that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Although a pattern of constitutional violations is usually required, "in certain
situations, the need for training can be said to be so obvious, that failure to do so
could properly be characterized as deliberate indifference to constitutional rights
even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223

(internal citation and quotation marks omitted).  Thus, in limited circumstances a pattern of prior violations is not required, and "a single incident may evidence deliberate indifference sufficient to establish <u>Monell</u> liability." *Loomis v. Montrose Borough Police Dep't*, No. 3:20-CV-1610, 2021 WL 2865290, at *4 n.4 (M.D. Pa. July 8, 2021).  "Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'" *Thomas*, 749 F.3d at 223–24 (quoting *Brown,* 520 U.S. at 409).  "To find deliberate indifference from a single-incident violation, the risk of [the plaintiff's] injury must be a 'highly predictable consequence'" of the defendant's failure to provide the specific training at issue. *Id*. at 225 (quoting *Connick*, 563 U.S. at 64).

Here, proceeding under the single-incident theory of liability, Evans points to evidence that the dangers of restraint chair usage were well known such that the need for training was obvious.  She notes that there was a prominent warning on the restraint chair that its use could cause injury or death.  Evans also points to testimony from her experts that the dangers of use of the restraint chair were well known in the correctional field. *See doc. 89-1* at 255 (Graziano report: "It was well-known in the field of corrections that indefinite mechanical restraint creates a risk of injury or death."); *doc. 89-1* at 296-97  (Normandin-Carpio report: "Correctional restraint chairs are intended to be employed under limited

circumstances and in strict compliance with policies and procedures designed to avoid harm to the restrained inmate.  The safety risks of failing to do so are well-known in the Correctional field."; "[The] custom and practice by Columbia County Prison represented a complete disregard of correctional standards regarding medical supervision of inmates in correctional restraint chairs, which were developed based on the known danger of these chairs.").  Further, we note, an inference that officers will confront the situation of a prisoner needing medical care while in restraints is reflected by the fact that the Columbia County Prison had policies regarding both the use of the restraint chair and the provision of medical care to prisoners in restraints.

Based on the summary-judgment evidence, a reasonable factfinder could conclude that given the frequency of the use of the restraint chair at the Columbia County prison coupled with the known risks involving prolonged restraint chair use that a violation of a prisoner's right to adequate medical care was a highly predictable consequence of failure to train on the dangers and use of the restraint chair and on how to handle an emergency medical situation involving a prisoner in the restraint chair.  In sum, viewing the evidence in the light most favorable to Evans, she has presented enough evidence to create a genuine, material factual dispute about whether Columbia County was deliberately indifferent.

In addition to deliberate indifference, a plaintiff asserting a municipal liability claim based on a failure or inadequacy of training, supervision, or discipline must also establish causation. *Elliott v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 595 F. Supp. 3d 312, 324 (M.D. Pa. 2022) (Brann, C.J.). "[T]he causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Thomas*, 749 F.3d at 226 (quoting *City of Canton*, 489 U.S. at 391). "The alleged deficiency in a training program must be closely related to the alleged constitutional injury because '[i]n virtually every instance where a person has had his or her constitutional rights violated by a [county] employee, [said] plaintiff will be able to point to something the [county] "could have done" to prevent the unfortunate incident.'" *Forrest*, 930 F.3d at 109 (quoting *City of Canton,* 489 U.S. at 392). Although causation is an element of a failure-to-train claim that is separate from the deliberate indifference element, in single-incident cases, the same high degree of predictability that a failure to train will lead to a constitutional violation "'may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.'" *Thomas*, 749 F.3d at 226 (quoting *Brown,* 520 U.S. at 409–10).

Here, Columbia County contends that Evans has not shown what specific training would have made a difference in Tyler's case. But Evans points out that

Columbia County failed to provide training on its own written policies concerning the duration of use of the restraint chair and the medical supervision required when a prisoner is restrained.  Evans also points out that Columbia County failed to provide training regarding the manufacturer's instructions for use of the restraint chair and on "basic national correctional and correctional health care standards on restraint chair use." *Doc. 88* at 33.  And she points to the opinions of her experts that such lack of training led to Tyler's death. *See doc. 89-1* at 253 (Graziano report: "Tyler Evans died because Columbia County Prison did not have adequate polices to ensure safe use of the restraint chair and did not train its correctional or medical staff on the policies that it did have."); *doc. 89-1* at 297 (Normandin-Carpio report: "With appropriate policies implemented by properly trained medical staff, [Tyler] would have been transferred back to Geisinger-Bloomsburg Hospital long before the third shift came on duty."); *doc. 89-1* at 279–80  (Mufti report: explaining the treatment that Tyler would have received if he had been sent back to the ER and concluding: "In summary, it is my opinion to a reasonable degree of medical certainty that [Tyler's] death would have been prevented if the Columbia County Prison had returned him to Geisinger ER for timely and appropriate medical and psychiatric clinical interventions."); *doc 89-1* at 269-70 (Kamerow report: explaining the symptoms of excited delirium; opining that Tyler's cause of death was "excited delirium due to methamphetamine toxicity and confinement in

106

a restraint chair"; opining that if Tyler had "been referred back to the hospital for appropriate medical evaluation, he would have received treatment including sedation that would have prevented the onset of the excited delirium syndrome that caused his death"; and opining that "if the corrections officers had recognized [Tyler's] condition and intervened even after the onset of labored breathing on June 2, 2019, [Tyler] could have been removed from the restraint chair and received the emergency assistance necessary to save his life").  This evidence is sufficient for Evans to survive summary judgment as to the causation element.

In sum, Evans has presented evidence from which a reasonable factfinder could conclude that Columbia County violated Tyler's right to medical care by failing to adequately train its corrections officers.  Accordingly, Columbia County is not entitled to summary judgment as to this claim.

## V.  The Doe Defendants.

In addition to the named defendants, the amended complaint names Doe defendants.  But because Evans has not identified these Doe defendants, they will be dismissed from this action.

"Doe defendants 'are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed.'" *Hindes v. F.D.I.C.*, 137 F.3d 148, 155-56 (3d Cir. 1998) (quoting *Scheetz v. Morning Call, Inc.,* 130 F.R.D.

34, 36 (E.D.Pa.1990)).  But the plaintiff must eventually identify the Doe

defendants; "an action cannot be maintained solely against Doe defendants." *Id*. at

155.  "On motion or on its own, the court may at any time, on just terms, add or

drop a party." Fed. R. Civ. P. 21.  And if the plaintiff does not identify the Doe

defendants after adequate time for discovery, the court may dismiss the Doe

defendants pursuant to Fed. R. Civ. P. 21. *See McCrudden v. United States*, 763 F.

App'x 142, 145 (3d Cir. 2019) (concluding that the district court did not abuse its

discretion in dismissing the Doe defendants after discovery was complete).

*Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250–51 (3d Cir. 2009) (affirming the

dismissal of Doe defendants pursuant to Rule 21 given that the plaintiff failed to

identify them during discovery); *Doe v. Pennsylvania Dep't of Corr.*, No. 4:19-

CV-01584, 2022 WL 3219952, at *4 (M.D. Pa. Aug. 9, 2022) (dismissing "an

anonymous James Roe defendant" after discovery ended and the plaintiff had not

identified this defendant); *Graham-Smith v. City of Wilkes-Barre*, No. 3:17-CV-

239, 2021 WL 2020591, at *11 (M.D. Pa. May 19, 2021) (dismissing John Doe

defendants pursuant to Rule 21); *King v. Mansfield Univ. of Pennsylvania*, No.

1:11-CV-1112, 2014 WL 4546524, at *10 (M.D. Pa. Sept. 12, 2014) (observing

that "[d]istrict courts in the Third Circuit have used this Rule [Rule 21] to exclude

John Doe parties from an action when appropriate" and citing cases for that

proposition).

Evans had adequate time to conduct discovery.  She has not, however, identified the Doe defendants.  Thus, we will dismiss the Doe defendants from this action.

## VI.  Conclusion.

Based on the foregoing, we will deny Nurse Novotney's motion for summary judgment, and we will grant in part and deny in part the Columbia County defendants' motion for summary judgment.  We will also dismiss the Doe defendants.  An appropriate order will be issued.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge